| | |
|---|---|
| NORTH CAROLINA<br>COUNTY OF ORANGE | IN THE GENERAL COURT OF JUSTICE<br>SUPERIOR COURT DIVISION |

REBECCA J. MACY           )
                                 )
        Plaintiff,           )
                                 )
      vs.                    )
                                 )
THE UNIVERSITY OF NORTH    )
CAROLINA SYSTEM, THE       )
UNIVERSITY OF NORTH CAROLINA )
AT CHAPEL HILL, THE UNIVERSITY )
OF NORTH CAROLINA – CHAPEL  )
HILL BOARD OF TRUSTEES     )      COMPLAINT
BOARD OF GOVERNORS THE    )      Jury Trial Demanded
UNIVERSITY OF NORTH CAROLINA, )
LEE H. ROBERTS, in his official capacity, )
KEVIN M. GUSKIEWICZ, in his official )
capacity, J. CHRISTOPHER CLEMENS )
in his official capacity, RAMONA    )
DENBY-BRINSON, in her official capacity, )
JEREMY ENLOW, in his official capacity, )
C.ELIZABETH HALL, in her official   )
Capacity, DONNA JAMES-WHIDBEE, in, )
her official capacity, MIMI V.       )
CHAPMAN in her official capacity, and )
JOY BRYDE, in her official capacity.   )
                                 )
        Defendants.         )

**NOW COMES**, the Plaintiff, Rebecca Jane Macy, by and through their undersigned Attorney for her claims against Defendants based upon her discharge, alleges and says as follows:

### PARTIES AND JURISDICTION

1.    Plaintiff, Rebecca Jane Macy, is a citizen and resident of Orange County, North Carolina.

UNIVERSITY<br>EXHIBIT<br>1  **3**

2. Defendant the University of North Carolina System (hereinafter the "UNC System") was and is a body politic and corporation capable of being sued pursuant to N.C.G.S. § 116-3 for the actions of its constituent institutions. By statutory directive, the UNC System is "responsible for the general determination, control, supervision, management and governance of all affairs of the constituent institutions" (Id. § 116-11(2)) including, but not limited to, the University of North Carolina at Chapel Hill, East Carolina University, Elizabeth City State University, the University of North Carolina at Charlotte, the University of North Carolina at Asheville, the University of North Carolina at Wilmington, Western Carolina University and Appalachian State University. N.C. Gen. Stat. § 116-2(4).

3. Defendant, the University of North Carolina (the "University" or "UNC") was and is a public research university operated by the State of North Carolina and is a part of the UNC System and network of facilities of higher education with its principal place of business in Chapel Hill, Orange County, North Carolina. As such, the University is a "constituent institution" of the UNC System. N.C. Gen. Stat. § 116-2(4).

4. At all relevant times, the Board of Governors of the University of North Carolina System has been and is the corporate entity of the University "capable in law to sue and be sued" under N.C. Gen. Stat. § 116-3. At all relevant times, the University of North Carolina – Chapel Hill, Board of Trustees, composed of eight individuals elected by the UNC Board of Governors, four individuals appointed by the North Carolina General Assembly, and the president of the student government, was and is tasked with serving as an advisor to the Board of Governors on matters pertaining to its institution and as advisor to the Chancellor concerning the management and development of the institution.

2

5. Upon information and belief, at all times relevant to this Complaint, UNC and the UNC System receives and continues to receive federal funding and is therefore subject to liability under Title IX of the Education Amendments of 1972, 20 U.S.C. §1681(a) (hereinafter "Title IX").

6. Since on or about January 12, 2024, Defendant Lee H. Roberts (hereinafter "Defendant Roberts") has been and is the Interim Chancellor and then Chancellor of the University of North Carolina at Chapel Hill.

7. At all times relevant times, up and until on or about January 12, 2024, Kevin M. Guskiewicz (hereinafter "Defendant Guskiewicz") served as Chancellor of the University of North Carolina at Chapel Hill.

8. At all times relevant times, J. Christopher Clemens (hereinafter "Defendant Clemens") served as Provost for the University of North Carolina at Chapel Hill.

9. At all times relevant times, Ramona Denby-Brinson (hereinafter "Defendant Denby-Brinson") served as Dean of the School of Social Work at the University of North Carolina at Chapel Hill.

10. At all times relevant times, Jeremy Enlow (hereinafter "Defendant Enlow") served as a Senior Investigator for the University of North Carolina at Chapel Hill within the Equal Opportunity and Employment Compliance Office.

11. At all times relevant times, C. Elizabeth Hall (hereinafter "Defendant Hall") served as Vice Chancellor of the Equal Opportunity and Compliance Office for the University of North Carolina at Chapel Hill.

12. At all times relevant times, Donna James-Whidbee (hereinafter "Defendant James-Whidbee") served as a manager within the University of North Carolina at Chapel Hill Employee

3

Management Relations Office Human Resources (OHR).

13.     At all relevant times, Joy Bryde (hereinafter "Defendant Bryde" served as Director and Officer at the Conflict of Interest (COI) Office.

14.     At all times relevant times, Mimi V. Chapman (hereinafter "Defendant Chapman") served as Associate Dean for Doctoral Education within the School of Social Work at the University of North Carolina at Chapel Hill.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### Plaintiff's Professional Employment and Background at the University of North Carolina at Chapel Hill

#### Plaintiff's UNC-CH Employment

15.     On or around February 28, 2002, Dr. Jack M. Richman, who was then Interim Dean of the University of North Carolina at Chapel Hill (UNC-CH) School of Social Work (SSW) and who is presently a retired Emeritus Faculty at the SSW, recommended, via a letter, that the Plaintiff be appointed as a tenure track Assistant Professor in the SSW.

16.     On or around February January 2, 2003, Dr. James C. Moeser, who was the then UNC-CH Chancellor and is presently Chancellor Emeritus at UNC-CH, informed the Plaintiff via a letter that her appointment as an Assistant Professor at UNC-CH had been approved. The letter indicated that additional information concerning University regulations were to be found in the "Trustee Policies and Regulations Governing Academic Tenure in the University of North Carolina at Chapel Hill" (hereafter "Tenure Policies").

17.     On or around May 26, 2005, then Chancellor Moeser informed the Plaintiff via a letter that she had been reappointed at the rank of Assistant Professor. The letter noted that additional information concerning University regulations were to be found in the Tenure Policies.

4

18.    On or around May 22, 2008, then Chancellor Moeser informed the Plaintiff via a letter that she had been promoted to the rank of Associate Professor with tenure. This letter indicated that additional information concerning University regulations were to be found in the Tenure Policies, which state that academic tenure refers to the conditions and guarantees that apply to a faculty member's employment.

19.    On or around June 5, 2012, then Dean Richman informed the Plaintiff that he was recommending her into the role of SSW Associate Dean for Academic Affairs, into which she was confirmed and served for three years.

20.    On or around April 27, 2012, Dr. Bruce W. Carney, who was then UNC-CH Provost and the Samuel Baron Professor of Physics and Astronomy and who is now retired, informed the Plaintiff via a letter that her appointment as the L. Richardson Preyer Distinguished Chair for Strengthening Families had been approved by the UNC-CH Board of Trustees (BOT).

21.    On or around May 23, 2013, Provost Carney, informed the Plaintiff via a letter that she had been promoted to the rank of Professor. The letter declared that her appointment was made under the terms and conditions of the Tenure Policies.

22.    On or around June 12, 2018, then Dean Gary L. Bowen, who is a retired SSW Emeritus Faculty, conveyed to the plaintiff the results of her Post Tenure Review, which were laudatory, stating: "I feel that your record of performance and accomplishment in the past five years has been most impressive and broad in impact," and he went on to say, "I value you as a colleague and the School is fortunate to have you on our faculty."

23.    On or around August 16, 2019, Dean Bowen informed the Plaintiff that he was recommending her into the role of Associate Dean for Research and Faculty Development at the SSW, into which she was confirmed and served for nearly three years.

5

**Plaintiff's Professional Background**

24.     The Plaintiff's program of research comprised over 20-years of experience conducting studies that focus on preventing and responding to intimate partner violence, sexual violence, and human trafficking. Dedicated to finding effective and feasible programs to help address the needs of violence survivors, the Plaintiff conducted studies in community settings, working with survivors and their families, service providers, and policy makers.

25.     The Plaintiff's research was supported with funding from numerous foundations, private donors, state government, and federal agencies, including the Centers for Disease Control and Prevention and the Department of Justice.

26.     The Plaintiff has published over 100 peer-reviewed articles, book chapters, editorials, and invited commentaries, and has given over 200 peer-reviewed and invited presentations at national and international venues.

27.     In Google Scholar, the Plaintiff has an h-index of 46, which is considered an outstanding metric of scholarly productivity, especially in the social sciences.

28.     The Plaintiff served as a Governor-Appointed Member of the North Carolina Domestic Violence Commission. She was first appointed to this role under Governor Beverly Perdue in 2012 and then reappointed under Governor Patrick McCroy in 2013.

29.     The Plaintiff served as the Editor-in-Chief for a leading scientific journal in her field for seven years.

30.     The Plaintiff has received numerous awards for her mentoring and teaching from UNC-CH, with recognitions in 2004, 2005, 2006, 2017, and 2019.

31.     The rigor of the Plaintiff's research and its benefit to practice has been recognized with awards from the North Carolina Division of Public Health in 2018, the Office of the UNC-

6

CH Provost in 2013, and the Orange County Rape Crisis Center 2010. She also received the Daily Village Pride Award from WCHL Radio in Chapel Hill in 2015.

32. The Plaintiff gave considerable service to the SSW via membership on the: Admissions Committee; Committee on Students; Curriculum Committee; Doctoral Program Committee; Global Engagement Committee; Governance Taskforce; Human Participant and Protections Review Committee; Personnel, Promotion and Tenure Committee; Reaccreditation Committee; Workload Taskforce; and multiple Faculty Search Committees.

33. The Plaintiff gave considerable service to the UNC-CH including as: Chair of the Review Committee for the Injury Prevention Research Center; Core Faculty Member at the Injury Prevention Research Center; Member of the Academic Policy Committee of the Graduate School; Member of the Administrative Board of the Dental School; Member of the Administrative Board of the Graduate School; Member of the Carolina Center for Public Service Advisory Board; Member of the Graduate School Strategic Planning Committee; Member, Review Committee for the Carolina Women's Center; Member, Review Committee for Dean of the School of Dentistry; and Member, Review Committee for the Dean of the School of Government.

34. In sum, for nearly 20 years, the Plaintiff demonstrated excellence in all areas expected of her faculty role. In all that time, the Plaintiff had never been accused of a policy violation nor disciplined for any reason.

**Applicable Policy Governing Plaintiff's UNC-CH Tenure**

35. As mentioned above, the Tenure Policies is the key document governing all matters regarding tenured faculty such as the Plaintiff, which declare that the purpose of tenure is to secure faculty members' academic freedom and aid in attracting and retaining high quality faculty.

36. The Tenure Policies state that a faculty member may only be discharged from

Case 1:25-cv-00095-LPA Document 6 Filed 02/22/25 Page 7 of 120

employment on a narrow set of grounds and in accordance with the procedures provided within these Policies (Tenure Policies, Section 3).

37.    Briefly, the Policies state that the permissible grounds for discharge include the following: misconduct of such a nature as to indicate that the faculty member is unfit to continue as a member of the faculty, including, but not limited to, violations of professional ethics, mistreatment of students or other employees, research misconduct, financial fraud, criminal, or other illegal, inappropriate or unethical conduct (Tenure Policies, Section 3a).

38.    To justify serious action, misconduct should be either (i) sufficiently related to a faculty member's academic responsibilities as to disqualify them from effective performance of university duties, or (ii) sufficiently serious as to adversely reflect on the individual's honesty, trustworthiness, or fitness to be a faculty member (Tenure Policies, Section 3a).

**Applicable Policies Relevant to Additional Aspects of Plaintiff's UNC-CH Employment**

39.    In addition, to the Tenure Policies, five other sets of policies are relevant to the Plaintiff's matters herein.

**Policy on Prohibited Discrimination, Harassment and Related Misconduct**

40.    The second policy is the UNC-CH Policy on Prohibited Discrimination, Harassment and Related Misconduct (PPDHRM), which directs reports, assessments, investigations, determinations, and disciplinary actions concerning discrimination, harassment, including sexual or gender-based harassment and sexual violence, interpersonal violence, stalking, complicity, and retaliation. The policy version described here is dated as last revised on March 11, 2021, and was the version submitted by the UNC-CH Office of University Counsel (OUC), who represented the UNC-CH Administration against the Plaintiff, for her faculty hearing.

41.     UNC-CH has a related set of PPDHRM Procedures Policies for various roles, including for different employee categories, students, etc. The relevant Procedures Policy for the Plaintiff's matters is the: "Procedures for Reporting and Responding to the Complaints of Discrimination, Harassment and related Misconduct Involving a University Employee as the Responding Party" (hereafter "PPDHRM Procedures"). The policy version described herein is dated as last revised on May 1, 2020, and it was the version submitted by OUC at the hearing.

**Employment of Related Persons (Nepotism) Policy**

42.     The third policy is the UNC-CH Employment of Related Persons (Nepotism) Policy. As OUC submitted an incorrect version of this policy to the Plaintiff's faculty hearing, the version of the correct policy described herein was dated as last revised on January 24, 2018, which the Plaintiff downloaded from the UNC-CH's websites on or about November 5, 2023, and which she submitted to her faculty hearing.

43.     The relevant sections of the UNC-CH nepotism policy state that the department head is responsible for verifying management relationships for new hires and transfers to ensure compliance with this policy and, when necessary, the department head must certify a lack of related persons' influence on an Employment of Related Persons Certificate.

**Improper Relationships Between Students and Employees (IRBSE) Policy**

44.     The fourth policy is the UNC-CH Improper Relationships Between Students and Employees Policy (IRBSE). The policy version described here was produced on or about November 16, 2023 by the UNC-CH OUC, and it was the version submitted by OUC for use at the Plaintiff's faculty hearing.

45.     This version of the IRBSE policy states that it is misconduct, subject to disciplinary action, for a University employee, incident to any instructional, research, administrative or other

9

University employment responsibility or authority, to evaluate or supervise any enrolled student of the institution with whom he or she has an amorous relationship or to whom he or she is related by blood, law or marriage.

46. The IRBSE policy also states that: every reasonable effort should be made to resolve alleged policy violations on an informal basis if possible; efforts should be made to be constructively educational for concerned parties and to be corrective rather than punitive if a policy violation is found; acknowledgment of the violation and a commitment not to violate the policy in the future, along with a warning or other appropriate action directed toward the faculty or staff member, may be sufficient resolution.

### Policy on Individual Conflicts of Interest and Commitment ( "COI Policy")

47. The fifth policy is the UNC-CH Policy on Individual Conflicts of Interest and Commitment (hereafter "COI Policy"), dated as last revised on March 19, 2021. This policy version described herein was the version submitted by OUC for use at the Plaintiff's faculty hearing.

**48.** The policy requires investigators to complete any applicable Conflict of Interest Disclosure form and provide details regarding their Personal or Financial Interests as necessary in the conflict-of-interest review process.

### UNC-CH EOC's Important Information Regarding the EOC Investigation Process

49. There is also one set of Guidelines of relevance to the Plaintiff's matters, which is UNC-CH Equal Opportunity and Compliance's (EOC) "Important Information Regarding the EOC Investigation Process."

50. To supplement and summarize the PPDHRM policies, EOC provides all reporting parties and responding parties a written set of guidelines concerning investigations titled:

10

Important Information Regarding the EOC Investigation Process ("EOC Guidelines").

## Context and History: Macy and Wretman

51.     Dr. Christopher J. Wretman became a doctoral student at the SSW in 2012.

52.     In 2014, with direction from then Dean Richman, Wretman was funded to work on an administrative project with the Plaintiff via a time-limited summer semester research assistantship.

53.     The 2014 project included research components, which eventually led to academic papers and presentations, as the development of such scholarly products can take months and even years, particularly when they undergo peer review before dissemination.

54.     In summer 2015, the Plaintiff again worked with Wretman on research, again via a time-limited summer semester research assistantship.

55.     Although the assistantship completed that August 2015 with the start of the academic year, the work conducted also eventually led to papers and presentations.

56.     In December 2015, the Plaintiff and Wretman had two social outings together.

57.     It is a typical practice and regular occurrence for faculty and graduate students, particularly with doctoral students such as Wretman, to socialize off campus.

58.     These two social outings were the first for the Plaintiff and Wretman, and it became apparent to both that there was a romantic interest in each other. As context, the following were all true at that time.

59.     The Plaintiff had never engaged in any romantic relationship with any student, current of former, before meeting Wretman.

60.     Wretman had successfully completed all his course work and defended his dissertation proposal.

11

61. Wretman's single remaining benchmark for his academic progression was to complete and defend his doctoral dissertation which would grant him his Doctor in Philosophy in Social Work.

62. Wretman was 37 years of age, the Plaintiff was 46 years of age, and both were single.

63. At the time, Wretman's faculty adviser, and thus supervisor, was then Bowen. Also, Wretman was being supervised in his academic dissertation coursework by Bowen, and in a paid research assistantship by Dr. Sarah Verbeist. At the time, Dr. Sheryl Zimmerman was then Associate Dean for Doctoral Education at the SSW, and as such had purview over Wretman's academic progression and the entire SSW Doctoral Program.

64. Verbeist is a Clinical Professor at the SSW, Director of the Jordan Institute for Families at the SSW, and Executive Director of the Collaborative for Maternal and Infant Health at UNC School of Medicine.

65. Zimmerman is a University Distinguished Professor and Co-Director of the Program on Aging, Chronic Illness, and Long-term Care in the Cecil G. Sheps Center for Health Services Research (hereafter "The Sheps Center").

66. Following from the realization of romantic interest, in January 2016, the Plaintiff met with Zimmerman in her role as Associate Dean to disclose the sentiments, which was necessary transparency, and to seek administrative guidance.

67. Following from that meeting, and as consistent with Zimmerman's statements in her future UNC-CH Office of Human Resources (OHR) investigation interview statements, and also her testimony at the Plaintiff's faculty hearing, she met with Wretman individually on two instances.

12

68.     Per her statements to the Plaintiff at the time, Zimmerman discussed the matter with an administrator in the UNC-CH Graduate School as well as then Dean Richman.

69.     In addition, this same administrator in the Graduate School, whose names has been lost to memory and time, interviewed Wretman.

70.     Wretman's future OHR investigation interview also supports these facts.

71.     Next, the Plaintiff and  Zimmerman met again to discuss the guidance she had received.

72.     Zimmerman outlined a framework for the Plaintiff and Wretman which was the following: (i) the Plaintiff could not serve on Wretman's dissertation committee; (ii) the Plaintiff could not fund Wretman to do any University-based work; and (iii), the Plaintiff could not serve on any awards or similar type committee that would adjudicate him or other doctoral students.

73.     The Plaintiff and Wretman complied with these three stipulations through his dissertation defense and graduation in August of 2017 under the auspices of Dr. Michael Canute Lambert, who was then a Professor in the SSW and who is presently retired from UNC-CH.

74.     Zimmerman also indicated to the Plaintiff that she could, and should, complete any papers and presentations with Wretman begun before the relationship's start because they were already in progress and not academically related to, nor prescribed for, his doctoral degree.

75.     Zimmerman's guidance was consistent with the reality that academic researchers often work on multiple scholarly products at any given time, with temporary working arrangements created as necessary to see products to fruition. Although researchers may lead on such products, such activities are outside of a formal supervisory role.

76.     At the time, Zimmerman told the Plaintiff that she would document all decisions in writing to be placed in the SSW Doctoral Program Office files.

13

77.    In addition, the Plaintiff consulted with an SSW faculty colleague with relevant expertise in both UNC-CH policies, as well as professional social work ethics, Dr. Kimberly Strom, who was and is Smith P. Theimann Jr. Distinguished Professor of Ethics and Professional Practice, and who at the time was also serving as Director of the UNC-CH Office of Ethics and Policy.

78.    As changes in SSW leadership occurred, the Plaintiff and Zimmerman informed others of the relationship, including Bowen, who became Dean in 2016 and Dr. Matthew Howard, who was the Frank A. Daniels Distinguished Professor for Human Services Policy Information at the SSW and who became the Associate Dean for Doctoral Education in 2016. Bowen's OHR investigation interview supports these facts. Howard sadly passed away in 2018.

79.    At no time did Bowen, Howard, Richman, Zimmerman, nor Dr. Ramona Denby-Brinson, who is the Kuralt Distinguished Professor of Public Welfare Policy and Administration and who would later become Dean of the SSW in 2021, ever come to the Plaintiff with concerns about the relationship or about the relationship's impact on the SSW.

80.    For over five years, the matters, which had been managed per UNC-CH contemporary guidance and policy, were settled.

81.    Presently, the Plaintiff and Wretman have been in a committed long-term intimate partnership for nine years and own a home together.

### Context and History: The Research Team

82.    Dr. Cynthia Fraga Rizo, who is an Associate Professor at the SSW as well as the Thomas Willis Lambeth Distinguished Chair in Public Policy, is an expert in the issues of human trafficking, intimate partner violence, sexual violence.

83.    The Plaintiff and Fraga Rizo were long-standing research collaborators, beginning

14

when Fraga Rizo was a doctoral student at the UNC-CH SSW and continued when she completed her PhD (Doctor of Philosophy) degree and joined the SSW faculty in 2014.

84.     Following the completion of his PhD degree, Wretman began working as a Senior Data Analyst at the Program on Aging, Disability, and Long-Term Care in Sheps Center August 2017.

85.     The Sheps Center Director was, and is, Dr. G. Mark Holmes, who is a Professor at the Gillings School of Global Public Health (hereafter "Gillings"), as well as a Thomas Willis Lambeth Distinguished Chair in Public Policy.

86.     The Program on Aging, Disability, and Long-Term Care's Co-Director alongside Zimmerman was Dr. Phillip D. Sloane, who at the time was a Professor in the School of Medicine but who is now retired. Zimmerman and Sloane are long-term intimate partners as well as research collaborators.

87.     As a Senior Data Analyst in this Program, Wretman's sole supervisor was Zimmerman.

88.     At the Sheps Center, Wretman was funded at 75% "full time equivalent" (FTE), meaning he was considered a full-time UNC-CH employee with benefits, but had extra time to seek additional duties and income sources as he saw fit. Zimmerman encouraged Wretman to fill his remaining 25% FTE by seeking additional duties at UNC-CH.

89.     Given Wretman's expertise in quantitative data management and analysis, as well as longstanding collegial relationships with Fraga Rizo and the Plaintiff, the three began collaborating on SSW-based research projects beginning largely in 2019 with Wretman's initial contributions to Fraga Rizo's and the Plaintiff's work being unfunded.

15

90. Over the course of the time that he actively worked with Fraga Rizo and the Plaintiff, Wretman provided his effort and expertise to about six research projects in an unfunded capacity, which resulted in about 11 peer review publications.

91. Wretman was particularly helpful in taking research projects for which the Fraga Rizo and the Plaintiff had collected data but had not been able to conduct the necessary quantitative analyzes. This effort produced scientific papers and presentations that otherwise might not have been disseminated.

92. Concerning Wretman's work with the Plaintiff, it is not unusual for intimate partners and spouses who are academics to collaborate with one another. As Sloane and Zimmerman, mentioned above.

93. Beginning in 2018, Bowen, who was SSW Dean at the time, repeatedly encouraged the Plaintiff to collaborate with Fraga Rizo to develop a formal research center focused on family and interpersonal violence to be housed in the SSW.

94. Bowen directed personnel resources to their research and center-development in three ways.

95. First, Bowen authorized funding for a postdoctoral scholar, Dr. Jeongsuk Kim, who worked with Fraga Rizo and the Plaintiff from 2019 to 2022, with the Plaintiff as Kim's supervisor.

96. Second, Bowen authorized funding at 25% FTE, for a period of three years, for Wretman to work as a Senior Researcher with Fraga Rizo and the Plaintiff, with Bowen designated as Wretman's "de facto" supervisor at the SSW.

97. Third, Bowen authorized funding for a Research Program Manager to assist the PhD-holding team members. For this role, Ms. Jia Luo began working at the SSW with Fraga Rizo, Kim, Wretman, and the Plaintiff in the summer of 2020, with the Plaintiff as Luo's supervisor.

16

98.     Over about a two-year period, Fraga Rizo, Kim, Luo Wretman, and the Plaintiff worked together on projects and to develop a research center as advised by Bowen.

99.     Fraga Rizo, Wretman, and the Plaintiff also worked independently from one another with other faculty on other projects. These dynamic and interchanging relationships are typical for university-based researchers.

100.    The informal team also collaborated with other faculty and students at different points on various research projects, including frequently with the following four people.

101.    Dr. Sarah M. Godoy who was formerly a doctoral student at the UNC-CH SSW from 2020 to 2024 and is presently an Assistant Professor at a major university in the United States.

102.    Dr. LB Klein, who was formerly a doctoral student at the UNC-CH SSW from 2016 to 2021 and is presently an Assistant Professor at a major university in the United States.

103.    Ms. Erin A. Meehan, who was formerly a MSW student at the UNC-CH SSW from 2020 to 2021 and is presently an Evaluation Director at a non-profit social service organization.

104.    Ms. Spenser R. Radtke, who was and is presently a doctoral student at the UNC-CH SSW who began her studies in 2021.

105.    Dr. Tonya Van Deinse, who was and is presently a Research Associate Professor at the SSW.

106.    Contemporaneous, the world was disrupted by the COVID-19 global health crisis.

107.    Given UNC-CH COVID-19 mitigation policies beginning in 2020 and lasting into 2022, UNC-CH research activities were almost wholly accomplished remotely via email, telephone, and virtual technology, mainly via the videoconferencing software Zoom.

108.    Also, during this time, Bowen and other UNC-CH leaders were platforming the team's work, especially the collaborative research partnership between the Plaintiff and Wretman.

17

109.    For example, UNC-CH Advancement arranged a private dinner in February 2020 at a restaurant in the local area, which comprised the Plaintiff and Wretman, Bowen and his wife, Dr. Kevin Guskiewicz, who was then UNC-CH Chancellor and his wife, and another spousal couple who are high-profile UNC-CH donors with the aim of facilitating a major gift from this couple to UNC-CH. During the dinner, the Plaintiff's and Wretman's research partnership was touted by Bowen.

110.    In April 2021, at Bowen's prompting, the Plaintiff presented a formal proposal for an SSW-based research center, which was tentatively named the Program for Advancing Violence Research and Education ("PAVRE"). Bowen was highly enthusiastic about the proposal, and a formal launch for PAVRE was planned for the fall semester of 2021.

111.    Given the detrimental consequences of UNC-CH's OHR investigations, PAVRE was never formally launched and no longer exists in any form.

112.    Per UNC policies, the development of a formal center is a process, which requires a formal request for authorization to establish, as well as approval of the UNC-CH Board of Trustees (BOT). No such formal actions were ever taken regarding PAVRE.

113.    During the academic year of 2021–2022, which coincided with the launching of OHR investigation against the Plaintiff and Wretman, the research team, which then included Fraga Rizo, Kim, Radtke, Wretman, and the Plaintiff, continued working on research together collegially, productively, and successfully.

### Context and History: UNC-CH SSW's Conflicts

114.    Despite being a well-regarded organization nationally, behind the scenes racial tensions and accusations of discrimination have been longstanding difficulties within the SSW.

115.    On or about June 2, 2020, in the context of Black Lives Matter and the global

COVID-19 crisis, racial tensions and accusations of discrimination at the SSW became particularly pronounced and led Dr. Iris Carlton-LaNey, Dr. Gina Chowa, Dr. Trenette Clark Goings, and Lambert to issue a "Joint Statement from Black Full Professors" via an SSW-wide email that urged the SSW community to call out toxic behaviors and racism. Carlton-LaNey, Chowa, Clark Goings, and Lambert alleged that the SSW was blocking opportunities for people of color, ensuring that people of color were kept in their place, and oppressing people of color.

116.    Carlton-LaNey was and is a retired SSW Emeritus Faculty member.

117.    Chowa is the Johnson-Howard-Adair Distinguished Professor at the SSW, as well as the Associate Dean for Global Engagement and the Director of the Global Social Development Innovations at the SSW.

118.    Clark Goings is the Sandra Reeves Spears and John B. Turner Distinguished Professor at the SSW.

119.    Following from this statement, the SSW instituted several new strategies for fighting purported racism internally (see then Dean Bowen's June 5, 2020 statement[1]) and uprooting racism in the UNC SSW (see then Dean Bowen's June 19, 2020 statement[2]).

120.    These strategies, which focused inward on the SSW, impacted school climate and led to the development of several initiatives, including the establishment of new committees, including the now defunct, Reconciliation Committee, whose charges included creating a forum where faculty, staff, and students could raise concerns of discrimination.

121.    The committee's formal charge included working with the Dean to address perpetrators of discrimination and to issue disciplinary actions against alleged perpetrators.

122.    This committee also formalized what heretofore had been an informal culture of

---

[1] https://ssw.unc.edu/recommitment-to-social-justice-letter/
[2] https://ssw.unc.edu/anti-racism-task-force-letter/

SSW faculty colleagues meddling in each other's affairs, based on accusations of discrimination and harassment.

123. Concerns about whether the existence of this committee followed UNC-CH policies and federal laws were raised but dismissed by the members of the committee and other SSW faculty, including in one contentious meeting of the faculty that occurred in 2021.

124. Such an initiative was highly consistent with the social justice framework that has been embraced by and promulgated throughout social work higher education in the United States, Anti-Racism, Diversity, Equity, and Inclusion (ADEI).[3,4,5,6]

125. The committee had no written policies, procedures, nor any due process protections for those accused of so-called injustices.

126. In its two years of operation, Chowa, Goings, and Lambert served as members of the Reconciliation Committee, along with Dr. Mimi V. Chapman, who is the Frank A. Daniels Distinguished Professor for Human Service Policy Information.

127. Dr. Kirsten Kainz, who was then a Research Professor at the SSW, also served on the Reconciliation Committee for a time.

128. The Committee gave members of the SSW community a formal venue to "call out" one another for contentions of abuse, discrimination, harassment, harms, sexism, and racism even when such allegations may have been entirely without evidence or merit.

129. At the beginning of 2021 academic year, Denby-Brinson joined the SSW faculty

---

[3] Paul, Pamela (December 7, 2023). What Is Happening at the Columbia School of Social Work? The New York Times. https://www.nytimes.com/2023/12/07/opinion/social-work-columbia-ideology.html
[4] Strom K., & Lieberman A. (2025). Deck chairs on the Titanic. Journal of Teaching in Social Work, 45(2), 384-392. https://doi.org/10.1080/08841233.2025.2469563
[5] Reisch M., & Jani, J. S. (2025) Deconstructing DEI: Unmasking its complexities, contradictions, and challenges, Journal of Teaching in Social Work, 45(2), 250-275, https://doi.org/10.1080/08841233.2025.2469550
[6] Farber, N. (2023). The dystopian world of social work education. *Academic Questions*, *36*(4), 17-25. https://doi.org/10.51845.36.4.5

Case 1:25-cv-00509-LPA   Document 6   Filed 10/22/25   Page 20 of 120

and stepped into the role of Dean.

130.    Per a Daily Tar Heel (DTH) news article, members of the search committee that had recommended Denby-Brinson for the position declared that she would emphasize improving diversity, equity and inclusion (DEI) at the SSW.[7]

131.    In the article, Denby-Brinson was quoted saying that she was attracted to the UNC-CH SSW as an opportunity to use the school's existing strengths to tackle current social problems, especially the twin pandemics of COVID-19 and racial injustice. Likewise, she indicated that furthering the SSW's diversity was a priority for her.

132.    On information and belief, since Denby-Brinson has been in the leadership role, racial tensions at the SSW have exacerbated.

133.    During the Plaintiff's 2024 faculty hearing, Strom described her assessment of the SSW's organizational culture in the following way: "The culture is -- the culture is problematic. And I don't know at what date, but the introduction of the reconciliation committee to hear and act on -- I mean, I can talk more about that if folks -- folks want to know what that is. But that --that was an escalation of the toxicity that led to people -- people's harms, people leaving, people picking teams from each other, and that had nothing --that was on -- more on issues of race, I would say, than whatever their -- I think their relation. So I don't -- I can't even -- I mean, in that I will say -- let me say this: Definitely the culture changed from a culture of grace and humility and assuming people's best intentions."

134.    Similarly, one senior SSW faculty member with decades of experience at UNC-CH told the Plaintiff that she would not have been subjected to the processes and decisions that she has had she been a person of color. This individual has also described the Plaintiff as the "canary

---

[7] Eagan, E. (2021, September 10). New dean of School of Social Work hopes to increase innovation and diversity. The Daily Tar Heel.

in the coal mine" given that she was among one of the first faculty to experience such differential treatment by the SSW since Denby-Brinson's appointment as Dean.

### Context and History: UNC-CH

135.     Over the last four presidencies, beginning with President Barack Obama's Dear Colleague Letter of 2011 through President Donald Trump's 2025 action to eliminate DEI initiatives, the United States Department of Education (DOE) has enacted considerable shifts in how it requires universities that receive federal funding to respond to alleged violations of civil rights.

136.     Like all federally-funded universities throughout the United States, UNC-CH has had to grapple with such policies shifts. In addition, UNC-CH has received particular scrutiny and sanctions from the DOE.

137.     In June 2018, federal investigators found that UNC-CH mishandled complaints of campus sexual assaults and thus violated gender-discrimination laws.[8]

138.     Then Chancellor Carol L. Folt reported out to the campus community that UNC-CH[9] had signed a Resolution Agreement[10] with the federal government, which required changes to UNC-CH's policies and practices for both PPDHRM Procedures and Title IX policies that strengthened protections for parties reporting sexual and gender-based harassment, among other required remedies.

139.     Then in August 2019, DOE contacted UNC-CH following an additional review of UNC-CH's compliance with the requirements of the Jeanne Clery Disclosure of Campus Security Policy and Campus Crime Statistics Act, among other policies.

---

[8] https://www.insidehighered.com/news/2018/06/27/unc-found-have-violated-title-ix-multiyear-investigation
[9] https://www.unc.edu/posts/2018/06/26/campus-email-on-carolinas-title-ix-program/
[10] https://www.unc.edu/wp-content/uploads/2018/06/resolutionagreement.pdf

22

140. In its determinations, DOE found that that the UNC-CH violations identified through their review process triggered a special concern for the Department.[11]

141. As described by a DTH news article, the DOE determined "...that UNC violated campus safety laws for years to an extent that can't be fully measured, including by providing inadequate systems for sexual violence victims, omitting dozens of serious crimes from annual reports, violating a federal non-retaliation provision and demonstrating a lack of administrative capability..."[12]

142. Then, in June 2020, as communicated by then Chancellor Guskiewicz to the UNC-CH community,[13] an agreement to resolve these matters with the DOE included a $1.5 million fine, required enhancements by UNC-CH, as well as participation in a monitoring program over the next three years to improve UNC-CH's policies and practices related to the Clery Act.[14]

143. Thus, at the time of the Plaintiff's matters, UNC-CH had recently received serious federal sanctions due to its repeated and systemic failures related to reporting parties and victims of violence.

144. On information and belief, the severity of these sanctions from the federal government and the related public relations damages resulted in UNC-CH shifting into practices that overcorrected how they carried out activities related to PPDHRM and Title IX.

145. Also on information and belief, such overcorrections at UNC-CH were solidified when, in the time period directly proximal to the Plaintiff's matters, in March 2021, then President Joe Biden announced a review of DOE regulations, which indicated DOE returning to the Obama

---

[11] https://campussafety.unc.edu/wp-content/uploads/sites/873/2019/11/U.S.-Department-of-Education-Final-Program-Review-August-2019.pdf
[12] https://www.dailytarheel.com/article/2019/11/unc-clery-act-violation-findings-reveal-report-omissions-and-retaliations-from-the-university
[13] https://www.unc.edu/posts/2020/06/30/clery-settlement/
[14] https://chapelboro.com/news/unc/unc-pays-1-5-million-to-settle-over-past-campus-safety-violations

era of civil rights in higher education and away from the policy shifts of the first Trump Presidency, which afforded greater due process protections to responding parties.[15]

146. In addition, UNC-CH has been embroiled in high profile controversies during the time of the Plaintiff's matters. Examples include: (i) the mismanagement of Ms. Nikole Hannah-Jones faculty appointment to UNC-CH[16]; (ii) a faculty member who taught at the business school since 2006 alleged that the school retaliated against him for "challenging UNC's lack of faculty diversity and its prior discriminatory conduct toward him;"[17] (iii) faculty members connected with divisive School of Civic Life and Leadership, which had been touted as promoting civil discourse, resigned from leadership roles, citing strong disagreements with the dean who appointed them[18]; and most recently, (iv) the BOT's delays in approving tenure for faculty, which included publicity and blowback.[19]

147. Relative to peer institutions, the number of controversies that UNC-CH has experienced is notable, suggesting an institutional environment that is conflictual and dysfunctional.

**Office of Human Resources Reports, Assessments, Investigations, Findings and Discharge Recommendation: April 2021 to June 2022**

148. At the time of these matters, EOC was the entity at UNC-CH tasked with investigating reports of discrimination and harassment under its policies, which include the PPDHRM.

---

[15] https://www.chronicle.com/blogs/higher-ed-under-biden-harris/biden-orders-review-of-title-ix-regulations
[16] https://abc11.com/post/nikole-hannah-jones-nhj-tenure-unc/12054260/
[17] https://www.theassemblync.com/education/higher-education/larry-chavis-lawsuit-unc-chapel-hill-kenan-flagler/
[18] https://www.insidehighered.com/news/faculty-issues/shared-governance/2025/03/18/resignations-disagreements-dean-roil-unc-civics
[19] https://www.insidehighered.com/news/faculty-issues/tenure/2025/06/04/after-delay-chapel-hill-board-votes-award-tenure

149. If a report of retaliation emerged during EOC actions and matters, EOC investigated such reports under its PPDHRM.

150. Ms. C. Elizabeth Hall was then and remains the Associate Vice Chancellor of Equal Opportunity and Compliance at EOC.

151. At the time of these matters, the UNC-CH Office of Employee and Management Relations (EMR) was the entity at UNC-CH charged with investigating reports concerning policies under their Office's purview, which included the nepotism and IRBSE policies.

152. On information and belief, Mr. Linc Butler, who was and remains an Associate Vice Chancellor for Human Resources led EMR.

153. At the time of these matters, both EOC and EMR were situated under the Office of Human Resources (OHR), which at the time, was led by Dr. Becci Menghini, who was the Vice Chancellor for Human Resources and Equal Opportunity and Compliance.

154. On or about March 24, 2025, Mr. Lee H. Roberts, the current UNC-CH Chancellor, announced that the OHR was to be a part of the Division of Finance and Operations, that the EOC was to be part of the OUC, and that as Menghini's position had been eliminated, she was departing UNC-CH.

155. More recently, the EOC has since been renamed the UNC-CH Compliance Office.

156. For the sake of clarity and consistency with the time frame of all the events herein, the former names and structures of EOC, EMR, and OHR will be used throughout.

**Godoy Reports**

157. In August 2020, Godoy began her first year in the SSW Doctoral Program as a student.

158. Because of her interest in pursuing research focused on anti-human trafficking, Godoy's faculty adviser and research mentor was Fraga Rizo, who is an expert in this area.

159. On or about April 1, 2021, according to OHR reporting, Godoy met with Chapman, who was the then SSW Associate Dean for Doctoral Education, and Kainz for a year-end review meeting.

160. Both Chapman and Kainz were members of the Reconciliation Committee during the 2020–2021 academic year, when the meeting with Godoy occurred.

161. In Godoy's first interview with OHR investigators, which was held on or around December 20, 2021 about 263 days after the April 2021 meeting, she described her discussions with Chapman and Kainz in the following way per the interview transcript: "And I had written something along the lines that I felt like I needed to have better communication with my team because the communication just fell -- felt off. And I -- I think I really had put the onus on myself of saying that, you know, I felt like I was not communicating well with the team. But the more that the associate dean for the School of Social Work probed [i.e., Chapman], and also a professor of mine at the time [i.e., Kainz], more conversation occurred about kind of the toxicity of the research team that I was part of within my first year."

162. Following that initial discussion, Chapman initiated follow-up conversations with Godoy, as well as with Fraga Rizo and Zimmerman, about Godoy's concerns in the weeks following.

163. Although the content and nature of these conversations is not known, OHR records indicate that at least some became emotional. In one meeting among Chapman, Fraga Rizo, and Godoy, the discussion led both Fraga Rizo and Godoy to tears.

164. Sometime later, Chapman made a report to the EOC/Title IX Office.

Case 1:25-cv-00960-LCB   Document 1   Filed 12/22/25   Page 26 of 120

165.    On or about May 6, 2021, Chapman sent an email calendar invitation to the Plaintiff, Fraga Rizo, and Wretman with the following message, on which Ms. Adrienne Allison, who was then UNC-CH Director of Title IX Compliance, was copied: "Dear Rebecca, Cindy, and Chris—Please prioritize this meeting with myself and Adrienne Allison of the EOC office. With thanks, Mimi."

166.    This calendar email invitation was the first indication to the Plaintiff that Godoy had any concerns. Heretofore, neither Godoy nor Fraga Rizo had ever indicated in any way that Godoy had problems with anyone on the team.

167.    In her testimony at the Plaintiff's faculty hearing, Godoy acknowledged that she never brough any of her concerns about team communications or any other concerns to the Plaintiff at any time.

168.    Also, contemporaneous emails show that the Plaintiff's and Wretman's communications and interactions with Godoy had been positive. For example, in February 2021 Godoy sent an email to Wretman that included the following: "Thanks Chris. Honestly, these side chats are hilarious, but they also provide opportunity for one-on-one connection and relationship building. I really appreciate that you go the extra step in mentorship!"

169.    Ultimately, two meetings were subsequently held via Zoom. Chapman, Fraga Rizo, and the Plaintiff met on or about May 10, 2021, while Allison and Wretman met on or about May 13, 2021.

170.    In their meeting, Chapman related to Fraga Rizo and the Plaintiff that Godoy reported that the team dynamics made her uncomfortable. Godoy alleged that Wretman made inappropriate comments.

171. Chapman did not ask for the Plaintiff's and Fraga Rizo's perspectives on Godoy's allegations. Chapman declared that she felt concern about Godoy's contentions, describing them as indicative of harassment, without presenting any explanation of such.

172. Chapman, while acknowledging that Wretman was the lead on the team's statistical research, declared that Wretman should not be involved further with Godoy's work.

173. Chapman also declared that she needed to create a memorandum about Godoy's first-year meeting and its resolution for keeping in the SSW doctoral program files.

174. Despite being shocked and distressed by the content and tone of both meetings, the Plaintiff and Wretman subsequently offered to Fraga Rizo to step off research projects on which Godoy was working to help resolve matters as amicably as possible.

175. Also following the meetings, sometime throughout May 2021, upon information and belief, discussions were held among sub-groupings of Bowen, Chapman, Godoy, and Fraga Rizo about Godoy's concerns and Fraga Rizo's supervision of Godoy.

176. Then, in May 2021, both Bowen and Fraga Rizo told the Plaintiff that Godoy chose to leave Fraga Rizo's supervision of her own wishes.

177. Chapman also indicated that she had this understanding as she stated to OHR investigators per the transcript from her February, 18, 2022 OHR interview that Godoy decided that she wanted to switch her research assistantship, which Chapman described to the investigators as "fortuitous."

178. With input from Wretman, the Plaintiff and Fraga Rizo developed a written plan to enable Godoy to complete all research products that she had begun with the Plaintiff, Fraga Rizo, and Wretman in the prior academic year, which would ensure that Godoy could retain her role as an author/co-author on all papers and presentations going forward.

179.    Via email, Godoy indicated to Fraga Rizo that the plan was agreeable to her.

**Luo Reports**

180.    In August 2021, Luo began working as a Research Program Manager at the SSW with the Plaintiff as her supervisor. Throughout their work together, the Plaintiff held regular supervision meetings with Luo.

181.    The Plaintiff regularly invited Luo to provide feedback to her as a supervisor, including offering to adjust her role, supports, and work activities if needed.

182.    At no point during their time working together, before June 2021, did Luo ever raise concerns to the Plaintiff about herself, Fraga Rizo, or Wretman, nor about how the team communicated and functioned.

183.    Also, as contemporaneous emails show, the Plaintiff's and Wretman's communications and interactions with Luo had been constructive and positive throughout.

184.    For example, in response to March 21, 2021 email from Wretman in which he expressed appreciation for Luo's comments and feedback on a work product, Luo replied: "Hi Chris, Thanks for your kind words! I do enjoy editing and working on various kinds of products, so I'm happy to contribute in any way that I can to this team's important work. Have a good day! Lisa"

185.    Sometime in late May 2021, following Godoy's report and her decision to leave Fraga Rizo's supervision, Godoy and Luo had dinner together. As indicated by Luo's October 22, 2021 interview statement to OHR investigators, Godoy reported to Luo her experiences with EOC/Title IX, while also falsely reporting to Luo that Fraga Rizo, Wretman, and the Plaintiff removed Godoy from the research team.

186. Luo declared to the OHR investigators: "And so we got together for dinner and she told me everything about her side of the story and how she had an EOC case and went through all of this -- these things with EOC, and they [Plaintiff, Fraga Rizo, and Wretman] decided to have her be removed from the team."

187. On or about June 3, 2021, Luo met with the Plaintiff to raise concerns about the research team and its functioning, as well as with Wretman.

188. Luo raised concerns about "anti-Asian hate," "bullying," "bullshit," "harassing," "toxic work environment." Luo also declared that Wretman's communication style when giving feedback was a problem for her. Luo likewise alleged that the Plaintiff and Fraga Rizo had "silenced" Godoy by "lying" and "covering-up" for Wretman.

189. Given relevant UNC-CH policies protecting confidentiality, the Plaintiff could not and did not respond to Luo's concerns about how Godoy's matters had been managed.

190. The Plaintiff listened to Luo's allegations, as well as invited Luo to suggest solutions. Luo indicated that she wanted the team to change the ways that they deliver feedback to one another. Luo also indicated broadly that she wanted the Plaintiff to do something to resolve matters but was not specific in what she wanted the Plaintiff to do.

191. Before concluding the meeting, the Plaintiff indicated to Luo that she would need to consult with others before taking any actions, as well as encouraged Luo to do the same, including to consult with or make a report to EOC herself if she wanted to do so.

192. On or about June 4, 2021, following consultation with Bowen as the Dean at that time, the Plaintiff reported Luo's concerns about herself, Fraga Rizo, and Wretman to EOC via EOC's online portal.

193. Next, the Plaintiff spoke with Luo by telephone to let her know that she had made a report of Luo's concerns to EOC and that EOC should be reaching out to Luo soon.

194. After making the EOC report, in June 2021, the Plaintiff sought and received guidance from UNC-CH administrators about how to manage working relationships while EOC assessments of her report and Luo's concerns were made.

195. These consultations included emails, telephone, and Zoom meetings with Bowen, Butler, Hall, and Ms. Kara Simmons, who is the Associate Vice Chancellor and Senior University Counsel in the OUC.

196. As Luo's supervisor, the Plaintiff worked with Bowen, OHR, and Luo to adjust Luo's working arrangements while the EOC assessment was ongoing. The Plaintiff connected Luo to Bowen so that she could have supervision support as needed. The Plaintiff offered for Luo to have time out of office to participate in EOC processes and to seek emotional support.

197. Luo also requested permission to work remotely while the EOC assessment was ongoing because she claimed, without evidence, that Wretman would retaliate and/or take revenge against her verbally or physically. Luo also claimed that she was undergoing heightened psychological distress and racial trauma due to anti-Asian violence. Despite being confused by these groundless claims, the Plaintiff sought the approval as Luo requested.

**Assessment of Luo's Reports**

198. Per email communications and Zoom consultations the Plaintiff had with Butler and Hall in 2021, her report of Luo's concerns went into an undefined period of assessment. During this time, the Plaintiff continued to seek advice and guidance from Hall, Butler, Bowen, and others about how to manage workplace activities, including with the UNC-CH Ombuds, Ms. Dawn Osborne-Adams, whose office aims to help support approaches to conflict. The guidance the

Plaintiff received was inconsistent.

199. Hall and Butler guided the Plaintiff to not to do anything that might have the appearance of trying to bring the assessment to premature closure while continuing to work normally.

200. Bowen and Osborne-Adams guided the Plaintiff to first receive a determination from EOC concerning the assessment, and any potential investigations, before beginning to repair working relationships and return to work activities fully.

201. Together, such guidance effectively placed the Plaintiff in a workplace holding pattern as stressed and strained working relationships had to continue indefinitely and in an indeterminant manner over the course of what became a lengthy period of assessment.

202. As the weeks passed, a key OHR due date of August 2021 was approaching in which the Plaintiff was required to complete Luo's annual performance evaluation as her supervisor. The Plaintiff, she sought guidance from Osborne-Adams, among others, about how best to conduct such an evaluation.

203. Osborne-Adams strongly recommended against the Plaintiff conducting such an evaluation of Luo given the uncertain situation. She urged the Plaintiff to reach out to Butler and Hall for dispensation, which the Plaintiff did via email.

204. After waiting several days for a reply, Hall and Butler indicated that the Plaintiff was required to complete Luo's evaluation but that she could have additional time to do so.

205. On August 19, 2021, Luo contacted the Plaintiff by email asking to meet by Zoom. The Plaintiff responded to her email within the hour, and they met that day. During the meeting, Luo declared that she wanted to move her supervision to Van Deinse and had begun discussions with Van Deinse to formulate a plan to do so.

Case 1:25-cv-00950-LLA   Document 6   Filed 07/22/25   Page 32 of 120

206. In the days around this meeting, given OHR's directives, the Plaintiff completed Luo's performance evaluation. The Plaintiff rated Luo's performance as either meeting or exceeds expectations in all aspects, which, from the Plaintiff's perspective, was a highly positive review, especially for an employee who had just completed her first year in a new role.

207. The Plaintiff sent Luo a draft of the evaluation and invited her to review it, make comments, ask questions, and offered to meet with to discuss the evaluation. Luo declined the offer of a meeting, a discussion of the evaluation, and did not offer any questions.

208. Also during this time, the Plaintiff worked with Luo, Van Denise, and SSW Human Resources, to enact the transition, which became in effect on September 1, 2021.

209. Shortly after this transition, in early September 2021, Luo met with the SSW's Reconciliation Committee.

210. Chapman, who was actively involved with Godoy's reports, and who later became a witness in the OHR investigations, attended this meeting. On information and belief, other attendees at the meeting included Chowa, Goings, and Lambert.

211. Per the transcript of her October 22, 2021 OHR investigation interview, Luo described the discussions at this meeting and their influence on her in the following way: "Yes. I met with them [the Reconciliation Committee] September 2nd, 2021, a day after I left the team, and I had reached out to them in June about it, and I had shown them all of the emails. Some -- there were some of the emails. And at the end of that conversation, I said that this was emotional abuse, and they all agreed and nodded their heads and affirmed that. I said that this -- that they -- that this team [i.e., Fraga Rizo, Wretman, and the Plaintiff] was upholding white supremacy, and they affirmed and said that, and they validated that. And one of the committee members said this is also a lot of gaslighting. I said yes. And they said -- one of the committee members said, can we

go to the dean [Denby-Brinson] about this because we might have more information? So I don't know what kind of information they -- probably just more information about Chris and Rebecca, but the reconciliation committee, who are four full professors at the School of Social Work, agreed with my claims that this is emotional abuse and upholding white supremacy culture. And the fact that they have more information and would like to go to the dean themselves, I think, is really validating of my experience. And yeah. I -- I think the reason, like, I am doing this [i.e., making reports against and asking for investigations of the Plaintiff and Wretman]"

212.    Upon information and belief, around the same time, Luo began contacting other UNC-CH employees, current graduate students, and former graduate students to invite them into OHR actions against the Plaintiff and Wretman.

**Notice of Investigation Based on Luo's Report of Retaliation**

213.    Luo held her first OHR interview on or about October 22, 2021.

214.    The interview was led by Mr. Jeremy Enlow, who was and is a Senior Investigator in EOC.

215.    In contrast to the PPDHRM Procedures, the investigators asked Luo broad questions that were not associated with specific UNC-CH policies, and which led Luo to make disparaging statements against the Plaintiff that were not based in fact nor evidence.

216.    For example, Luo exaggerated considerably her role on research projects with the following statement critical of the Plaintiff as Luo's supervisor "… I was doing everything and doing all of the work …" and "I did everything, right? And so I led all of the studies."

217.    Although Luo made important contributions to research projects, she was in no way conducting "all" the study activities or leading projects. Moreover, at no time during regular supervision meetings with the Plaintiff did Luo bring up concerns about her workload.

34

218.    In her OHR interview, Luo shared others' emails to the Plaintiff and Wretman with the investigators. She likewise indicated, several times throughout the interview, that she had spoken to "her witnesses" about her allegations and reports. Luo also repeatedly directed the investigators to speak to "her witnesses" about the Plaintiff and Wretman, indicating that Luo had knowledge of what "her witnesses" would declare to EOC investigators

219.    On November 23, 2021, the Plaintiff received a Notice of Investigation (NOI) from OHR indicating that Luo alleged that the Plaintiff had violated the retaliation policy under the PPDHRM.

220.    Luo also asserted allegations against Wretman at this time, which likewise resulted in an NOI to him from OHR also on November 23, 2021. None of Luo's allegations against Wretman were ultimately determined by OHR to be violations of UNC-CH policies.

221.    None of Luo's primary concerns in her June reports resulted in an allegation against the Plaintiff. Instead, Luo's retaliation allegations against the Plaintiff emerged as secondary concerns following from Luo's initial reports.

222.    Per the NOI, UNC-CH OHR determined to investigate the Plaintiff formally for retaliation for Luo's perceptions that the Plaintiff allegedly had changed her supervision style; cancelled meetings; failed to provide timely communication; failed to timely administer Luo's performance evaluation; and provided an inaccurate reflection of Luo's work in her performance evaluation.

223.    Thus, OHR elected to investigate the Plaintiff for changes that were due to the uncertainty and stress during the lengthy period of assessment, which were also entirely based on Luo's perceptions, rather than facts.

224. Likewise, OHR elected to investigate the Plaintiff for actions following directly from guidance that she had received from Butler and Hall, including to administer Luo's performance evaluation.

225. Denby-Brinson was named as the Administrative Advisor on both the Plaintiff's and Wretman's NOI, which is a role she would serve throughout the duration of OHR's investigations against both.

### Notice of Investigation Based on Luo's Report of Nepotism

226. In addition to Luo's allegations, the NOI declared that OHR was investigating the Plaintiff for violations for the nepotism policy based on Luo's statements to OHR, without detailing the specifics of what statement(s) of Luo's had been concerning to OHR.

227. None of Luo's primary concerns in her June reports related to an allegation of nepotism against the Plaintiff. It was also never made clear how such an allegation emerged as a concern following from Luo's reports, particularly because the NOI contained no information about what actions or inactions by the Plaintiff had led to the allegation of nepotism.

228. At this time, Luo was notified by OHR via email that the Plaintiff was being investigated for alleged violations of the nepotism policy, in violation of the NC State Human Resources Act requirements that employees' privacy will be safeguarded, and that information from investigations remains confidential.

229. Transcripts from the OHR investigation interviews show that Luo communicated with and shared information with other reporting parties and witnesses, despite written OHR guidance to the contrary.

230. Thus, on information and belief, the fact that the Plaintiff was investigated for nepotism was known throughout those involved in the OHR investigations even before they were

interviewed by OHR.

231.    Also, on information and belief, via gossip about of the Plaintiff, the wider SSW community came to know about this investigation of nepotism due to OHR's breach of the Plaintiff's policy-based requirement of confidentiality.

232.    The biasing nature of this policy and legal violation was compounded by the fact that ultimately none of Luo's retaliation allegations against the Plaintiff were founded by OHR as violations of policies, nor were any of her allegations against Wretman founded.

### Assessment of Godoy's Reports

233.    While Chapman made her report of Godoy's concerns sometime in April 2021, Godoy held her first OHR interview about her concerns, on or about December 20, 2021.Godoy's interview was led by Enlow.

234.    Ms. Donna James-Whidbee, Manager in UNC-CH EMR, was also present as an investigator.

235.    On information and belief, during the time both before and after her OHR interview, Godoy was reaching out to other doctoral students in efforts to draw additional individuals into OHR complaints against Wretman and the Plaintiff.

236.    Also, on information and belief, gossip and speculation concerning Wretman's and the Plaintiff's OHR matters relative to Godoy was being actively shared among SSW doctoral students as well as SSW faculty.

237.    Based on statements Godoy made to OHR investigators as evidenced in a transcript of her interview, as well as statements Godoy made at the Plaintiff's faculty hearing, Godoy's concerns with Wretman comprised about four comments Wretman made over the course of the entire 2021–2022 academic year as follows.

238.    Upon the first time Wretman met Godoy outside of a Zoom room and in-person, he remarked that she was "taller than [he] thought [she] would be."[20]

239.    On one occasion that the Plaintiff was running late to a morning Zoom meeting, during a time when due to pandemic mitigation strategies, everyone was working from home, Wretman remarked that the Plaintiff would "be late as she is just getting out of the shower."

240.    On one occasion, Wretman complimented a woman who had joined a Zoom meeting with the team that he was impressed with how well dressed she was. Attempting to establish rapport with a new colleague, he made a non-sexual complimentary remark noting how "[her] lipstick matched her jacket" with a pink color.

241.    On an occasion of a research team meeting in which all members of group were making lighthearted comments about what one another was wearing that day due differences in weather across members' Zoom locations, Wretman stated "Sarah's ready for summer!"

242.    Godoy had also raised concerns, without connection to any policy, about how she did not like Wretman discussing social matters in the context of work meetings, in particular weekend plans.

243.    Contemporaneous team emails and meeting agendas will show that any such conversations about social activities in no way dominated team communications. Also, Godoy herself discussed her own social life and personal life at times.

244.    Ultimately none of Godoy's allegations against Wretman were founded by OHR as violations of policy.

---

[20] Concerning this statement, Godoy also alleged that Wretman looked at her inappropriately when he spoke. The Plaintiff, who was present on this occasion, standing beside Godoy and Wretman, does not recall such a look, and no such look was substantiated by OHR as being a policy violation by Wretman or a problem.

245. Nonetheless, in statements Godoy made at the Plaintiff's faculty hearing based on the concerns noted above, Godoy described Wretman as someone who "perpetuates gender-based violence" and that the Plaintiff "couldn't even call out the cycle of abuse that existed on her own team," which Godoy declared to be "unsafe."

246. Denby-Brinson, who was a crucial part of the decision-making regarding the Plaintiff's matters throughout the entirety of her processes reiterated Godoy's beliefs at the Plaintiff's hearing, stating: "From Sarah's vantage point, they study violence against women and exploitation of women. And she felt that Rebecca should be very consistent, be a champion for women, protect women."

247. Despite indicating at the hearing that she understood that Godoy's reports against Wretman had not been founded, Denby-Brinson likewise declared at the Plaintiff's faculty hearing that Godoy "was not protected" when, in fact, Godoy received the full extent of relevant policy options afforded to UNC-CH students and had ample opportunity to present evidence and argument against Wretman—none of which materialized into any action against Wretman.

### NOI Based on Godoy's Report of Retaliation

248. Once the Plaintiff received the first NOI, a situation that had already been extremely confusing, distressing, and trying for her became increasingly so for the following reasons.

249. The NOI entailed allegations that were actions that could be due to any number of reasonable work-related circumstances such as "changing your supervision style," "cancelling meetings," and an alleged lack of "timely communication."

250. The NOI entailed allegations that were actions for which the Plaintiff had received guidance from OHR leadership.

251. The NOI was comprised of allegations that would never have been possible if OHR processes had been conducted with greater consideration of timeliness and/or if OHR had provided better guidance to the Plaintiff about their interpretations of their own policies.

252. For all these reasons, the Plaintiff sought additional guidance, this time from Ms. Katie Nolan, who at the time was Executive Director of Strategy, Policy, and Special Projects in the OHR and who has now– on information and belief– a position in UNC-CH OUC, as well as the SSW Dean, Denby-Brinson.

253. Following meetings in January and February 2022, with Nolan and Denby-Brinson, the Plaintiff sent are series of emails to colleagues and students in social work for the following reasons.

254. To follow her understanding of Nolan's guidance that the Plaintiff should seek to clarify uncertainties about research activities and scholarly products, as well as to "memorialize" her own actions and understanding with others so that she would have defenses against any future allegations of retaliation that might arise.

255. To follow the Dean's guidance that the Plaintiff attempt to dialogue with those involved if possible.

256. To restart research projects and work activities that had stalled due the uncertainties surrounding the now months-long OHR assessments and investigations.

257. To ensure that colleagues and students would come to the Plaintiff if they had questions, as well as for any professional requests and opportunities as they might wish to do so.

258. Thus, the Plaintiff sent the same email to a group of eight individuals on February 13, 2022 who all were or had been affiliated with the SSW, had worked on research projects with the Plaintiff during the 2020-2021 academic year, and to the best of the Plaintiff's knowledge were

Case 1:25-cv-00959-LPA Document 6 Filed 12/22/25 Page 40 of 120

not active reporting parties in OHR processes at that time.

259.    In brief, the email acknowledged ongoing OHR investigations; encouraged the recipient to do as they wished according to their own personal priorities concerning any OHR matters; invited the recipient to reach out to the Plaintiff at any time concerning work opportunities; and indicated that the Plaintiff would be glad to make herself available on the matters for discussions. In essence, the email was a proactive attempt to address any potential or outstanding concerns among those in the SSW who had worked with the Plaintiff.

260.    All the recipients except for Godoy responded with an acknowledgement of the email.

261.    Two recipients, Kim and Radtke, took the Plaintiff up on her offer to meet, which led to positive conversations.

262.    Based on Nolan's guidance to clarify uncertainties and memorialize matters, the Plaintiff also sent emails to Luo and Meehan who she knew were active reporting parties to ensure that no work activities or products were stalled on the count of misunderstandings. However, these communications were framed in different ways relative to the eight who received the other email.

263.    Unbeknownst to the Plaintiff, after receiving her email, Godoy contacted Chapman, who then, on information and belief, called a contact in OUC.

264.    Per Chapman's OHR interview transcript, this unknown person asked Chapman to forward the Plaintiff's email onto them so that they could then forward the email onto OHR.

265.    On or about February 14, 2022, OHR administers and leaders immediately characterized the Plaintiff's email as "retaliation" in their email communications with both Godoy and the Plaintiff.

266.    Then, on or about March 9, 2022, which was the same day that Wretman received an updated NOI with allegations from Godoy, the Plaintiff received an updated NOI indicating that Godoy was alleging that by sending the email of February 13, 2022, the Plaintiff had violated the PPDHRM retaliation policy against Godoy.

267.    Similar to Luo's reports, none of Godoy's primary concerns in her April 2021 reports resulted in an allegation against the Plaintiff. Instead, Godoy's retaliation allegations against the Plaintiff emerged as a secondary concern following from the initial reports.

### NOI Based on a Report of IRBSE

268.    On or about March 16, 2022, OHR notified the Plaintiff that she was being investigated for a report concerning IRBSE (or improper relations with a student) because of her relationship with Wretman based on something that Godoy, or possibly another reporting party, had indicated in their investigation interviews.

269.    None of Godoy's nor Luo's primary concerns in their respective April and June reports related to an allegation of IRBSE against the Plaintiff.

270.    In addition, it was never made clear by OHR how such an allegation emerged following from Godoy's and/or Luo's reports, particularly because the NOI contained no information about what actions or inactions had led to the allegation of IRBSE.

### OHR Investigations: November 2021 to April 2022

271.    The OHR investigation activities primarily consistent of investigation interviews with various individuals. In addition to the aforementioned interviews with Luo that was held in October 2021 and Godoy in December 2021, the Plaintiff's investigation appeared to be comprised of the following individuals: Bowen on/about February 11, 2022; Godoy again on/about February 15, 2022; Van Deinse on/about February 23, 2022; Fraga Rizo on/about March, 9, 2023; Luo again

42

on/about March 14 2022; Richman on/about March 16, 2022; Zimmerman on/about March 17, 2022; the Plaintiff on/about March 24, 2022; Wretman on/about March 25, 2022; Ms. Carolyn Adams, then Human Resource Officer at the SSW on/about April 5, 2022; and Dr. Joyce Tan, then Associate Vice Chancellor for Research, Office of the Vice Chancellor for Research on/about April 6, 2022.

272.     Although redacted, the OHR's investigative report indicated that an individual's statement is not provided in the report as she did not provide relevant information. Nonetheless, the investigators appear to have included her as a witness in the report. On information and belief, this individual was Klein, who was interviewed on or about March 4, 2022.

273.     Although investigators did not include her as a witness in the investigation report, Radtke, who was interviewed on or about March 23, 2022 provided relevant testimony that was excluded by OHR.

274.     OHR investigators also held interviews with additional individuals ostensibly concerning Wretman's conduct, including Chapman, Meehan, Dr. John S. Preisser, who is a Professor of Biostatistics in Gillings, and Ms. Kimberly Ward, who was formerly the Director of the Program on Aging, Disability, and Long-Term Care at The Sheps Center.

275.     In all these interviews, except for Preisser's, the plaintiff and her alleged conduct were also discussed multiple times, thus representing a great mixing of both responding parties and allegations.

276.     In addition, OHR's investigations of the Plaintiff and Wretman both bear the same case number (#T0001472021), and all the OHR investigation interviews were led almost universally by the same two OHR employees, Enlow and James-Whidbee.

277.    The investigators asked reporting parties and witnesses questions that were not associated with specific UNC-CH policies, which resulted in individuals making aspersions against the Plaintiff that were not based in fact nor in evidence.

278.    For example, concerning communication between Godoy and the Plaintiff, Godoy stated to the OHR investigators: "I think the moment I left the team [in May 2021], the communication stopped…", which indicated that the Plaintiff ceased communicating with Godoy, despite the Plaintiff's professional obligations to do so. Also, Enlow queried Godoy "… so roughly, I guess at this point, roughly ten months, nine-ten months, Dr. Macy's not reached out to you to help you in your career and the research, or anything even related to projects that you worked on underneath Dr. Macy's supervision. Is that correct?" To which, Godoy responded: "Exactly, yeah."

279.    Contrary to Godoy's statements to investigators, from May 2021 through June 2022, via email, the Plaintiff worked on papers and conference presentations with Godoy as part of larger research teams, which was typical of the Plaintiff's interactions with Godoy before any OHR reports.

280.    During this same time frame, the Plaintiff wrote 10 or more group emails concerning team papers and presentation that included Godoy. Likewise, the Plaintiff communicated with Godoy on an individual basis via email as appropriate and relevant. Despite these efforts, Godoy noted in her OHR interview that she would regularly remove the Plaintiff from group email replies and only reply to others, not the Plaintiff.

281.    In a similar way, Luo declared to the investigators in her interview: "Where she used her power as my supervisor, to give an inaccurate performance review, which has affected my ability to receive a discretionary raise this past year …" when in fact, the Plaintiff gave Luo a

44

constructive performance review that in no way would have impacted Luo's ability to receive a raise if her then supervisor, Van Deinse, had wanted to give Luo such a raise. In this same interview, Enlow asked Luo if she has checked-in with Van Deinse about the possibility of a raise, to which Luo admits that she has not.

282.     In her investigative interview, Van Deinse recounted a disagreement that had occurred in September 2020, which was a year and half before the time of her interview, among her, Fraga Rizo, and Wretman in inaccurate ways.

283.     Van Deinse stated of the Plaintiff to OHR investigators: "And it felt very dismissive, and it was like, how about you and he [Wretman] have a conversation and get this sorted out. Basically, it was just like gaslighting, like there's no problem here." Contrary to this statement, the Plaintiff in fact spoke with Van Deinse for approximately an hour about the disagreement and offered to help in any way that she could to resolve matters. The Plaintiff also offered and did change her own communication style in response to Van Deinse's recommendations.

284.     In interviews with OHR investigators, Klein made damaging, false statements about the Plaintiff's professional conduct.

285.     Klein declared to OHR investigators: "Because she [i.e., Plaintiff], at any point that I saw her, was prioritizing her relationship with Dr. Wretman over Dr. [Fraga Rizo] who she'd work with a very long time, any of the doctoral students and their opportunities, et. cetera." This statement is a falsehood for which contemporaneous emails exist and for which the Plaintiff can provide scholarly products that directly contradict Klein and that show that the Plaintiff frequently prioritized and actively supported Klein's education and career opportunities.

286.     During Klein's 5-year doctoral studies, the Plaintiff supported Klein with regular, 12-month research assistantship funding, which is highly unique among doctoral students.

287.     The Plaintiff likewise supported Klein with opportunities to engage with multiple research teams on multiple studies; engagement in the development of about nine scientific papers; engagement in the development of about 19 conference presentations; as well as chaired her dissertation.

288.     Klein also falsely declared that the Plaintiff directed her to work with Wretman, while also disparaging Wretman: "… she would frequently direct me to him when it came to quantitative opportunities in the program, as though he, not her, should supervise me in these projects. Because working with him was uncomfortable in the nicest sense of the word, I chose not to take on those opportunities."

289.     Contrary to this statement, the Plaintiff connected Klein to Dr. Sandra L. Martin, who was then a Professor in Maternal and Child Health at Gillings and is presently a retired Professor Emerita, and Kainz for quantitative consultation and opportunities. Likewise, the Plaintiff and Klein worked together to form the committee for Klein's dissertation, which included Martin and Kainz, but did not involve Wretman.

290.     OHR investigators never presented these statements or other, similarly disparaging statements from Godoy, Luo, Klein, and Van Deinse to the Plaintiff nor gave her an opportunity to respond to information that they collected and used in their analysis, determinations of findings, and reports.

**SSW Environment During the Investigations**

291.     Contemporaneous with the ongoing OHR processes, events at the SSW indicated that the Plaintiff's confidential OHR matters were being discussed widely in the SSW community.

292. On information and belief, SSW faculty members, including Dr. Amy Blank Wilson, Professor at the SSW, and Kainz were holding ad hoc meetings with doctoral students to discuss the Plaintiff's confidential OHR matters.

293. On information and belief, Blank Wilson also raised the Plaintiff's confidential OHR matters in a formal SSW Doctoral Committee Meeting which was led by Chapman.

294. In early March 2022, Denby-Brinson, in her role as SSW Dean, sent out an email to all the SSW faculty discouraging them from embroiling doctoral students in faculty OHR matters. This email was an acknowledgment by the Dean of (i) a fraught and conflictual situation at the SSW and (ii) a direct effect on the Plaintiff's supposedly confidential matters.

295. In the same week that this email was sent out, Denby-Brinson related to the Plaintiff that many SSW doctoral students knew "way too much" about the Plaintiff's and Wretman's confidential OHR matters.

296. Such an environment at the SSW was biasing of investigatory activities, influencing of decisions, and served to needlessly escalate matters beyond the scope of the allegations.

297. In her testimony at the Plaintiff's faculty hearing, Denby-Brinson declared, while openly repeating hearsay, that "Early career professors, some of the assistant professors, associate professors, doc students, research professors" had come to her with strong concerns about the Plaintiff, particularly the Plaintiff's relationship with Wretman, despite the fact that none of these individuals had direct knowledge of, or information about, how the Plaintiff's relationship with Wretman had begun, how it was managed, or how his work had been established at the SSW by and with the written approval of Bowen.

298. Likewise, at the Plaintiff's faculty hearing, Strom recalled of this time at the SSW: "And so -- and then the more -- people who are talking to each other in a reckless fashion create -

- create narratives that may not -- I mean, I heard narratives from people at other universities that were absurd, which told me people are talking elsewhere. And how does this [the Plaintiff's matters] get adjudicated in a fair fashion?"

**OHR PPDHRM Analysis and Finding of Retaliation: Unsupported by Evidence**

299.     Per the PPDHRM as well as the Tenure Policies, for the single email that the Plaintiff sent to Godoy to be deemed retaliation and thus a cause for discharge, it must be established by a clear and convincing standard that all the following elements are true.

300.     The Plaintiff had "actual or perceived" knowledge that Godoy was engaged in "protected activity" proximal to February 13, 2022, which was the date of the email.

301.     The single mail constitutes a materially "adverse action" by a reasonable person standard.

302.     There is a connection between the two elements above such that the Plaintiff's email was sent to discourage a reasonable person from engaging in protected activity.

303.     In their report and analysis, OHR erroneously declared that the Plaintiff became aware of Godoy's EOC/Title IX reports of April 2021 through a meeting with the then Title IX Coordinator, Allison, when it came via Chapman.

304.     In a meeting on or about May 21, 2021, Bowen relayed to the Plaintiff that he had met with Allison and Simmons concerning Godoy's matters and that her EOC/Title IX reports were resolved and final.

305.     Wretman was also told in his meeting with Allison that his matter with Godoy was done and not further actionable.

306.     Likewise, in May 2021, both Bowen and Fraga Rizo told the Plaintiff that Godoy chose to leave Fraga Rizo's supervision of her own wishes.

Case 1:25-cv-00095-LPA   Document 6   Filed 02/22/25   Page 48 of 120

307. Despite seeking guidance from OHR at different times, including meetings with Bulter, Hall, Menghini, and Nolan, the Plaintiff was never informed that Godoy's reports were not resolved, never informed that EOC re-engages with reporting parties, and never informed about Godoy's preferences for communications and interactions.

308. Thus, the Plaintiff had no knowledge or perception of Godoy's re-engagement with OHR in December of 2021, nor when she sent her email on February 13, 2022.

309. Relatedly, in her interview with OHR investigators, Chapman indicated that she had decided to stop responding to the Plaintiff's communications about OHR matters.

310. However, Chapman did not communicate this decision to the Plaintiff nor redirect the Plaintiff to other administrators for information and support with Godoy's matters.

311. Once Chapman elected to withdraw communication from the Plaintiff, Chapman denied the Plaintiff crucial information, which was due to her given Chapman's SSW administrative leadership role and her heavy involvement in Godoy's processes.

312. Also, as important context, with approval from Chapman, Godoy recruited an individual from among the students in the course that the Plaintiff was teaching, in which Godoy was enrolled at the time she received the Plaintiff's email, to be a support person for Godoy.

313. The Plaintiff, however, was never informed that Godoy had been given such an accommodation, particularly one involving another student enrolled in the course.

314. Had the Plaintiff been made aware of the accommodation made for Godoy by Chapman, consistent with typical SSW practices, the Plaintiff could have stepped out of teaching the course before it started to prevent any potential distress for Godoy. Also, the Plaintiff would have known to not contact Godoy for any reason.

315.     The OHR report erroneously assert that because the Plaintiff knew in May 2021 that Godoy reported concerns, that the Plaintiff continued to hold perceptions about Godoy's protected activity into February 2022—about 284 days later. This assertation is not based in evidence.

316.     Although Godoy re-engaged with EOC in December 2021, the Plaintiff had no knowledge of this fact as OHR did not inform her nor Wretman of this crucial change. Rather, the knowledge that the Plaintiff had in February 2022 was as follows.

317.     She and Godoy had held albeit limited, but nonetheless cordial, email communications in the Fall of 2021. Godoy appeared to the Plaintiff to be content to be an enrolled student in the Plaintiff's 2022 spring semester course.

318.     On or around February 2, 2022, Godoy approached the Plaintiff following a class session to encourage her to attend a meeting of a student group that Godoy was leading, which the Plaintiff gladly did on or around February 8, 2022, to discuss research grant funding.

319.     For all these reasons, and because of UNC-CH administrators' failures, the Plaintiff had no actual or perceived knowledge that Godoy was in protected activity proximal to sending the email in question in February 2022.

320.     Second, OHR's erroneous determinations do not evidence a materially adverse action.

321.     OHR discusses that the Plaintiff's email constituted intimidation or threats because of some unwritten combination of the following factors: (i) the email came on a Sunday; (ii) Godoy's self-reported fear that the Plaintiff might confront her before, during, or after class; (iii) the Plaintiff's status as a "star" in her field; and (iv) Godoy's personal feelings about the email. None of these four factors are delineated as being relevant to a determination of an adverse action

50

per UNC-CH policy.

322.    In contrast to OHR's analysis, UNC-CH email communications on weekends are not atypical. Moreover, the Plaintiff had engaged in weekend emails with Godoy previously, without ever expecting or requiring a response, especially outside of work hours.

323.    The Plaintiff had not and did not approach Godoy before, during, or after class.

324.    Considerations of a person's career standing do not appear in the PPDHRM policies.

325.    Although the Plaintiff's email unintentionally caused Godoy self-reported distress, this single email did not affect Godoy's participation in the course, involvement with OHR, nor her progress in the SSW doctoral program.

326.    In their analysis, using a tautology, OHR incorrectly declares the email an adverse action because Godoy self-reported it as such.

327.    Consistent with the UNC-CH's own EVERFI Preventing Harassment and Discrimination Training, which faculty were all required to take beginning in 2019, an adverse action is an act that has a major impact on a person's benefits, conditions, and opportunities.

328.    The Training also underscores the importance of not excluding people who have been or are engaged in protected activity from communications and meetings. Thus, not including Godoy in a communication the Plaintiff sent to others might have also been a problem.

329.    Third, OHR never produced evidence nor analysis that the email Godoy received in February 2022 was intended by the Plaintiff as a retaliative response to the events of 2021 or that it was sent for the purpose of interfering with Godoy's rights and privileges to engage in protected activity.

330.     In contrast, the email in question was sent to eight individuals, including Godoy, and followed from collective guidance that the Plaintiff received after she sought consultation from OHR and SSW administrators in January and early February 2022.

331.     The proximal context that led the Plaintiff to send the email was administrative guidance received in the preceding weeks, which is stated in the text of the email itself, and not events from 10 months prior.

332.     The EOC's own "Important Information Regarding the EOC Investigation Process" acknowledge that responding parties may need to discuss the investigation with certain individuals in order to protect their interests or to seek emotional, logistical, or other forms of support. Despite these being the intentions behind the email that was sent to eight individuals, OHR ignored their own Guidelines in their report and analysis.

333.     Relatedly, OHR's analysis fails to make the case that the Plaintiff's single email would be discouraging to a reasonable person, which is required standard per the PPDHRM.

334.     A similarly situated SSW doctoral student, Radtke, who also received the same email as Godoy, was interviewed by OHR, but the entirety of her testimony was excluded from OHR's report, their analysis, and thus subsequent decision making.

335.     As a research assistant working with the Plaintiff that academic semester, Radtke was being evaluated by as well as funded by the Plaintiff. Also, both the Plaintiff and Radtke were meeting together regularly throughout the semester, similar to a class schedule.

336.     In contrast to Godoy, Radtke declared to the OHR investigators that she was very comfortable with the Plaintiff and thanked the Plaintiff for the email about the matters, which had come to her attention via gossip at the SSW.

337. Radtke took the Plaintiff up on the invitation to meet, which led to positive discussions.

338. Radtke also noted in her OHR interview that, unlike other witnesses involved in the OHR investigation, she was not in contact with Godoy at that time, despite Godoy attempting to approach her about the ongoing matters.

339. OHR's analysis also ignored evidence of the material actions the Plaintiff took to safeguard OHR processes which undermine the idea that the Plaintiff's email was an attempt at retaliation. This evidence includes the following.

340. First, the Plaintiff copiously documented all steps, preserving emails and other documents, as well as regularly seeking out guidance.

341. Second, working with Fraga Rizo, who was Godoy's supervisor, the Plaintiff developed a written plan to ensure that Godoy could complete all work she started with the team even after she transitioned away from projects.

342. Third, working with OHR and SSW administrators, the Plaintiff helped develop Interim Measures to help preserve research and teaching activities during lengthy OHR processes.

343. Altogether, evidence shows that before sending her email in February 2022, the Plaintiff had been working to establish safeguards for those involved, not retaliating against them.

344. Likewise, once the Plaintiff's was informed of Godoy's reaction to her email, she met with Denby-Brinson within days and formed a plan to step out of the course voluntarily the very next week so that Godoy could continue with the course uninterrupted.

345. While making these plans, the Plaintiff was deeply confused about Godoy's distress because the Plaintiff did not know that Godoy had re-engaged with EOC.

53

346. Nonetheless, and although stepping out of the course caused material harm to the Plaintiff's herself, she wanted to take any actions that she could to rectify matters promptly.

**OHR Nepotism Analysis and Finding: Unsupported by Evidence**

347. Although OHR's finding that the Plaintiff had violated the nepotism policy was overturned at a future step in the Plaintiff's processes, because the investigation of this issue was biasing of other processes and matters, it is worth noting OHR's analysis of their finding here.

348. First, OHR relied on a non-policy definition of "employment decision" taken from a source outside of the University policies in their analysis and support of their finding.

349. Second, in making the determination that the Plaintiff violated this policy, the OHR report considerably discusses that no UNC-CH "Employment of Related Persons Certificate" was completed concerning Wretman's work at the SSW in 2019.

350. However, the OHR analysis completely disregarded Adams's interview statement indicating that the same form had not been completed when Wretman had been hired to teach a course as an SSW adjunct faculty member in 2018 solely by Dr. Lisa de Saxe Zerden, who is presently an Associate Professor and the John A. Tate Early Career Scholar for Children in Need, and was the Senior Associate Dean for Academic Affairs at the time of Wretman's hiring.

351. The fact that this form had been overlooked twice in regard to Wretman's roles at the SSW show an organizational failure, rather than an omission on the Plaintiff's part. However, this context is not noted in OHR's report, despite Adam's statement to OHR investigators.

352. Also, OHR's analysis does not note that, per the policy, the responsibility for completing this form shall be with the administrative official who has authority to give final approval for employment, not with the faculty member related to the employee in question.

Case 1:25-cv-00090-LPA Document 6 Filed 02/12/25 Page 54 of 120

353. This erroneous "evidence," that a particular form was not completed was also mistakenly raised by Hall during the Plaintiff's faculty hearing. As per the hearing transcript, Hall stated: "… there's no employment related person certificate that was filed to document that" indicating that Hall too (i) overlooked exonerative evidence concerning the Plaintiff and (ii) misunderstood the nepotism policy.

354. Third, the OHR analysis disregarded Bowen's testimony as the transcript shows that he said about five times that Wretman's SSW role should have been formalized, including some form of formal supervision, but that he, Bowen, not the Plaintiff, failed to do so.

355. Fourth, OHR's analysis relies on a vague, speculative investigation statement from Richman, who was in no way involved with any matters pertaining to Wretman's work at the SSW in 2019, which were solely established by Bowen. Rather, Richman was retired at the time that Wretman became involved with the SSW in 2019.

356. Richman said to the OHR he "thinks" the Plaintiff never informed of the relationship; while also indicating that he lacks recall of other important aspects of the situation. Despite serving on Wretman's dissertation committee, Richman could not recall Wretman's name during the OHR interview. Such memory lapses are not noted in the OHR investigation report.

357. Despite their use of Richman's statement in their investigation report, the Plaintiff was never queried about Richman's remark by OHR investigators.

358. In the Plaintiff's faculty hearing, Hall repeated Richman's statement to discount statements made by other SSW administrators that were exonerative of the Plaintiff "Well, I want to make clear that, when the relationship began, I think, the -- there was a different Dean who did not recall this relationship being reported to him."

Case 1:25-cv-00095-LPS Document 6 Filed 12/22/25 Page 55 of 120

359. Fifth, in a footnote within their report, Enlow and James-Whidbee declared that SSW administrators may also be held responsible for any violations of the nepotism policy, but that such actions were outside the scope of the investigation.

360. In marked contrast to this footnote statement, the relevant sections of the nepotism policy state that the department head is responsible for ensuring compliance with the policy.

**OHR IRBSE Analysis and Finding: Unsupported by Evidence**

361. Although OHR's investigation of the IRBSE policy focused on matters five years and oftentimes seven years prior, no mention of that timeline was specified in OHR's report.

362. The key focus of OHR's analysis against the Plaintiff's concerned conference presentations and research publications stemming from work begun before the relationship.

363. The OHR report fails to note that a majority of these papers and presentation were based on work conducted wholly before the relationship and that none were academic requirements nor necessary for Wretman to complete his PhD degree.

364. The OHR report fails to note that no participation or authorship changed on any of these products, including for any students nor for any faculty, and that no one lost opportunities on any of the products at any time.

365. The OHR report fails to note that other UNC-CH faculty played key roles in the development, as well as the delivery and submission of the presentations and publications, thus, the Plaintiff was not the sole faculty member involved nor leading these presentations and publications.

366. The presentation for one conferences noted by OHR as a problem had been planned well before the relationship. Also, Fraga Rizo was the lead faculty, not the Plaintiff.

Case 1:25-cv-00509-WO-LPA Document 6 Filed 12/22/25 Page 56 of 120

367.    The OHR report also failed to note that two other conference presentations occurred after Wretman had completed his dissertation.

368.    Moreover, in carrying out these presentations, the OHR report failed to note that the Plaintiff was following the contemporary guidance she received from relevant administrators.

369.    Also, to the best of the Plaintiff's knowledge, no concerns were ever raised about these papers and presentations by administrators, faculty, or students.

370.    OHR's report also included unclear analysis concerning Wretman's post-PhD employment at the Sheps Center. OHR contended, without evidence, that the Plaintiff somehow helped Wretman acquire his position and thus indirectly conferred UNC-CH benefits.

371.    In fact, the Plaintiff had no role in hiring Wretman at Sheps. Per her OHR interview statement, Zimmerman said of Wretman and the search for the position: "And he was hands down the most qualified person for the position ... Absolutely an open competitive search, absolutely."

### Discharge Recommendation Based on OHR Findings: May to June 2022

372.    Via an email, received on or about May 6, 2022, from Hall, OHR declared that investigators had determined by a preponderance of evidence that the Plaintiff had violated the nepotism policy, the IRBSE policy, and the PPDHRM as alleged by Godoy, but there was not a preponderance of evidence that the Plaintiff had violated PPDHRM as alleged by Luo.

373.    Hall's notice came to the Plaintiff one year to the day from Chapman's initial communication to the Plaintiff asking for a meeting regarding Godoy's concerns.

374.    Enlow and James-Whidbee provided no disciplinary recommendation in the report despite policy-based requirements in the PPDHRM Procedures (section III.C.D) to do so.

375.    Following from the OHR investigation report, per Clemens', Denby-Brinson's, and Hall's later testimony at the Plaintiff's faculty hearing, a series of meetings, among these

57

individuals, OHR administrators, and OUC attorneys were held to make disciplinary decisions about the Plaintiff sometime in late April and early May 2022.

376.    Ultimately, Clemens and Denby-Brinson alone determined that the Plaintiff should be recommended for discharge from her faculty position and tenure.

377.    Despite 20 years of outstanding service to UNC-CH with no prior policy violations, she was recommended for discharge without any opportunity for amelioration or correction in violation of policy.

378.    Moreover, none of the OHR administrators nor investigators, nor Clemens or Denby-Brinson, ever gave the Plaintiff an opportunity to respond to the OHR report nor present reasons why she should not be recommended for discharge.

379.    On or about May 12, 2022, the Plaintiff met with Clemens and Denby-Brinson. They verbally informed the Plaintiff that Clemens was recommending her for discharge from UNC-CH under the Tenure Policies.

380.    On or about June 15, 2022, the Plaintiff received a written notice of intent to discharge from Clemens. This notice also placed the Plaintiff on administrative leave.

381.    On or about June 28, 2022, the Plaintiff, per section 3.b.3 of the Tenure Policies, requested a faculty hearing to appeal Clemens's recommendation.

### Conflict-of-Interest Office Investigations: July 2022 to October 2022

382.    At the time of these matters, the UNC-CH Conflict-of-Interest (COI) Office was the entity at UNC-CH tasked with investigating reports of COIs under its policies.

383.    Ms. Joy Bryde was then Director and Officer at the COI Office. On information and belief, Bryde is no longer employed at UNC-CH.

58

384.    At the time of these matters, the COI Office was situated under the Division of Institutional Integrity and Risk Management (IIRM), which at the time, was led by Mr. George Battle, who was Vice Chancellor for Institutional Integrity and Risk Management.

385.    On or about June 3, 2024, UNC-CH announced that Battle would be leaving his role in July 2024 and that IIRM would reorganize, with the COI Office moving to the Office of the Vice Chancellor for Research.

386.    For the sake of clarity and consistency with the time frame of all the events herein, the former names and structures of the COI Office and IIRM will be used throughout.

### COI Investigation

387.    On or about July 19, 2022, which was about three weeks after the Plaintiff had requested a faculty hearing in her OHR matters, the Plaintiff met with Bryde and Dr. Jennifer Brennan, Director Office of Research, School of Medicine (SOM) and Co-Chair of the SOM COI Committee, who informed the Plaintiff that there would be a review for a violation of the UNC-CH's COI Policy, concerning a 2019 grant-funded study (#RAMSeS A20-0676/#IPF 19-4732) entitled "Partnering to Enhance Services for Survivors: An Evaluability Assessment and Formative Evaluation of Safe Horizon's Anti-Trafficking Program" (#2019-VT-BX-0039), which was supported by the National Institute of Justice (NIJ), which is a division within the Department of Justice (DOJ).

388.    In brief, this study was intended to be a novel partnership between a university research team and a client-serving community organization to understand efforts to combat human trafficking.

389.    Relevant to the alleged COI, the research team included, among others, Wretman in a role as a formal and funded research collaborator, as well as the Plaintiff as the lead Principal

59

Investigator. This working arrangement was normal for the Plaintiff in Wretman based on past work.

390. The COI Office's 2022 review revealed that the DOJ guidelines, which govern funding awards once they are made, prohibit intimate partners from working on research teams where one partner is the lead. This proviso is highly unusual among most funders of research projects and is, for example, distinctly different than other government funders such as the National Institutes of Health.

391. During their July 2022 meeting, Brennan noted that the SOM has a number of couples who work together regularly on research, and such collaborations would not typically be viewed as a COI at the SOM.

392. Likewise, as Bryde testified at the Plaintiff's hearing, that both at UNC-CH and at neighboring universities "there's easily a couple of hundred of" dual career couples of which her office was aware.

393. The following text from the official DOJ Grants Financial Guide, which had never been provided to the Plaintiff before her July 2022 meeting with Bryde and Brennan, including when she received the funding award, but which was cited in the COI finalization letter stated the following: "In the use of award funds (direct or indirect), a recipient or subrecipient should not participate in any decisions, approval, disapproval, recommendations, investigation decisions, or any other proceeding concerning any of the following people or groups: (1) An immediate family member; (2) A partner..."

394. In contrast, the NIJ's actual language regarding COIs in the 2019 Request for Proposals (RFP) document, which was all that was provided to the Plaintiff when she submitted her proposal, stated the following: "Some examples of potential investigator (or other personal)

conflict situations are those in which an investigator would be in a position to evaluate a spouse's work product (actual conflict), or an investigator would be in a position to evaluate the work of a former or current colleague (potential apparent conflict)."

395. Although the Plaintiff was aware of this RFP text in 2019 when she applied for the grant, her contemporaneous thoughts regarding this text were the following. First, the Plaintiff considers any collaborator on a grant proposal to be a "colleague," so she did not believe this language was referring to day-to-day research work. Second, the Plaintiff interpreted the language as referring to a specific "work product" such as a named intervention, measure, or program, which would clearly be a conflict if the Plaintiff were evaluating an such a product that her intimate partner had developed. For these reasons, the Plaintiff misunderstood the NIJ's RFP sentence and meaning.

396. In the July 2022 meeting about these matters Bryde stated to the Plaintiff that she had not been aware of the financial guide language at the time of the grant submission or grant award either and had just recently found this guidance, which she also indicated was unique to this specific funder.

397. Markedly, the Plaintiff had been involved with about seven DOJ-related projects dating back to 2012. However, neither the UNC-CH Office of Sponsored Research, the UNC-CH SSW Business Office, nor the UNC-CH COI Office had ever provided her with the Guide.

398. Likewise, in early 2022, the research project in question went through a detailed compliance review and site visit with the funder, NIJ. UNC-CH participants in the review and site visit included the Plaintiff, as well as representatives from SSW Business Office and Office of Sponsored Research. All aspects of the project were reviewed for compliance with the funder's policies. The project passed the review perfectly well, with no concerns raised.

399. The extra specificity in this document concerning the funder's policies concerning COIs was completely unknown to the Plaintiff for all the times that she submitted her COI Disclosures paperwork to the COI Office concerning the project, as required by the UNC-CH COI Policy.

400. Despite all these circumstances, Bryde alleged that the Plaintiff had not adequately disclosed information about her personal relationships with Wretman when she sought the grant that funded the research project.

## COI Findings

401. On or about October 13, 2022, the COI Office communicated its determinations that the Plaintiff had violated the COI Policy.

402. Notably, even though the research study in question had been funded and ongoing for nearly three years prior, no issues were raised until 2.5 weeks after the Plaintiff had formally requested a faculty hearing.

403. How Bryde and her office came to apply a heretofore unknown set of guidance to the Plaintiff's project that had never been applied previously to any of the Plaintiff's COI reviews for this funder in the weeks following her request for an appeal remains unknown.

404. Reflecting the importance of the role that the University typically plays in helping faculty with such external demands, Bryde testified at the Plaintiff's faculty hearing that the COI Office had added questions to their standard reporting process for researchers to help prevent such COIs with this funder going forward.

405. Also, the Plaintiff recommended to Bryde, as a strategy for mitigating any concerns that the funder might have, an external evaluation of the study's science by an expert, independent reviewer. This evaluation was conducted sometime in 2023 and determined that the study

demonstrated impressive organization, a thoughtful and well-documented process, and analytical rigor. The reviewer concluded: "…the authors demonstrate impeccable organization, clarity, consistency, and rigor, and I can independently confirm that their results do not appear biased or fabricated in any way."

406.     This independent review led the funding and study to continue under the leadership of Fraga Rizo. The final report for the project, which is available on the NIJ's website,[21] was received by NIJ on or around April 2025. Also available on this same website, is a scientific paper from this study and funding, which was led by Wretman.[22]

### Discharge Amendment: January 2023

407.     On or about January 18, 2023, Clemens amended his notice of intent to discharge setting forth the finding of the violation of the UNC-CH COI Policy as an additional reason for discharge.

408.     On information and belief, this decision was made despite the fact that no faculty member had ever been discharged from their employment for such a COI policy violation before.

409.     On or about January 19, 2023, the Plaintiff again requested a faculty hearing to appeal Clemens's recommendation.

### Plaintiff's Whistleblower Concerns: November 2021 through August 2023

410.     At key points throughout the Plaintiff's processes and prior to her hearing, she raised concerns about violations of her own civil rights, as well as concerns that UNC-CH processes had been considerably mismanaged.

---

[21] https://nij.ojp.gov/library/publications/partnering-enhance-services-survivors-evaluability-assessment-and-formative
[22] https://nij.ojp.gov/library/publications/study-protocol-evaluability-assessment-anti-human-trafficking-program

Case 1:25-cv-00595-LPA   Document 6   Filed 12/02/25   Page 63 of 120

411. In November 2021, following policy guidance from PPDHRM Procedures, the Plaintiff made a report of concern to Menghini that she was experiencing retaliation as per the PPDHRM, as she was being excluded from research studies by others involved in the OHR matters.

412. Per the PPDHRM Procedures (Section IV.A.), the Plaintiff's concerns about retaliation should have been assessed by OHR at that time. However, and in violation of UNC-CH policy, the Plaintiff's concerns were not assessed.

413. In January 2022, the Plaintiff reported concerns about EOC processes and how her matters were being handled at the SSW via the Carolina Ethics Line (CEL), which is UNC-CH's official whistleblower reporting system (Report #416).

414. The Plaintiff made this report after both Nolan and Strom had both independently recommended this system as a way in which the Plaintiff could document her concerns.

415. In March 2022, the Plaintiff received a reply indicating that the review of her matter was completed, and that appropriate action had been taken.

416. What the CEL log shows is that Nolan, who at the time worked on a small OHR senior leadership team with the lead of EOC (i.e., Hall), was the main individual who analyzed, reviewed, and responded to the Plaintiff's report.

417. Contemporaneous with her review of the Plaintiff's CEL report, Nolan was also providing consultation to the Plaintiff regarding her OHR investigations. Nolan never disclosed to the Plaintiff that she was serving in these dual roles.

418. In June 2022, after the Provost's recommendation of discharge, following guidance from the Tenure Policies, the Plaintiff made a report of EOC concerns and PPDHRM violations.

Case 1:25-cv-00595-LPA   Document 6   Filed 12/02/25   Page 64 of 120

419. Nolan secured Dr. J. David Elrod, Associate Vice Provost Equal Opportunity and Equity at North Carolina State University, to serve as the assessor because the Plaintiff's concerns involved UNC-CH personnel, including in EOC.

420. In July 2022 emails, the Plaintiff's attorney raised with Nolan, the issue of Elrod being unable to provide an arms-length EOC assessment given that he was employed at a University that is also within the UNC System. In response, Nolan responded with an assurance that Elrod had no conflicts.

421. Following completion of her work with Elrod, because of the publicity available records, the Plaintiff learned that Elrod had served previously as a Hearings Officer for EOC in April 2022, which was prior to his assessment of the Plaintiff's concerns.

422. Given Elrod's service to UNC-CH and EOC, Nolan's assurances were not an accurate description of Elrod's standing to conduct an unbiased EOC assessment. Likewise, Elrod did not disclose to the Plaintiff his prior work with EOC and UNC-CH, when such transparency was important to his assessment of the Plaintiff's concerns.

423. The EOC assessment report from Elrod that was made available to the Plaintiff in which he declined to investigate her concerns, was denoted as "draft," had been redacted, and showed errors of fact and omission.

424. In January 2023, again following consultation with Strom, in which Strom indicated that (i) she and others at UNC-CH had received numerous reports of concerns about OHR's handling of investigations and (ii) she had concerns that the Plaintiff's first whistleblower report had not been handed properly, the Plaintiff filed an additional CEL report (#500).

425. Also in January 2023, again following the Tenure Policies, the Plaintiff sought to make a report of potential PPDHRM violations.

65

426.     Ms. Felica Cenca, Report and Response Coordinator at EOC, met with the Plaintiff to gather limited information, but never did undertake an EOC assessment of her concerns.

427.     On August 3, 2023, after waiting over 6 months, the Plaintiff received a reply via the CEL system indicating that her whistleblower report had been reviewed by the Central Compliance Office, that no action would be taken, and that she should direct any concerns to her faculty hearing.

428.     UNC-CH records show that Battle, who was then Vice Chancellor for IIRM, was the ultimate decision-maker handling the Plaintiff's CEL report.

429.     At the time, Battle was supervising Bryde and her leadership of the COI Office, which were noted as potential area of concern in the Plaintiff's 2023 CEL report.

430.     Cenca likewise emailed the Plaintiff a few days following Battle's communication to indicate that it was her understanding that the Plaintiff's EOC concerns were resolved via the CEL reporting system.

431.     Cenca's email communication was confusing because the CEL and EOC reporting systems are two distinct operations guided by different sets of UNC-CH policies. Also, no one from the Central Compliance Office, including Battle, communicated with the Plaintiff about her CEL report, let alone gathered any information from her about potential EOC concerns.

432.     In her testimony at the Plaintiff's hearing later, Strom, who served as the Director of the UNC-CH Office of Ethics Education and Policy Management for seven years and thus has singular expertise in the management of CEL reports, declared that the CEL is not meant to respond to EOC complaints, especially in an active case, like the Plaintiff was at that time.

433.     The one person who did follow-up with the Plaintiff concerning her CEL report was Strom who contacted the Plaintiff on or around February 1, 2023.

434.    Strom reported that she had been authorized to read the Plaintiff's recent CEL report. Strom also reported that Mr. Dean Weber, who is the UNC-CH Chief Audit Officer, and who had initially received the Plaintiff's report was advocating to UNC-CH leadership for a special, independent investigation of all of OHR.

435.    In that same communication, Strom conveyed that she had been told in the context of discussing the Plaintiff's CEL report with Weber and others that UNC-CH administrators were declaring that litigation regarding the Plaintiff's matters was a forgone conclusion.

### Faculty Hearing: September 2023 to June 2024

**Pre-Hearing Processes**

436.    On or around September 18, 2023, the Chair of the FHC (Faculty Hearings Committee) Panel, Dr. Jane Brice who is a Professor at the SOM and Chair of the Department of Emergency Medicine, contacted the attorneys involved in the Plaintiff's matters to begin the process of scheduling the hearing, which was eventually set for dates in December 2023.

437.    Then, mere days before the Plaintiff's faculty hearing was to begin, it had to be postponed when a member of the FHC's five-member panel realized a conflict that prevented her participation and when no replacement could be found on short notice.

438.    Without a full panel, postponing the faculty hearing became necessary because, per section 3.b.3 of the Tenure Policies, the Chancellor or the Chancellor's delegate shall ensure that a hearing occurs before a faculty panel composed of at least five faculty members with permanent tenure.

439.    In response to the possibility of postponement, OUC, which was representing the administration in all facets of the hearing, offered to proceed with a panel of four faculty member and to stipulate that the fifth vote would automatically be counted as vote in favor of the Plaintiff.

Case 1:25-cv-00590-LPA    Document 6    Filed 02/22/25    Page 67 of 120

440.     Given that OUC's suggestion was in clear violation of the Tenure Policies and that any votes earned through such a stipulation, in her view, risked being perceived as meaningless, the Plaintiff declined to proceed with a four-member panel.

441.     Following the cancellation of the hearing in December, the Plaintiff was contacted by the UNC-CH on or around the end of January 2025 about rescheduling the hearing, which was subsequently planned for March.

### Faculty Hearing

442.     Ultimately, the hearing was held over about 18 hours, about five days, and the span of about 10 weeks, from on or about March 25, 2024 through on or about May 29, 2024.

443.     In addition to Brice, the panel members for the hearing, included: Dr. Ashley Leak Bryant, Frances Hill Fox Distinguished Professor and Senior Associate Dean for Global Initiatives at the School of Nursing; Dr. Deborah Givens, Professor in the Department of Health Sciences at the SOM; Dr. Evelyne Huber, Morehead Alumni Distinguished Professor of Political Science in the College of Arts and Sciences; and Dr. Brendan Thornton, Associate Professor in the Department of Religious Studies in the College of Arts and Sciences.

444.     Although the length of time for the hearing overall was 18 hours, each side was limited to three hours of direct presentation. Cross-examination and questioning time was unlimited, which comprised the additional 12 hours, in addition to opening and closing statements by each side's attorneys.

445.     The three-hour time limit prevented a full presentation of all the Plaintiff's matters directed to the hearing, which were numerous given that the Plaintiff was defending herself against four allegations and the discharge recommendation itself, as well as directed to address her EOC and whistleblower reports to her hearing.

446. Thus, the Plaintiff and her attorney ran out of time during the presentation of her evidence and were not able to present a complete defense of her matters.

### Faculty Hearing Committee's Report and Recommendations

447. Following the completion of the hearing, the FHC developed their report, which they submitted to the Chancellor on or about June 26, 2024. The report contained the following determinations.

448. Exactly half of the HFC panel, with 2.5 votes, found that the UNC-CH administration met its burden to present clear and convincing evidence of the Plaintiff's violation of the retaliation per the PPDHRM. Exactly half of the HFC panel, with also 2.5 votes, found that the administration did not meet its burden.

449. This split decision on the PPDHRM allegation came despite the HFC panel noting in its report that although they found Godoy's testimony about her emotional distress to be genuine, it was also "highly unusual" under the circumstances.

450. The majority of the HFC panel members, by 3.5 votes, found that the administration did not provide clear and convincing evidence in support of its claim that the Plaintiff engaged in conduct that violated the nepotism policy.

451. The HFC panel members unanimously found that the administration did not meet its burden to present clear and convincing evidence in support of the claim that the Plaintiff violated the IRBSE policy.

452. The majority of HFC panel members, with 3.5 votes, found that the administration met its burden to present clear and convincing evidence that the Plaintiff violated the COI Policy.

453. The report also indicated that a majority of the HFC panel recommended that the Plaintiff receive some sanctions, including the loss of her distinguished chair, restrictions on

holding administration positions for a time, and a requirement to take a COI training.

454. Taken together, such recommended sanctions were severe, given that the FHC found only against the Plaintiff in the matter of the COI Policy violation and rendered a split vote related to the PPDHRM policy violation, which was not a strong basis on which to base considerable penalties.

455. The FHC's report includes minor errors such as the date that the hearings began is incorrect, suggesting a lack of attention detail.

456. Also, an error of fact in the FHC's report concerning a falsely noted timing of the email the Plaintiff sent to Godoy and others, indicates that the HFC panel did not have a complete understanding of some of the key facts of the relevant matters.

457. Likewise, the HFC report indicated errors of omission. For example, the report overlooked the fact and mitigating factor that the Plaintiff stepped out of teaching the class in which Godoy enrolled to remedy matters. As another example, the FHC did not note in their letter that typically it is not a COI for spouses and intimate partner to conduct research together—a fact expressly noted by Bryde at the hearing.

458. Nonetheless, the FHC Panel unanimously recommended that the Plaintiff not be discharged from her faculty position, stating "All Panel members were in agreement that termination was too severe given the evidence of Dr. Macy's efforts to seek guidance from appropriate campus offices in different circumstances."

### Chancellor Lee H. Roberts's Decision: July 2024 to September 2024

459. On or about August 13, 2024, Roberts notified the FHC of his disagreement with their recommendations by letter.

460. Roberts had just recently been appointed permanent Chancellor by the UNC Board of Governors (BOG) on or about August 9, 2025.

461. Roberts disagreed with the FHC on their findings concerning the PPDHRM allegation, the IRBSE allegation, and their recommendation that the Plaintiff not be discharged.

462. Concerning the PPDHRM allegation, in arguing with the FHC, Robert's letter repeats the erroneous analysis initially put forth by OHR that because the Plaintiff knew in May 2021 that Godoy reported concerns, that the Plaintiff continued to hold perceptions about Godoy's protected activity into February 2022.

463. Also concerning the PPDHRM Allegation, Robert's erroneous determinations did not evidence a materially adverse action. Using a tautology, Roberts incorrectly declares the email an adverse action because Godoy self-reported it as such.

464. Moreover, Roberts produced no evidence or analysis in his letter that the email Godoy received in February 2022 was intended as a retaliative response to the events of May 2021.

465. Relatedly, Roberts's analysis establishes no evidentiary connection such that the Plaintiff's email was sent for the purpose of interfering with Godoy's rights and privileges to engage in protected activity.

466. Concerning Roberts's disagreement with the FHC on the IRBSE allegation, like OHR, the key focus of Roberts's findings against the Plaintiff concerns conference presentations and research publications stemming from work begun before the relationship. A majority were based on work conducted wholly before the relationship. None were academic requirements nor necessary for Wretman to complete his PhD degree. In completing these few products, the Plaintiff was following contemporary guidance she had received in 20216. None of these factors are acknowledged, analyzed, or discussed by Roberts.

71

467. Concerning Roberts's disagreement with the FHC on the IRBSE allegation, Roberts's argument and analysis missed key statements made at the hearing that indicate why the FHC came to the decision they did. In asking a question of a witness, HFC panel member Givens stated: "So I'm a little confused because I know of programs where Ph.D. students have relationships and have married faculty in the university, and I also am aware of faculty who collaborate and are either in committed relationships or married in the university. And I was just looking up also that I know of at least the program I'm talking about the couple became involved. The faculty member and this couple, they published extensively throughout the person's career until they graduated … So I'm trying to figure out where here testimony from, you know, or read that people were aware that these two were together and tried to inform everybody they could and ask for advice, and now they're being told they didn't do it right. So can you help me understand how they didn't do it right, but they told everybody they were trying to do it right?"

468. Concerning Roberts's decision of discharge, per section III.D of the PPDHRM, UNC-CH had wide latitude in the imposition of disciplinary action. However, there is no written evidence in Roberts's letter that at any of steps in the Plaintiff's process, including in his own review, that an analysis was conducted concerning other potential sanctions or remedies. There is also no evidence that Roberts's considered the Plaintiff's 20-year distinguished service to UNC-CH in his decision-making.

469. Despite the Roberts's disagreement with the FHC, on or about August 20, 2024, the FHC responded to the Chancellor's disagreement via a letter that they affirmed their recommendations and votes on the two allegations, in addition, they remained unanimously committed to their recommendation against the discharge recommendation.

72

470. Nonetheless, on or about September 19, 2024, the Plaintiff received Roberts's notice of discharge, which declared Roberts's assessment that the Plaintiff had violated the COI Policy, the IRBSE, and the PPDHRM.

471. Overall, in the first opportunity the Plaintiff had to respond to the findings against her, through a faculty hearing, the FHC unwaveringly maintained that she not be discharged from her employment nor lose her tenure.

472. Nonetheless, Roberts, who is not an academic and has never earned tenure himself, chose to overrule a faculty panel comprised of the Plaintiff's proximal colleagues in one of his first acts as permanent Chancellor.

473. On information and belief, Roberts deferred to Denby-Brinson as part of his decision-making about the Plaintiff, which led to him overruling the FHC, despite section 3.b.7 of the Tenure Policies stating that the Chancellor shall consider only the written transcript of the hearing and the report of the FHC.

### Appeal to UNC-CH Board to Trustees: October 2024 to August 2025

474. Following from Robert's discharge decision, and consistent with the Tenure Policies, the Plaintiff submitted an appeal the BOT within the policy-based time frame of two weeks on or around October 2, 2024, per section 8.a. of the Tenure Policies, as well as the "Procedure for Appeals to the Board of Trustees" Policy.

475. On April 15, 2025, Ms. Kirsten C. Stevenson, Senior University Counsel, communicated by email that the BOT had agreed to consider portions of the Plaintiff's appeal. Portions of the Plaintiff's appeal that were excluded by the BOT included the following six items.

476. First, that the Chancellor was not permitted to consider exhibits which were not accepted into the record at the faculty hearing for purposes of his decision.

73

477.     Second, that the Plaintiff was not given an opportunity to respond to the OHR report or present reasons why she should not be recommended for discharge before the discharge recommendation was made by the Provost.

478.     Third, that certain faculty panel members' splitting of their vote effectively disregarded the policy-based standard of clear and convincing evidence.

479.     Fourth, that the time limits imposed on both parties during the faculty hearing process deprived the Plaintiff of an appropriate opportunity to present her case.

480.     Fifth, that the FHC and the Chancellor are required to include in their documentation and reports key contextualizing, exonerative, and mitigating evidence that should be considered in their analysis and determinations.

481.     Sixth, the BOT also declined as ground the breaches of confidentiality by OHR, EOC, or SSW, as well as the handling of the Plaintiff's EOC and whistleblower reports.

482.     Why some grounds were not accepted as a basis for the appeal was not explicated in Stevenson's letter.

483.     Stevenson's letter also communicated that the then Chair of the BOT, Mr. John P. Preyer, had appointed BOT panel comprised of the three Trustees to conduct the review of the Plaintiff's appeal. These three Trustees were: Mr. James Blaine II, who chaired the panel, Mr. Richard E. Allison, Jr., and Mr. Robert P. Bryan III.

484.     Consistent with policies, the Chancellor was invited to submit a written response to the Plaintiff's appeal within 14 calendar days. Simmons responded to Stevenson's email and asked for additional time to submit the Chancellor's response.

485.     Roberts's letter was sent by Ms. Marla Spector Bowman, Litigation Counsel in OUC, on May 13, 2025.

486.    Similar to his letter of disagreement to the FHC, Roberts's letter contained errors of fact, overlooked key facts concerning the processes, and misrepresented events.

487.    As an example, Roberts blamed the rescheduling of the faculty hearing on the Plaintiff by stating "Though the University consented to go forward with a four-person hearing panel, Dr. Macy refused, so the hearing was postponed until five faculty members were available" when in fact, moving forward with a four-person panel would have been in violation of the Tenure Policies.

488.    In another distortion, Roberts's letter blames the Plaintiff for the length of the 2021–2022 OHR investigations by stating that the Plaintiff's email to Godoy was the reason why the investigations were extended. In fact, at the time that the Plaintiff sent the email to Godoy, the investigations of Luo's allegations against the Plaintiff had been ongoing for 54 business days, excluding holidays and weekends. Even allowing the UNC-CH OHR an additional eight days for December holidays, the investigation had been ongoing for 46 business days. In that time, the OHR Investigators had only interviewed two individuals, Godoy and Bowen, had not scheduled an interview with the Plaintiff, and had not even contacted other individuals key to the matters to schedule interview meetings. Thus, regardless of whatever actions the Plaintiff did or did not take, the investigations would in no way been completed within the policy-based 60-day time frame because of OHR's operations.

489.    Likewise, Roberts assertion in his letter that "the timeline of events was extended time and again at Dr. Macy's request, and consistent with University policy and applicable law, to provide her with more and more due process" is false.

490.    As an example of one timeline that was extended in the Plaintiff's matters for inexplicable reasons, there is no policy or law indicating that UNC-CH or Battle had to hold onto

the Plaintiff's 2023 whistleblower report for more than six months, particularly given that no one from UNC-CH, including Battle who made the final adjudication, ever spoke with the Plaintiff about her report.

491. Likewise, while the Plaintiff adhered to policy-based due dates in submitting her appeal to the BOT, as she has done at every step in her processes, she had no reply from the BOT for over six months.

492. Roberts also states in his letter to the BOT that "…Dr. Macy's contentions seem to suggest that she would prefer a process in which she had the opportunity to review EOC's entire investigation report and then sit for an interview to respond," which completely misrepresent the point the Plaintiff made in her appeal which is that she never had an opportunity to review and respond to OHR's highly erroneous report before it was finalized and conveyed to decision-makers.

493. Seemingly, UNC-CH now agrees that such a step in an investigation process for faculty is crucial to due processes, given that the current PPDHRM Procedures policy[23] now includes such a review for responding parties and the Provost's new policies concerning Faculty Discipline[24], which were issued November 2024, also include such a review step.

### BOT Decision: A Falsehood and A Procedural Error

494. Next, in a letter dated August 15, 2025, Preyer reported out that the BOT panel convened to review the Plaintiff's appeal and exhibits provided in support of the appeal, the written transcript of the faculty hearing including exhibits accepted to the record during the hearing, the report of the FHC, and the decision of the Chancellor.

---

[23] https://policies.unc.edu/TDClient/2833/Portal/KB/ArticleDet?ID=132486
[24] https://facultyaffairs.unc.edu/policies-and-procedures/faculty-conduct-and-external-activities/

495.    Preyer also declared in his letter that, following the review, the BOT panel determined that the Plaintiff had not met the burden to show clear and material error with respect to the Robert's decision to terminate her.

496.    Preyer's letter went onto say that at the July 31, 2025 meeting in which the BOT panel's recommendation was presented during closed session, the BOT voted to adopt the panel's recommendation to uphold the decision to terminate the Plaintiff's employment.

497.    Preyer's letter states specifically that "the BOT panel convened to review the appeal and exhibits provided in support of the appeal."

498.    Consistent with the policy "Procedure for Appeals to the Board of Trustees," the Plaintiff provided exhibits in support of her appeal as a set of pdf documents available via her Dropbox Account, along with a URL so that the BOT could access these documents.

499.    This set of documents was unique to her BOT appeal, and several had never been submitted in the prior steps in her process. The Plaintiff's main appeal document specifically denoted these documents throughout. Thus, key points of her appeal were supported by these corroborating exhibits.

500.    A key function of Dropbox is its notification and tracking features that indicates when others have accessed and viewed folders and files.

501.    The Plaintiff's Dropbox, however, shows that no one other than the Plaintiff and her attorney have ever accessed all but one of these documents. This one document was reviewed by "guest" from on or about May 6, 2025 to May 12, 2025, which the time frame when the Plaintiff's appeal was with Roberts.

502.    No member of the BOT ever contacted the Plaintiff or her attorney about otherwise accessing the document.

503.    Without accessing the Dropbox, there could be no way in which the BOT reviewed the exhibits provided in support of the Plaintiff's appeal. Thus, Preyer's statement to this effect in his letter cannot also be true.

504.    In addition, on information and belief, sometime in May 2025, before the BOT Panel had met to review the Plaintiff's appeal, Preyer in a breach of processes and the Plaintiff's confidentiality declared outside a formal communication and meeting of the BOT: "The torpedo is already in the water as she had an inappropriate relationship with a student."

505.    This statement, which shows a lack of understanding of the facts and UNC-CH policies, indicated a biased and pre-determined judgment on the part of the BOT Chair who was the author of the letter affirming the Plaintiff's discharge.

### Initial BOT Decision Letter Corrected

506.    On August 21, 2025, the Plaintiff received a second letter from Preyer that again detailed the BOT's process and decision.

507.    Markedly, the first letter from August 15, 2025, contained an error in fact and analysis.

508.    The first letter erroneously stated that "It [The FHC] found that the University had met its burden to show clear and convincing evidence of violations of the Improper Relationships Policy and the COI Policy,' when in fact that FHC has unanimously determined that the UNC-CH had not met its burden concerning the IRBSE.

509.    Instead, the FHC affirmed their unanimous decision that the UNC-CH had not met its burden concerning IRBSE twice.

510.    The second letter of August 21, 2025, corrected Preyer's error.

511.    Such an error in a letter from the BOT Chair concerned with one of the most serious

decision UNC-CH can make about its faculty shows, at best, a considerable lack of care and attention to detail. The error also suggest bias and a profound misunderstanding of the facts of the Plaintiff's matters in the BOT's decision-making.

## FIRST CLAIM OF RELIEF UNLAWFUL PROCEDURES

### (Against All Defendants)

512. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

513. Consistent with § N.C.G.S. 150B-43, Plaintiff now seeks judicial review of the aforementioned actions and adverse decisions made against here. Consistent with Chapter 150B this action is timely filed.

514. Per N.C.G.S. § 150B-51(b) a trial court's review of a final agency decision may reverse or modify the decision if the substantial rights of the petitioners may have been prejudiced because the findings, inferences, conclusions, or decisions are made upon unlawful procedure.

515. Unlawful procedure exist in every phase of the Plaintiff's procedures, including investigation, faculty hearing, and appeal process. From the initial OHR and COI investigation to the review by the BOT, UNC-CH engaged in multiple substantial violations of its own rules, policies, and procedures.

### PPDHRM Procedural Violations

516. The Investigation was governed entirely by the Procedures for Reporting and Responding to the Complaints of Discrimination, Harassment and related Misconduct Involving a University Employee ("PPDHRM Procedures"). The Improper Relationships Between Students and Employees Policy ("IRBSE Policy") does not have any policies or procedures that bind it to the PPDHRM; additionally, the IRBSE Policy states that "every reasonable effort" should be made

to resolve alleged policy violations on an informal basis if possible.

517. III.A. of the PPDHRM Procedures states that "The Report and Response Coordinator will first:... Explain the University's policy prohibiting Retaliation..." Three aspects of the investigations that directly related to this procedural violation are as follows.

518. Neither OHR nor Chapman provided Plaintiff with information about EOC processes nor guidance on preventing retaliation in May 2021 when Plaintiff first became aware of Godoy's reports.

519. Throughout OHR assessments and investigations Plaintiff proactively contacted UNC-CH administrators for guidance to prevent retaliation and safeguard OHR processes, including Bowen, Butler, Chapman, Denby-Brinson, Hall, Menghini, Nolan, and Osborne-Adams. No administrator informed Plaintiff of OHR's broad definition of retaliation.

520. Plaintiff received conflicting advice from administrator concerning preventing retaliation throughout investigations. Regarding Luo's performance evaluation, Osborne-Adams told Plaintiff to wait on OHR results before completing the assessment. Butler and Hall told Plaintiff to continue to work on the evaluation normally, and that she could have additional time to complete it. Hall's and Butler's advice conflicted with Osborne-Adams's advice. Plaintiff completed the performance evaluation in line with Butler's and Hall's advice. Plaintiff was then investigated by OHR for conduct undertaken following this guidance.

521. Denby-Brinson guided the Plaintiff to try to dialogue with those involved. Nolan guided the Plaintiff to clarify uncertainties and "memorialize" her own actions and understanding with others involved in OHR matters. Plaintiff sent the emails that are the focus of the PPDHRM retaliation allegation to eight individuals, including Godoy, on this guidance. Plaintiff was then investigated by OHR for conduct undertaken following this guidance.

522.    III.C. of the PPDHRM Procedures state that UNC-CH will initiate a prompt, thorough, and impartial investigation of conduct that, if true, would constitute a violation of the policy and that such an investigation is designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator.

523.    Investigators who led in Plaintiff's case were also the investigators who led in Wretman's case.

524.    Plaintiff's case had the same case number as Wretman's case.

525.    Denby-Brinson was named as the Administrative Advisor on both the Plaintiff's and Wretman's investigations.

526.    Fact finding concerning the Plaintiff was combined with fact finding concerning Wretman.

527.    In interviews, investigators asked questions of reporting parties and witnesses about Wretman's alleged misconduct, and such information was included in Plaintiff's case.

528.    Witnesses provided information relevant only to Wretman's misconduct that was included in Plaintiff's case.

529.    Investigators conducted investigation in an unfair and biased manner, asked pointed questions, and otherwise sought to interfere with the impartial nature of the policy-based process.

530.    In essence, Plaintiff's case was treated as the same case as Wretman, despite Plaintiff and Wretman facing separate and distinct allegations. This treatment directly impacted the impartiality of the investigators and investigations and clearly impacted the results of the investigations. This treatment contaminated the investigations to such a degree that any information gained as a result should be set aside.

531. III.C.6. of the PPDHRM Procedures state that during the Investigation, the Reporting Party and Responding Party will have an equal opportunity to be heard, to submit information, and to identify witnesses who may have relevant information.

532. Plaintiff was never given an opportunity to respond to the information gathered by Investigators and used in their report.

533. Plaintiff was only allowed one interview. Both Reporting Parties were interviewed twice.

534. The majority of the witnesses identified by Plaintiff as relevant were not interviewed by investigators.

535. Such violations of III.C.6. further taints the information gained as a result of the investigation.

536. III.A. of the PPDHRM Procedures states that "The Equal Opportunity and Compliance Office has sole authority to conduct investigations and oversee resolutions for reports of Prohibited Conduct under the Policy." However:

537. Following Godoy's first report to Chapman, Chapman initiated several follow-up conversations with Godoy, Fraga Rizo, and Zimmerman. Chapman consolidated information and conducted an investigation before contacting OHR. Information gathered from Chapman's investigation was provided to OHR through Chapman's report.

538. Chapman continually provided information during the investigations by communications and meetings with Denby-Brison, Godoy, and OHR, which in turn, influenced the investigations.

539. As Section III.C.7. of the PPDHRM Procedures state that "the investigator… may exclude information in preparing the investigation report if the information is irrelevant,

Case 1:25-cv-00950-LLA   Document 6   Filed 02/12/25   Page 82 of 120

immaterial, or more prejudicial than informative." Nonetheless, the initial report contained immaterial information gathered from a biased third-party, which was influencing throughout investigations. This bias was compounded because after receiving the Plaintiff's email, Godoy contacted Chapman, who then contacted others including, on information and belief, Denby-Brison and the Office of University Counsel (OUC).

540. III.C. of the PPDHRM Procedures states "The Investigation will safeguard the privacy of the individuals involved in a manner consistent with applicable law and University policy." However:

541. Chapman held a meeting with Plaintiff and Fraga Rizo in which she discussed Wretman's and Plaintiff's matters. This violated the procedures by disclosing information about Wretman to Plaintiff and Fraga Rizo and disclosing information about Plaintiff to Fraga Rizo.

542. Chapman developed a memorandum detailing the EOC matters for SSW files.

543. Luo discussed her EOC allegations against the Plaintiff with the Reconciliation Committee, of which Chapman was a member. The Reconciliation Committee communicated Luo's allegations to Denby-Brinson.

544. OHR notified Luo by email that Plaintiff was being investigated for allegedly violating the Employment of Related Persons ("Nepotism") Policy.

545. Several SSW faculty members held their own meetings with other faculty and doctoral students to discuss the Plaintiff's investigation.

546. These confidentiality violations went beyond harmless breaches and served to contaminate witnesses and information to the extent that witnesses knew about the investigation before being contacted by investigators.

547. III.C.8. of the PPDHRM Procedures state that "At the conclusion of the

Investigation, the investigator will prepare a written report that summarizes the information gathered and synthesizes the areas of agreement and disagreement between the parties with any supporting information or accounts." However:

548. OHR Investigators omitted witnesses and witness statements from their report that were exonerative of the Plaintiff, including statements by Adams, Bowen, Radtke, Wretman, and Zimmerman.

549. III.C.8. of the PPDHRM Procedures state that "the investigator will include an Investigative Finding regarding whether a policy violation occurred and recommendations for appropriate disciplinary action and other corrective measures, if appropriate." III.C.1. of the PPDHRM Procedures state that "The Administrative Advisor will review the investigation report and the recommended disciplinary action and/or other corrective measures (if applicable) and discuss the findings and recommendations with the Equal Opportunity and Compliance Office."

550. Investigators provided no disciplinary recommendation.

551. Clemens and Denby-Brinson alone determined the disciplinary recommendation, not the entire Outcome Team.

552. No recommendation for appropriate disciplinary action and other corrective measures was provided. As such, Denby-Brinson should not have been empowered to discuss the disciplinary recommendations with OHR, as such recommendations were not provided.

553. Given Denby-Brinson's involvement in the process beyond just the role of Administrative Advisor, her recommendations unfairly biased the outcome and recommendation of the Investigation.

554. Similarly, the entire outcome team was supposed to provide recommendations to determine the appropriate course of action, not just Clemens and Denby-Brinson.

Case 1:25-cv-00905-LLA Document 6 Filed 07/22/25 Page 84 of 120

555. III.D of the PPDHRM Procedures state that "…the Policy provides the investigator and the Outcome Team with wide latitude in the imposition of disciplinary action or corrective measures …" The PPDHRM Procedures go on to list nine categories of factors that "the investigator and the Outcome Team shall consider," however:

556. Investigators have no consideration of such factors in their report.

557. There is no documentation showing that the Outcome Team considered such factors in their discussion.

**EOC Guidelines Procedural Violations**

558. To supplement and summarize the PPDHRM policies, EOC provided all reporting parties and responding parties a written set of guidelines concerning investigations titled: Important Information Regarding the EOC Investigation Process ("EOC Guidelines").

559. The "Administrative Advisor" section of the EOC Guidelines state: "The Administrative Advisor is not a witness or otherwise directly involved in the allegations and does not have a conflict of interest, bias, or prejudice concerning the parties or allegations that would impact impartiality." However:

560. Denby-Brinson's roles as the Administrative Advisor on both the Plaintiff's and Wretman's investigations inherently created a biasing conflict of interest.

561. The communications Denby-Brinson received from Chapman, the Reconciliation Committee, as well as other faculty and doctoral students about the Plaintiff's matters outside of the OHR investigation processes was biasing and prejudicing to her role as Administrative Advisor.

562. The "Retaliation" section of the EOC Guidelines state: "Retaliation is taking any action … that could discourage a reasonable person from participating in the reporting,

85

investigation, or resolution of an alleged violation of the Policy," and "Retaliation may include intimidation, threats, coercion, or other adverse actions." However:

563.    The EOC Guidelines also state: "You may need to discuss the investigation with certain individuals in order to obtain and present evidence, to otherwise protect your interests, or to seek emotional, logistical, or other forms of support. You are not barred or discouraged from doing so," which are all intentions consistent with the email the Plaintiff sent to Godoy and other individuals.

564.    Per the EOC Guidelines, the Plaintiff could communicate with individuals to protect her interests and for logistical reasons, but the OHR investigators neglected to note so in their report.

565.    The "Confidentiality" section of the EOC Guidelines state: "we ask that you not discuss the details of your account with those individuals who may have relevant evidence" and "We ask that you otherwise discuss this matter only with those with a legitimate need to know." However:

566.    Luo's discussions with the Reconciliation Committee violated this guidance and was not noted by the OHR investigators in their report.

567.    SSW faculty members holding their own meetings with other faculty and doctoral students to discuss the Plaintiff's investigation indicate that her matters were discussed among those in SSW without a legitimate need to know.

**COI Policy Procedural Violations**

568.    The Investigation for the violation was governed by the Policy on Individual Conflicts of Interest and Commitment ("COI Policy").

569.    Section VI states that when a report of a possible COI is made to the COI Officer,

86

"the Officer may: (1) Investigate the matter and make a written memorandum of his or her conclusions; (2) Request that the person or committee assigned to monitor the activity conduct an investigation and file a written report of the results of that investigation; or (3) Appoint another faculty member or a committee of faculty members to conduct an investigation and file a written report of the results of that investigation." However:

570.    The COI Officer and the School of Medicine (SOM) COI Committee held a review, but no investigation.

571.    The review produced a "COI finalization letter," from the "COI Staff" but no "memorandum of conclusions" from the COI Officer nor a "written report" of an investigation from the SOM COI Committee.

572.    Nonetheless, the "COI finalization letter" was the basis of the Provost's recommendation that the Plaintiff be discharged.

573.    For the review, the Plaintiff was only allowed one interview meeting and limited opportunities to submit her own evidence; and she never met with the SOM COI Committee.

574.    No adjustments were made so that the Plaintiff could have access to her colleagues, office, and records for the review.

575.    Section VI. Of the COI Policy state that "…the COI Officer must consider recommending to the relevant officials the imposition of disciplinary or other action under other appropriate University policies …" However:

576.    The COI finalization letter makes no such recommendation.

577.    Section V.H. Disclosure of this policy states "Disclosure is required from all Investigators involved in any Project that is submitted through the Office of Sponsored Research or the Office of Human Research Ethics. Investigators are required to complete any applicable

Conflict of Interest Disclosure form and provide details regarding their Personal or Financial Interests as necessary in the conflict of interest review process."

578. Plaintiff completed the COI Disclosure form to the best of her knowledge and did not include her relationship, as conducting research with a partner/spouse is not typically considered a COI. Moreover, Plaintiff contacted the COI Office by email well in advance of the due date for the grant proposal and indicated that she was aware that a specialized COI review process was required because the grant was related to DOJ funding.

579. COI did not provide any guidance about disclosing personal relationships for DOJ funding.

580. The COI finalization letter did not note the Plaintiff's efforts to seek this guidance from the COI Office.

581. Given the policy states that disclosure is required but does not specify that all disclosure need be made through the disclosure form, Plaintiff's contact with the COI office was nonetheless attempted disclosure and an effort to comply with the external funder's policies.

**Tenure Policies Procedural Violations: Faculty Hearing**

582. The Trustee Policies and Regulations Governing Academic Tenure in the University of North Carolina at Chapel Hill ("Tenure Policies") governs entirely the procedures of the discharge of a tenured professor such as Plaintiff. Section 3.b.3. of the Tenure Policies states that "the hearing shall be on the written specification of reasons for the intended discharge, suspension, or demotion." However:

583. Godoy's allegations against Wretman were discussed considerably, despite Plaintiff's attorney's objections.

584.     The inclusion of extensive testimony and evidence related to Wretman's case further demonstrates the attitude taken by those involved in managing this case that the Plaintiff was somehow responsible for Wretman's alleged conduct, whether founded or unfounded.

585.     Also, UNC-CH's directive to the Plaintiff that she take the concerns raised in her own EOC and whistleblower reports to her faculty hearing violated this section of the Tenure Policies as the hearing shall only be on the written specification of reasons for the intended discharge, not mismanaged processes and policy violations that led to the hearing.

586.     Section 3.b.4. of the Tenure Policies states that "the hearing shall be closed to the public unless the faculty member and the hearing committee agree that it may be open." However:

587.     Denby-Brinson was allowed to attend all of the hearing, despite participating as a witness for UNC-CH against the Plaintiff.

588.     Denby-Brinson's presence directly violated this procedure and influenced other witnesses against the Plaintiff while allowing Denby-Brinson to be aware of all evidence presented during the hearing.

589.     Section 3.b.4. of the Tenure Policies states "The Faculty member shall have the right… to present the testimony of witnesses and other evidence." However:

590.     Brice and the Office of University Counsel (OUC) made no adjustments to Plaintiff's administrative leave to permit her to obtain documents and records from her UNC-CH office.

591.     At OUC's request, Brice denied Plaintiff's request to include several documents, evidence, and "letters of support" from faculty colleagues and former students, which were directly related to the discharge recommendation.

592.     Plaintiff and her attorney were prevented from contacting 18 potential witnesses by Bowman.

593.     Thus, administrators with crucial knowledge of matters, including Bowen, Chapman, Enlow, and James-Whidbee, did not participate as witnesses in the hearing because the Plaintiff could not call on them and UNC-CH elected not to call on them.

594.     These actions and decision directly violated Plaintiff's right to present the testimony of witnesses and other evidence.

595.     Section 3.b.4. of the Tenure Policies states "The Faculty member shall have the right… to confront and cross-examine adverse witnesses." However:

596.     Denby-Brinson stated that "Early career professors, some of the assistant professors, associate professors, doc students, research professors" had come to her with strong concerns about the Plaintiff, particularly the Plaintiff's relationship with Wretman.

597.     Bowman read adverse witness statements by Klein and Van Deinse from the transcripts of their OHR interviews during Plaintiff's cross-examination.

598.     These actions directly violated Plaintiff's right to confront and cross-examine adverse witnesses.

599.     Section 3.b.6. of the Tenure Policies states "In evaluating the evidence, the committee shall use the standard of "clear and convincing" evidence in determining whether the University has met its burden of showing that permissible grounds for serious sanction exist and are the basis for the recommended action." This standard means that to meet its burden, the faculty hearing panel members should have had a firm conviction that it was highly probable that the factual contentions of the University's claims were true.

600.    In the PPDHRM matter of retaliation the panel rendered a split vote of 2.5 to 2.5.

601.    The panel also reported out split votes concerning the allegations related to the COI and Nepotism.

602.    Splitting of individuals' votes in a faculty hearing is problematical as it would be in any quasi-judicial or judicial proceeding. Thus, members of juries, for example, are not allowed to split their individual votes.

**Tenure Policies Procedural Violations: Chancellor's Decision**

603.    Section 3.b.7. of the Tenure Policies states "the Chancellor shall consider only the written transcript of the hearing and the report of the hearing committee." However:

604.    In his letter of disagreement with the faculty hearing panel, Roberts referenced exhibits not discussed in the hearing transcript or in the report.

605.    Such references clearly demonstrates a procedural violation of the Tenure Policies.

**Tenure Policies Procedural Violations: BOT Review**

606.    Section 8.a. of the Tenure Policies states "The request must contain a brief statement that alleges one or more of the following as the basis for the appeal: (1) that the process for making or reviewing the decision was materially flawed, so as to raise questions about whether the faculty member's contentions were fairly and reliably considered, (2) that the result reached by the chancellor was clearly erroneous, or (3) that the decision was contrary to controlling law or policy. The question under review shall be decided by the full Board of Trustees." However, the BOT refused to consider:

607.    In contrast to the Tenure Policies, that the Chancellor was not permitted to consider exhibits which were not accepted into the record at the faculty hearing for purposes of his decision.

608.     That the Plaintiff was not given an opportunity to respond to the OHR report or present reasons why she should not be recommended for discharge before the discharge recommendation was made by the Provost.

609.     In contrast to the Tenure Policies, faculty panel members' splitting of their vote effectively disregarded the policy-based standard of clear and convincing evidence.

610.     That the time limits imposed on both parties during the faculty hearing process deprived the Plaintiff of an appropriate opportunity to present her case fully.

611.     That the FHC and the Chancellor neglected to include in their documentation and reports key contextualizing, exonerative, and mitigating evidence that should be considered in their analysis and determinations

612.     In contrast to the PPDHRM Procedures and the North Carolina State Human Resources Act (N.C.G.S. §126-22-126-24), the breaches of confidentiality by OHR and SSW.

613.     Refusing to consider portions of the Plaintiff's appeal violates the procedural requirement that the BOT consider the question under review.

614.     Section 8.a. of the Tenure Policies states "The question under review shall be decided by the full Board of Trustees. However, the Board may delegate the duty of conducting a hearing to a committee of at least three members." However:

615.     The BOT appointed a panel of three Trustees that convened and reviewed relevant evidence but did not conduct a hearing.

616.     The BOT panel determined that the Plaintiff had not met the burden of proof. It made a recommendation to the BOT, which was accepted in closed session.

617.     By not conducting a hearing, and by making a determination, the BOT's panel simultaneously failed to follow its requirements and exceeded its bounds.

## SECOND CLAIM OF RELIEF ARBITRARY DECISION, CAPRICIOUS DECISIONS, AND ABUSE OF DISCRETION
### (Against All Defendants)

618.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

619.    Consistent with § N.C.G.S. 150B-43, Plaintiff now seeks judicial review of the aforementioned actions and adverse decisions made against here.  Consistent with Chapter 150B this action is timely filed.

620.    A standard of review for an allegation of an arbitrary and capricious agency decision under N.C.G.S. § 150B-51(b) is set out in *Zimmerman v. APPALACHIAN STATE UNIVERSITY,* 560 S.E.2d 374, 149 NC App. 121 (N.C. App. 2002):

621.    The standard of review employed by the reviewing court is determined by the type of error asserted:… the "whole record" test is applied to allegations that the administrative agency decision was not supported by the evidence or was arbitrary and capricious. *Amanini v. N.C. Dept. of Human Resources,* 114 N.C.App. 668, 443 S.E.2d 114 (1994)… Under the whole record test, "the reviewing court [must] examine all competent evidence (the `whole record') in order to determine whether the agency decision is supported by `substantial evidence.'" *ACT-UP Triangle v. Commission for Health Services,* 345 N.C. 699, 706, 483 S.E.2d 388, 392 (1997) (quoting *Amanini,* 114 N.C.App. at 674,443 S.E.2d at 118). Substantial evidence is "`more than a scintilla' and is `such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Williams v. N.C. Dep't of Env't & Natural Res.,* 144 N.C.App. 479, 483, 548 S.E.2d 793, 796 (2001) (quoting *Lackey v. Dept. of Human Resources,* 306 N.C. 231, 238, 293 S.E.2d 171, 176 (1982)). However, the whole record test "does not permit the court `to replace the [agency's] judgment as between two reasonably conflicting views, even

though the court could justifiably have reached a different result had the matter been before it *de novo,"* *N.C. Dept. of Correction v. McNeely,* 135 N.C.App. 587, 592, 521 S.E.2d 730, 733 (1999) (quoting *Thompson v. Wake County Board of Education,* 292 N.C. 406, 410, 233 S.E.2d 538, 541 (1977)); but "merely gives a reviewing court the capability to determine whether an administrative decision has a rational basis in the evidence." *Dept. of Correction v. Gibson,* 58 N.C.App. 241, 257, 293 S.E.2d 664, 674 (1982), *rev'd on other grounds,* 308 N.C. 131, 301 S.E.2d 78 (1983). If the agency's findings are supported by substantial evidence, they must be upheld. *Id.*

622.    Also of note, as applied in *Frampton v. Univ. of N.C. At Chapel Hill*, 773 S.E.2d 526, 241 N.C.App. 401 (N.C. App. 2015), the Court in *Rainey v. N.C. Dep't of Pub. Instruction,* 361 N.C. 679, 681–82, 652 S.E.2d 251, 252–53 (2007) found that "if the *only* authority for the agency's interpretation of the law is the decision in that case, that interpretation may be viewed skeptically on judicial review.

### OHR Investigation: Retaliation

623.    PPDHRM defines retaliation as "any adverse action or attempted action that would discourage a reasonable person from engaging in protected activity." Plaintiff's email to Godoy can not be viewed by a reasonable mind as an adverse action, as:

624.    It begins with pleasantries: "Hope this note finds you doing well and you are having a nice weekend."

625.    Explicitly states that the "email is in no way meant to be an action that might discourage you or any person from engaging in protected activities."

626.    Offers multiple opportunities for Godoy to contact Plaintiff, while specifying that there is no pressure to do so.

627.    Identical emails were sent to several other people.

628.    Although the Court may not substitute its judgement for the agency's, there is no aspect of this email that can be construed as supporting the determination of retaliation. The OHR report states that "A reasonable person would assume its purpose was to attempt to influence a person's participation in, or recollection of, any ongoing University processes in exchange for academic benefits." At point in time in which the email was sent, and explicitly as a result of the OHR process, Plaintiff was positioned within the class so that she could not grade or otherwise influence Godoy's academic performance.

### Faculty Hearing: PPDHRM Determination

629.    As noted in the FHC Report, Section V.D.2. of the PPDHRM defines retaliation as "any adverse action or attempted action that would discourage a reasonable person from engaging in protected activity." The FHC Report notes that:

630.    The Plaintiff was aware the graduate student, i.e., Godoy, to whom the email was sent had been a reporting party in allegations made to EOC in 2021;

631.    That the graduate student was a member of a course that the Plaintiff was teaching at the time the email was sent;

632.    That the graduate student was emotionally impacted by the email given its reference to the investigation, as well as the timing of the email, with class being held the following day, which was erroneous as the class session was not scheduled for the following day.

633.    The faculty hearing panel found the graduate student's testimony about her emotional distress to be genuine, yet highly unusual under the circumstances.

634.    As to the first point, sending an email does not have the inherent effect of discouraging a reasonable person from engaging in protected activities. Furthermore, given that every instance of the offer for a meeting was sent with a clarification that such request was

95

optional, no reasonable person would be discouraged from engaging in any protected activity as under the PPDHRM.

635.    As to the second point, the Plaintiff sent this email to several others all of whom acknowledged the email. No others reported the email as a concern to EOC, including a similarly situated graduate student, who took the Plaintiff up on her offer to meet. Also, the nature of the "professor-student" relationship bears no impact on the effect this email had in discouraging a reasonable person from engaging in protected activities.

636.    As to the other above points, given that the faculty hearing panel found the emotional distress to be "highly unusual under the circumstances," and given that "unusual" can be construed as removed from the reasonable, finding that Godoy's emotional distress was unusual further demonstrates that the panel believed that no reasonable person could have interpreted the email as retaliation.

**BOT Review**

637.    Section 8.a. Trustee Policies states that the potential "…bas[e]s for appeal [are]: (1) that the process for making or reviewing the decision was materially flawed, so as to raise questions about whether the faculty member's contentions were fairly and reliably considered, (2) that the result reached by the chancellor was clearly erroneous, or (3) that the decision was contrary to controlling law or policy.

638.    The BOT's amended letter stated, "the appeal was made on the grounds that (1) the processes for making and reviewing decisions were materially flawed, so as to raise questions about whether the Appellant's contentions were fairly and reliably considered."

639.    The amended letter also stated, "After extensive review, consideration, and discussion, the panel determined that Dr. Macy had not met the burden to show clear and material

96

error with respect to the decision to terminate her employment."

640.　　However, the BOT made no direct decision on "the question under review" as specified in Section 8.a. of the Trustee Policies. Ruling that not demonstrating clear and material error with respect to the decision to terminate the Plaintiff's employment does not offer a decision on whether the process for making or reviewing the decision was materially flawed, and that this raised questions about whether the faculty member's contentions were fairly and reliably considered. As such, the BOT's decision upholding the termination of the Plaintiff's employment was arbitrary and capricious.

641.　　Even if the BOT explicitly stated that it had found that the Plaintiff had not met the burden to show clear and material error in the processes for making and reviewing decisions to show that they were materially flawed, and that this did not raise questions about whether the Plaintiff's contentions were fairly and reliably considered, such determination would be unreasonable. Incorporating all previous allegations of violations of procedure, no reasonable mind would accept as adequate that these errors did not at least "raise questions" about the fair and reliable consideration of Plaintiff's contentions.

### Abuses of Discretion

642.　　*Eury v. North Carolina Employment Sec. Com'n*, 446 S.E.2d 383, 115 N.C.App. 590 (N.C. App. 1994) determined that the abuse of discretion standard established in *Little v. Penn Ventilator Co.*, 317 N.C. 206, 218, 345 S.E.2d 204, 212 (1986) is appropriate to apply to review of an administrative decision. "Test for abuse of discretion requires the reviewing court to determine whether a decision is manifestly unsupported by reason or so arbitrary that it could not have been the result of a reasoned decision."

643.　　OHR abused their discretion in launching investigations of the Plaintiff under both

the nepotism policy and the IRBSE policy, given:

644.     The nepotism policy charges the "department head," not the employee with compliance.

645.     The IRBSE policy states "every reasonable effort should be made to resolve alleged policy violations on an informal basis..."

646.     Neither policy has procedures for assessing allegations, conducting investigations, nor enacting disciplinary actions.

647.     As such, it is clear that these OHR decisions were manifestly unsupported by reason, as Plaintiff was not a department head and no effect was made to resolve the alleged policy violations on an informal basis.

648.     As Chancellor, Roberts abused his discretion. Section 3.b.7. of the Trustee Policies and Regulations Governing Academic Tenure in the University of Noth Carolina at Chapel Hill ("Trustee Policies") states that "In reaching a decision, the Chancellor shall consider only the written transcript of the hearing and the report of the hearing committee."

649.     In these policies, and throughout, "decision" is not defined. Thus, the clearest interpretation of this word would be the decision to impose serious sanctions, rather than the decision as to whether or not the faculty member violated policy.

650.     In addition, Section 3.a.1. of the Trustee Policies, upon which Roberts based his discharge letter, explains that "serious disciplinary action must be based on misconduct of such a nature as to indicate that the faculty member is unfit to continue as a member of the faculty." Roberts further found that such determination was supported by a violation of the IRBSE policy. This determination was made arbitrarily and capriciously given that the panel found that there was no evidence that rose to a clear and convincing standard of this charge.

98

651.    Further, in the FHC's response to the Chancellor's disagreement, they stated that "Even if the University had met its burden on these two issues, the violations (including Conflict of Interest) do not meet the standard for dismissal."

652.    Similarly, even if the decisions and evidence presented demonstrated that Plaintiff was in the past engaging in misconduct that made her unfit, no evidence was presented that such unfitness would continue into the future. As such, the decision to discharge the Plaintiff is arbitrary and capricious, as the faculty hearing determined there was no evidence that called for discharge, and offered a clear alternative in line with governing policies.

### THIRD CLAIM FOR RELIEF – VIOLATION OF TITLE IX 20 USC 1681
### (Against All Defendants)

653.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

654.    Title IX provides, in relevant part, that: "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."

655.    Title IX applies to all public and private educational institutions that receive federal funding, which includes Defendant University of North Carolina at Chapel Hill.

656.    Title IX prohibits any covered entity from discriminating "in employment, or recruitment, consideration, or selection therefor, whether full-time or part-time" "on the basis of sex." 34 C.F.R. § 106.51(a)(1).

657.    Title IX requires a school to "adopt and publish grievance procedures providing for the prompt and equitable resolution of student and employee complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b).

658. Defendant University of North Carolina at Chapel Hill discriminated against Plaintiff Dr. Macy by applying an unfair, unreliable, and partial process against her in resolving the complaints against her.

659. The outcome in this case was erroneous, because Plaintiff Dr. Macy was innocent and did not violate Defendant University of North Carolina at Chapel Hill's policies.

660. Defendant University of North Carolina at Chapel Hill failed to conduct an adequate, reliable, and impartial investigation.

661. Defendant University of North Carolina at Chapel Hill's discriminatory process deprived Plaintiff Dr. Macy, a female, of employment opportunities and imposed discipline on her on the basis of her sex.

662. Defendant University of North Carolina at Chapel Hill applied its policies and procedures in a gender-biased manner and discriminated against Plaintiff Dr. Macy on the basis of her sex, which led to an erroneous and adverse employment outcome.

663. Particular circumstances suggest that the outcome was erroneous, and include, without limitation:

a. Defendant University of North Carolina at Chapel Hill's PPDHRM policy is an unreliable method of determining fault because:

   i. Empowers the same investigators with the power to find facts as well as to prosecute the case;

   ii. Does not require a preliminary determination that a complaint is well-founded before allowing an investigation;

   iii. Does not require investigators to inform the target of the investigation about the nature of the charges or her right to an advisor before commencing an interview;

100

iv.     Allows investigators to draw an adverse inference from a target's silence, lack of cooperation, or use of an advisor in the investigation;

v.      Does not require investigators to tell the target the nature of the evidence against him;

vi.     Does not guarantee that a target will be provided an advisor;

vii.    Does not allow active participation by the target's advisor in the investigation;

viii.   Does not allow a participant to directly question any witness;

ix.     Does not provide the target with the right to confront her accuser;

x.      Does not provide a live hearing to resolve factual disputes;

xi.     Does not require that any witness interview be recorded;

xii.    Does not require that any witness provide sworn testimony;

xiii.   Does not require investigators to disclose exculpatory or other favorable evidence to the target of the investigation;

xiv.    Does not place a burden of proof on the accuser; and

xv.     Premises a finding of responsibility on a mere preponderance of the evidence.

b.      The investigation against Plaintiff was unreliable because it disregarded many of the few procedural protections PPDHRM provided as referenced throughout the Complaint.

c.      The Investigators' Determinations Were Biased and Unreliable because the investigators for all the reasons referenced throughout the Complaint including but not limited to conducting joint investigations with Wretman's investigation, conducting both investigations under the same case number, and failing to interview witnesses provided by the Plaintiff.

664. Particular circumstances suggest that gender bias was a motivating factor in the erroneous outcome, and include, without limitation:

a. Circumstances suggest that Defendant UNC-CH adopted PPDHRM in an effort to lower the protections for females accused of sexual misconduct, and include, without limitation:

i. PPDHRM was adopted to avoid enforcement by Office of Civil Rights;

ii. PPDHRM was adopted to avoid rescission of federal funds by Education Department;

iii. Even after the adoption of PPDHRM, the Campus Code of Conduct was used for other investigations not related to sexual misconduct;

iv. Upon information and belief, statistically the overwhelming majority of investigations that have ever been conducted by Defendant University of North Carolina- Chapel Hill into an alleged violation of PPDHRM have involved female respondents.

b. The investigators disregarded certain provisions of PPDHRM as set forth above because of anti-female bias against Plaintiff Dr. Macy.

665. Based on the foregoing, Plaintiff Dr. Macy was subjected to a biased, prejudiced and explicitly unfair process in violation of Title IX.

666. As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, loss of career opportunities, reputational damages, economic injuries, and other direct and consequential damages.

667. As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

## FOURTH CLAIM FOR RELIEF – VIOLATION OF 42 U.S.C. § 1983 – DENIAL OF DUE PROCESS AND CONSPIRACY
### (Against All Defendants)

668.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

669.    The Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."

670.    Defendant UNC is a public entity that receives large amounts of state and federal funding and is therefore subject to the Fourteenth Amendment. UNC, the UNC System, the Board of Trustees, the Board of Governors, and the Individual Defendants, as state actors, are therefore bound by the requirements of the United States Constitution.

671.    UNC, the UNC System, the Board of Trustees, and the Board of Governors as public institutions established by the State of North Carolina as well as the Individual Defendants, as agents of the University and individually, have a duty to provide employees and students equal protection and due process of law by and through any and all policies and procedures set forth by the University and the Constitution of the State of North Carolina.

672.    Fourteenth Amendment due process protections are required in higher educational disciplinary proceedings. At a minimum, the Supreme Court has made clear that there are two basic due process requirements: (1) notice; and (2) an opportunity to be heard.

673.    Where an employee at a public university faces discharge through a disciplinary proceeding, a serious property interest is at stake; a discharge will have a lasting negative impact on the individual's life, so heightened due process protections including a hearing, with the right to present evidence, cross-examine adversarial witnesses, and to call witnesses are required.

674. Plaintiff, a tenured employee at UNC-CH, faced disciplinary action that included the possibility of discharge. Accordingly, the Due Process provisions of the Fourteenth Amendment applied to the disciplinary processes utilized in Plaintiff's case, and Plaintiff was entitled to a process commensurate with the seriousness of the allegations and potential discipline, sanctions, and repercussions she was facing.

675. It is well established that a person has a protected liberty interest in her good name, reputation, honor, and integrity, of which she cannot be deprived without due process.

676. It is also well established that a person has a protected property interest in pursuing and continuing her employment, as well as in future educational and employment opportunities and occupational liberty, of which she cannot be deprived without due process.

677. As the Supreme Court has eluded the ultimate question of whether there is a protected interest in continued employment at the public university level, the critical inquiry undertaken by the Fourth Circuit in such cases focuses on whether the procedural processes adopted by the university conformed to due process standards.

678. There is no question that the University failed to afford Plaintiff the minimum procedural safeguards required by due process, before discharge.

679. There also is no question that Plaintiff possessed both a constitutionally protected property and liberty interest.

680. Plaintiff's constitutionally protected property interest in her continued employment at UNC, and her right to be free from an arbitrary discharge, derives from the policies, courses of conduct, practices and understandings established by UNC, as well as the express and implied contractual relationship between UNC and Plaintiff.

681.     By their very nature, the applicable University conduct policies and procedures create an employee right to continued employment and the right to be free from arbitrary and capricious decision making and sanctions, as the University does not unlawfully discriminate in offering equal access and that the University recognizes the rights of all members of the University community to learn and work in an environment that is free from Discrimination and Harassment.

682.     Furthermore, the UNC System has delegated the authority to its individual campuses to determine the policies with which it will ensure Due Process is complied with which resulted in the creation of the PPDHRM and related policies.

683.     Furthermore, the PPDHRM and related policies ensure that the Chancellor and Provost ensure every employee's right to due process.

684.     In consideration of the foregoing assurances, UNC's policies created a property right in Plaintiff's continued employment with the University, and a contractual right to protection against an arbitrary discharge.

685.     Plaintiff further has a constitutionally protected liberty interest because the allegations brought against Plaintiff ultimately resulted in a discharge from UNC-CH, a sanction that will have significant and lifelong ramifications with respect to her employment and reputation.

686.     Thus, unless overturned, Plaintiff's discharge will remain a part of Plaintiff's permanent record and the stigmatizing label associated with the finding will impair her ability to seek further employment and related employment opportunities. Absent the relief sought through this matter, other individuals will inevitably come to learn of Plaintiff's wrongful discharge.

687.     Throughout the investigation and adjudication of the charges against Plaintiff, Defendants, individually and in concert, conspired to violate Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment when they deprived her of the

minimal requirements of procedural fairness, proper notice, and a meaningful opportunity to be heard.

688.    Plaintiff's Due Process rights were violated in several ways, including but not limited to

a.    Insufficient notice of the allegations against her;

b.    Plaintiff was never able to cross-examine any of her accusers aside from the one successful Faculty Hearing wherein the result was immediately ignored by Chancellor Roberts and the BOT; and

c.    The Investigators, who are supposed to be neutral fact finders, refused to interview witnesses provided to them by Plaintiff.

689.    Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

690.    The Individual Defendants, as well as other agents, representatives, and employees of UNC acted under color of state law when they showed intentional, outrageous, and reckless disregard for Plaintiff's constitutional rights.

691.    Plaintiff seeks to hold the Individual Defendants liable in their capacities because they knowingly violated Plaintiff's clearly established constitutional rights, as well as UNC policies, when they took actions that led to her expulsion from the University, without affording Plaintiff proper notice and an opportunity to be heard.

692. Defendant Hall knowingly violated Plaintiff's clearly established rights to notice, a meaningful opportunity to be heard, and the right to cross-examine witnesses.

693. Defendant Hall engaged in further violations of Plaintiff's clearly established rights, through her ratification and/or approval of the actions committed by those under her supervision, including the Investigators.

694. Without regard for Plaintiff's due process rights, the Defendants individually and collectively engaged in investigatory and adjudicatory processes that resulted in the improper discharge of the Plaintiff from the University and the UNC System.

695. As fully detailed above, the unlawful actions taken by the Individual Defendants, acting in their individual capacities, were motivated by a malicious motive or intent or, at the very least, reckless, or callous indifference to Plaintiff's right to due process, warranting an award of punitive damages to Plaintiff.

696. As a result of these due process violations, Plaintiff continues to suffer substantial injury, damage, and loss, including, but not limited to, loss of future career opportunities, reputational damage, economic injuries, and other direct and consequential damages.

697. As a result of the foregoing, Plaintiff is entitled to prospective relief against

698. Defendants, and compensatory and punitive damages against the Individual Defendants acting in their individual capacities in an amount to be determined at trial, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursements.

### FIFTH CLAIM FOR RELIEF - BREACH OF CONTRACT
### (Against University of North Carolina at Chapel Hill)

699. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

700.    At all times relevant hereto, a contractual relationship existed between UNC and Plaintiff by virtue of Plaintiff's employment at UNC and as defined by and through UNC's policies and procedures governing employees, including but not limited to the previously mentioned Tenure Policies and PPDHRM.

701.    Through these policies, UNC provided specific, enforceable provisions outlining certain procedures that were to be followed by the institution before Plaintiff could be disciplined or discharged for violation of a university policy.

702.    Any failure to follow promised procedures in the disciplinary process would therefore constitute a violation of the University's contract with its employees.

703.    Accordingly, through the documents it publishes and provides to employees, UNC makes express and implied contractual commitments to employees involved in the disciplinary process and/or the investigation of potential violations of the policies.

704.    Under North Carolina law, the elements of a claim for breach of contract are (1) existence of a valid contract and (2) breach of the terms of that contract.

705.    Based on the aforementioned facts and circumstances, UNC created express and implied contracts when it offered, and Plaintiff accepted, employment at UNC, and when Plaintiff performed for UNC.

706.    UNC committed several breaches of its agreements with Plaintiff during the investigation and adjudication processes.

**Failure to Conduct a Thorough and Impartial Investigation and Adjudication Process**

707.    Through the applicable policies, UNC agreed to: (i) conduct "a prompt, thorough, and impartial investigation, designed to provide a fair and reliable gathering of the facts by a trained and impartial investigator;" (ii) the University committed to conducting a prompt,

Case 1:25-cv-00090-LPA   Document 1   Filed 02/22/25   Page 108 of 120

thorough, and impartial resolution process; (iii) the Tenure Policies, the Title IX Policy and the PPDHRM assure that the University will "provide for the prompt and equitable" response to reports; and (iv) the University affirmed that the OHR, investigator(s), and any individuals designated by the University as a decision-maker in the formal resolution process, must not have a conflict of interest or bias for or against Reporting Parties or Responding Parties generally or an individual Reporting Party or Responding Party; and must promote impartial investigations and adjudications of any Formal Complaints.

708.    Each of the foregoing assurances were violated at every step of the process as described in detail above.

### Failure to presume Plaintiff not responsible

709.    Defendants also violated their conduct policies when they failed to presume Plaintiff not responsible for the reported conduct at all times during the process, until a determination regarding responsibility was made at the conclusion of the formal process.

710.    Defendant Hall likewise engaged in actions that revealed her predetermined conclusion that Plaintiff was responsible for the alleged misconduct before the investigation process even began.

711.    While acknowledging that the matters with the Plaintiff and Wretman did not arise out of the same facts and circumstances, she nonetheless requested that Plaintiff consider agreeing to a consolidated interviews without ever revealing that Wretman's and the Plaintiff's matter were being handled under the same internal case number.

712.    Defendant Hall presumed that a pattern of misconduct committed by Plaintiff would be revealed before the investigations had even gotten fully under way.

**Deprivation of Plaintiff's right to cross-examine her accusers**

713.    At no time in the University Process, prior to the Faculty Hearing after discharge was already recommended, was Plaintiff allowed to pose any questions to her accusers.

714.    Plaintiff was thus deprived of her right to question her accusers until after a decision was already made. Despite the FHC's recommended that discharge was inappropriate, Defendant Roberts nevertheless ignored their recommendation, in direct violation of the applicable policy and due process.

715.    In addition to the violations delineated above, UNC violated the covenant of good faith and fair dealing by failing to afford Plaintiff the fair, thorough, and impartial investigation processes to which she was entitled, resulting in an erroneous outcome and the final severe sanction of discharge.

716.    North Carolina courts recognize an implied covenant of good faith and fair dealing in every contract, which mandates that neither party will do anything which injures the right of the other to receive the benefits of the agreement.

717.    Each of the foregoing breaches contributed to a process that deprived Plaintiff of her fundamental and contractually guaranteed rights, ultimately leading to adverse and erroneous findings against Plaintiff.

718.    As a proximate and foreseeable consequence of the foregoing breaches,

719.    Plaintiff sustained damages, including, but not limited to, emotional distress, psychological damages, loss of future career opportunities, reputational damage, economic injuries, and other direct and consequential damages.

720.    As a result of the foregoing, Plaintiff is entitled to damages in excess of $25,000 in an amount to be determined at trial, plus prejudgment interest, attorneys' fees expenses, costs and

disbursements.

## SIXTH CLAIM FOR RELIEF - NEGLIGENT HIRING, SUPERVISION and RETENTION
### (Against University of North Carolina at Chapel Hill and Defendant Hall)

721.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

722.     At the time of the relevant events, UNC owed Plaintiff a duty to use care in the hiring, training, supervision, and retention of its personnel, including those employed by the OHR and COI who were involved in the disciplinary investigations and adjudications of the cases against Plaintiff.

723.     In investigating the matters against Plaintiff, Defendants Enlow and James-Whidbee acted negligently when they conducted a procedurally defective and biased investigation process, designed to support his predetermined conclusion that Plaintiff was responsible for the alleged misconduct.

724.     Such negligence was exhibited by, for example including but not limited to: (i) Enlow and James-Whidbee posing leading questions to the complainants and witnesses in an effort to elicit certain testimony and information, while repeatedly asking Plaintiff the same question in different ways, in an effort to catch her in inconsistencies; (ii) their failure to pursue material evidence referenced by the Plaintiff and speak to witnesses she provided; (iv) their withholding of exculpatory evidence from Plaintiff, which they knowingly and intentionally excluded; (v) mischaracterizing the "evidence" in the report and to the Outcome Team.

725.     Each of the foregoing demonstrated that Defendants Enlow and James-Whidbee were incompetent in their duties and should not have been serving as OHR investigators for the University.

111

726.    Defendant Hall, as Defendant Enlow's supervisor and the administrative lead of the investigation that Defendant Enlow and James-Whidbee conducted, had actual or constructive notice of Defendant Enlow's and Defendant James-Whidbee's actions described above, as she oversaw and was heavily involved in the investigation processes.

727.    Further, Defendant Hall negligently supervised Defendant Enlow by failing to properly train him on how to conduct a fair and impartial investigation in compliance with the applicable University policies, failing to retrain him, and/or failing to terminate his employment despite her knowledge of the repeated demonstrations of bias committed by through the investigation of all the matters involving the Plaintiff.

728.    Defendant Enlow's and Defendant James-Whidbee's ineptitude in conducting the investigations caused the harm Plaintiff suffered, namely discharge, as the University relied upon the investigators' findings in reaching their final determinations of fact and in issuing sanctions commensurate with the findings.

729.    UNC's decision to retain investigators with a track record of depriving those accused of a fair proceeding, was both negligent and reckless.

730.    Further, it was foreseeable that a negligently conducted disciplinary investigation would ultimately lead to incorrect findings, causing immense harm to the employee found responsible and consequently sanctioned.

731.    In committing the aforementioned acts or omissions, Defendant Hall and/or UNC negligently breached their duty to use due care, which directly and proximately resulted in the injuries and damages to Plaintiff as alleged herein.

732.    As a direct and foreseeable consequence of Defendants' conduct, Plaintiff has suffered irreparable injury to her reputation, loss of employment opportunities, loss of future

earning capacity, and other economic and non-economic losses.

## SEVENTH CLAIM FOR RELIEF – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (Against the Individual Defendants)

733.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

734.    Defendants Guskiewicz, Roberts, Campbell, Clemens, Denby-Brinson, Enlow, James-Whidbee, Hall, Bryde, and Chapman each carried out their duties with respect to the cases against Plaintiff in a negligent manner when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's processes against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with bias against Plaintiff.

735.    By way of example but not limitation, Defendants: (i) presumed Plaintiff responsible; (ii) deprived her of proper notice of the allegations; (iii) failed to disclose critical and exculpatory information at various junctures, until after the close of the proceedings in which Plaintiff could have used such information in her defense; (iv) permitted the inclusion of information concerning other allegations within each investigation report to ensure at least one finding of responsibility against Plaintiff was reached; (v) utilized the same two OHR Investigators for all matters involving Plaintiff and Wretman further contributing to the biased nature of the proceedings; (vi) conducted investigations skewed in favor of the complainants and designed to reach predetermined findings of responsibility; and (vii) deprived Plaintiff of the opportunity to cross-examine her accusers.

736. In combination with conduct described above, the Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff to suffer severe emotional distress.

737. Plaintiff has in fact suffered severe emotional distress as a proximate result of Defendants' actions. It was reasonably foreseeable that such negligent acts would result in severe emotional distress to Plaintiff, given the several year-long process that forced her to continuously defend herself, attempt to prove her innocence, face administrators that were not unbiased but instead presumed her to be responsible from the beginning and, despite all of her efforts, ultimately resulted in her being discharged from employment, ostracized from her collogues, removed from her esteemed position, and suffering from irreparable harm to her reputation.

738. Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to her reputation, the interruption in her employment, and the lifelong consequences that flow therefrom.

739. It was reasonably foreseeable that Plaintiff would suffer emotional and psychological harm as a result of Defendants' conduct.

740. As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered and will continue to suffer considerable emotional and psychological harm.

## EIGHTH CLAIM FOR RELIEF – NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS
### (Against the Individual Defendants)

741. Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

742. Defendants Guskiewicz, Roberts, Clemens, Enlow, Hall, James-Whidbee, Bryde, and Chapman each carried out their duties with respect to the cases against Plaintiff in a negligent

manner when, either acting individually or in concert, they permitted the reporting parties to weaponize UNC's processes against Plaintiff, engaged in decision-making calculated to lead to the predetermined conclusion that Plaintiff was responsible and must be punished severely, failed to ensure that the investigatory and adjudicatory processes were fair and objective, and instead contributed to the defective, prejudicial, and arbitrarily inequitable processes that were replete with gender bias against Plaintiff.

743. By way of example but not limitation, Defendants: (i) presumed Plaintiff responsible; (ii) deprived her of proper notice of the allegations; (iii) failed to disclose critical and exculpatory information at various junctures, until after the close of the proceedings in which Plaintiff could have used such information in her defense; (iv) permitted the inclusion of information concerning other allegations within each investigation report to ensure at least one finding of responsibility against Plaintiff was reached; (v) utilized the same two OHR Investigators for all matters involving Plaintiff and Wretman further contributing to the biased nature of the proceedings; (vi) conducted investigations skewed in favor of the complainants and designed to reach predetermined findings of responsibility; and (vii) deprived Plaintiff of the opportunity to cross-examine her accusers.

744. The foregoing actions committed by the Individual Defendants as employees of the University, were so outrageous, so extreme in degree, and went beyond all bounds of decency, such that they were utterly intolerable.

745. The actions of the Individual Defendants in their handling of the cases involving Plaintiff indicate either an intention to cause emotional distress to Plaintiff, or a reckless indifference to the high likelihood that such actions would cause severe emotional distress to Plaintiff, and such actions did directly cause severe emotional distress.

746.     In combination with conduct described above, the Defendants' actions evinced a malicious and corrupt intent and a pattern of extreme and outrageous behavior pursued with the intent to cause Plaintiff to suffer severe emotional distress.

747.     Defendants' conduct will continue to cause harm to Plaintiff given the irreparable harm to her reputation, the interruption in her career and professional activities, and the lifelong consequences that flow therefrom.

748.     As a direct and foreseeable consequence of the foregoing conduct, Plaintiff has suffered and will continue to suffer considerable emotional and psychological harm.

### NINTH CLAIM FOR RELIEF – VIOLATION OF STATE CONSTITUTION
### (Against University of North Carolina at Chapel Hill)

749.     Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

750.     UNC is an agency of the State of North Carolina and at all times relevant to this cause of action, UNC and its employees, agents, officers and directors were acting within the course and scope of the authority, employment or agency conferred on them by UNC. As such, all of the conduct alleged herein is attributable to UNC and the State of North Carolina.

751.     The foregoing acts, omissions, agreements, and concerted conduct of Defendants directly and foreseeably caused the deprivations of the rights guaranteed to the Plaintiff by the North Carolina Constitution, including, but not limited to the following:

a.     Defendants' conduct deprived Plaintiff of the right to the fruits of her own labor in violation of Article I, Section 1;

b.     Defendants' conduct denied Plaintiff the equal protection of the laws in violation of Article I, Section 19; and

116

c.    Defendants' conduct violated Plaintiff's constitutional right not to be deprived of her liberties, privileges or property but by the law of the land, in violation of Article I, Section 19.

752.    As a direct and foreseeable result of the foregoing violations of Plaintiff's constitutional rights, Plaintiff has suffered the harms and damages alleged above in an amount to be determined by a jury.

753.    Plaintiff pleads this direct cause of action under the North Carolina Constitution in the alternative to Plaintiff's state-law claims should those causes of action be barred in whole or part or otherwise fail to provide a complete and adequate state law remedy for the wrongs committed by the Defendants and their agents and employees.

**TENTH CLAIM FOR RELIEF – CIVIL CONSPIRACY**
**(All Defendants)**

754.    Plaintiff repeats and realleges each and every allegation above as though fully set forth herein.

755.    Defendants at some point were all aware of the baseless allegations against the Plaintiff and despite that knowledge set out on a course of conduct designed to result in the discharge of the Plaintiff from her employment at the University of North Carolina at Chapel Hill.

756.    This conspiracy has resulted in an injury to the Plaintiff in an amount in excess of $25,000.

757.    As a result of this civil conspiracy Defendants shall be jointly and severally liable for all damages therefrom.

**WHEREFORE**, Plaintiff Rebecca J. Macy prays the Court as follows:

1. That the Plaintiff have and recover of Defendants a sum in excess of Twenty-Five Thousand Dollars ($25,000.00);

2. That Plaintiff have and recover of Defendants, interest at the legal rate on any judgment from the date of the institution of this action, as provided by N.C.G.S. §§ 24-1 and 24-5;

3. Plaintiff be restored to her full employment with backpay.

4. That the costs of this action be taxed against the Defendants including reasonable attorneys' fees;

5. That all issue of fact be tried by a jury; and

6. For such and other relief as the Court deems just and proper.

This is the 22nd day of September , 2025.

/s/ Matthew C. Suczynski
Matthew C. Suczynski
Attorneys for Plaintiff
Law Office of Matthew Charles Suczynski, PLLC
208 North Columbia Street
Chapel Hill, NC 27514
T: (919) 619-3242
F: (919) 869-2036
matt@matthewcharleslaw.com

## VERIFICATION

I, Rebecca Jane Macy, first being duly sworn deposes and says that she is the Plaintiff named in the foregoing action; that she has read the foregoing instrument and knows the contents thereof and that the same is true of his own knowledge except as to those matters and things therein alleged upon information and belief and as to those she believes to be true.

_Rebecca J. Macy_
Rebecca Jane Macy

SWORN TO and SUBSCRIBED before me

This the 22nd day of September, 2025

_____
Notary Public – Matthew Charles Suczynski

My commission expires: 10/18/2025