**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| REBECCA J. MACY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:25CV953 |
| | ) | |
| THE UNIVERSITY OF NORTH CAROLINA SYSTEM, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION, ORDER, AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**

This matter comes before the undersigned United States Magistrate Judge on Defendants' Unopposed Motion to Seal (Docket Entry 14) (the "Motion to Seal") and Defendants' Motion to Dismiss (Docket Entry 12) (the "Motion to Dismiss"). For the reasons that follow, the undersigned (i) will deny the Motion to Seal and (ii) will recommend that the Court grant the Motion to Dismiss as to Plaintiff's federal claims and decline to exercise supplemental jurisdiction over her state claims under 28 U.S.C. § 1367(c)(3).

**BACKGROUND**

Following the termination of her employment with the University of North Carolina ("UNC"), Plaintiff Rebecca J. Macy ("Plaintiff") sought redress against multiple UNC entities — specifically, the UNC System, the University of North Carolina at Chapel Hill ("UNC-CH"), the UNC-CH Board of Trustees, and the UNC Board of Governors (collectively, "University Defendants") — and

against several individuals in their official capacities, namely, Lee H. Roberts, Kevin M. Guskiewicz, Ramona Denby-Brinson, J. Christopher Clemens, Jeremy Enlow, C. Elizabeth Hall, Donna James-Whidbee, Mimi V. Chapman, and Joy Bryde (collectively, "Individual Defendants," and with University Defendants, "Defendants"). (See Docket Entry 1-3 (the "Complaint") at 1 (identifying, in caption, Defendants and capacity in which Plaintiff sued Individual Defendants); see also id. ¶¶ 1-14 (describing Defendants).)[1]

## I. Factual Allegations[2]

### A. Plaintiff's Employment

Plaintiff received appointment as a tenure track assistant professor at UNC-CH's School of Social Work ("SSW") in 2003. (See id. ¶¶ 15-16.) Following her re-appointment in 2005 as an assistant professor (see id. ¶ 17), Plaintiff earned an associate professorship with tenure in 2008 (see id. ¶ 18) and a promotion to the rank of professor in 2013 (see id. ¶ 21). Before her termination, Plaintiff served as the Associate Dean for Research and Faculty Development at the SSW. (See id. ¶ 23).

---

1 Although an identical copy of the Complaint appears elsewhere on the Docket (see Docket Entry 6), the docketing of that copy resulted in the overwriting of the prior copy's footer with another, rendering the second copy's footer (and its pagination) illegible (see id.). This Opinion thus cites only to Docket Entry 1-3 when referencing the Complaint.

2 The factual allegations in this section come from the Complaint, and, for purposes of the Motion to Dismiss, the Court must accept those factual allegations as true. See, e.g., Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009).

**B. Plaintiff's Relationship with Dr. Wretman**

In 2014, Plaintiff collaborated with Dr. Christopher J. Wretman ("Dr. Wretman"), then a doctoral student at the SSW, "on an administrative project [during Dr. Wretman's] time-limited summer semester research assistantship." (Id. ¶ 52.) In January 2016, after Dr. Wretman "completed all his course work and defended his dissertation proposal" (id. ¶ 60), Plaintiff and Dr. Wretman began a romantic relationship (see id. ¶ 66). After disclosing their relationship to UNC-CH administrators (see id. ¶¶ 66-79), Plaintiff and Dr. Wretman, along with another colleague, "collaborat[ed] on SSW-based research projects beginning largely in 2019" (id. ¶ 89), "result[ing] in about 11 peer review publications" (id. ¶ 90). Plaintiff and Dr. Wretman "also collaborated with other faculty and students . . . , including frequently . . . Dr. Sarah M. Godoy[ ('Dr. Godoy'),] . . . formerly a doctoral student at the [ ] SSW" (id. ¶¶ 100-01), and Jia Luo ("Luo"), "a Research Program Manager at the SSW [under] Plaintiff['s ] supervis[ion]" (id. ¶ 180).

**C. OHR Reports of Plaintiff's Misconduct**

**1. Dr. Godoy's Reports**

"On or about April 1, 2021, . . . [Dr.] Godoy met with [Defendant] Chapman,. . . the then SSW Associate Dean for Doctoral Education, . . . for a year-end review meeting" (id. ¶ 159), during which Dr. Godoy raised concerns over "the toxicity of the research team" (id. ¶ 161 (internal quotation marks omitted)) which included

Plaintiff and Dr. Wretman (see id. ¶ 158). After multiple "conversations . . . about [Dr.] Godoy's concerns in the weeks following [that meeting]" (id. ¶ 162), Defendant Chapman "made a report to the [Equal Opportunity and Compliance ('EOC')]/Title IX Office" (id. ¶ 164). Sometime after May 6, 2021 (see id. ¶ 165), Defendant Chapman informed Plaintiff that "[Dr.] Godoy reported that the team dynamics made her uncomfortable[ and] that [Dr.] Wretman made inappropriate comments" (id. ¶ 170).

In December 2021, personnel within the Office of Human Resources ("OHR"), including Defendant James-Whidbee (see id. ¶ 234), interviewed Dr. Godoy (see id. ¶ 233). Sometime thereafter, Plaintiff received a notice indicating that Dr. Godoy reported Plaintiff for "actions that could be due to any number of reasonable work-related circumstances such as 'changing [her] supervision style,' 'cancelling meetings,' and an alleged lack of 'timely communication.'" (Id. ¶ 249.) Because the contents of the notice included "actions for which [ ] Plaintiff had received guidance from OHR leadership" (id. ¶ 250) and "allegations that would never have been possible if OHR [investigated the matter] . . . with greater [ ] timeliness and/or . . . provided better guidance to [ ] Plaintiff" (id. ¶ 251), "Plaintiff sought additional guidance" (id. ¶ 252).

"Following meetings in January and February 2022[] with . . . [Defendant] Denby-Brinson, [ ] Plaintiff sent a[] series of emails

to colleagues and students in [the SSW]" (id. ¶ 253), including "emails to Luo" (id. ¶ 262) and one "email . . . on February 13, 2022" (id. ¶ 258) to "[Dr.] Godoy" (id. ¶ 330), in which Plaintiff "acknowledged ongoing OHR investigations; encouraged the recipient[s] to do as they wished according to their own personal priorities concerning any OHR matters; invited the recipient[s] to reach out to [ ] Plaintiff . . . concerning work opportunities; and indicated that [ ] Plaintiff would be glad to make herself available on the matters for discussions" (id. ¶ 259; see also id. ¶ 625 ("[T]he email is in no way meant to be an action that might discourage you or any person from engaging in protected activities." (internal quotation marks omitted))).

One day later, after "[Dr.] Godoy contacted [Defendant] Chapman [about Plaintiff's email]" (id. ¶ 263), "OHR administers [sic] and leaders immediately characterized [ ] Plaintiff's email as 'retaliation'" (id. ¶ 265). In March 2022, "Plaintiff received an updated [notice] indicating that [Dr.] Godoy was alleging that[,] by sending the email of February 13, 2022, [ ] Plaintiff had violated [UNC-CH's] retaliation policy . . . ." (Id. ¶ 266.)

### 2. Luo's Reports

In June 2021, "Luo met with [ ] Plaintiff to raise concerns about the research team" (id. ¶ 187), "anti-Asian hate, bullying, . . . harassing, [and a] toxic work environment" (id. ¶ 188 (internal quotation marks omitted)). "Luo likewise [stated] that

[ ] Plaintiff . . . had 'silenced' [Dr.] Godoy by 'lying' and 'covering[] up' for [Dr.] Wretman." (Id. ¶ 188.) Shortly thereafter, "Plaintiff reported Luo's concerns . . . to [UNC-CH's] EOC [office]" (id. ¶ 192).

Following Luo's report, Plaintiff sought "guidance from [multiple UNC-CH administrators] . . . about how to manage [Luo's] workplace activities" (id. ¶ 198). "The guidance [ ] Plaintiff received was inconsistent." (Id.) Administrators instructed Plaintiff "to first receive a determination from EOC . . . before . . . return[ing Luo] to work activities fully" (id. ¶ 200), with one administrator "strongly recommend[ing] against [ ] Plaintiff['s] conducting [ ] an evaluation of Luo given the uncertain situation" (id. ¶ 203) and others "indicat[ing] that [ ] Plaintiff was required to complete Luo's evaluation but that she could have additional time to do so" (id. ¶ 204). In August 2021, "Plaintiff completed Luo's performance evaluation . . . [and] rated Luo's performance as either meeting or exceed[ing] expectations in all aspects . . . ." (Id. ¶ 206.)

In October 2021, OHR interviewed Luo (see id. ¶ 211), and, in November 2021, "Plaintiff received a [n]otice . . . from OHR indicating that Luo alleged that [ ] Plaintiff had violated [UNC-CH's] retaliation policy" (id. ¶ 219), as well as that she "had changed her supervision style, cancelled meetings, failed to provide timely communications, failed to timely administer Luo's

performance evaluation, and provided an inaccurate reflection of Luo's work in her performance evaluation" (id. ¶ 222 (internal semi-colons replaced with commas)). The notice further "declared that [UNC-CH] was investigating [ ] Plaintiff for violations [of its] nepotism policy based on Luo's statements" (id. ¶ 226) but "contained no information about what actions or inactions by [ ] Plaintiff had led to the allegation of nepotism" (id. ¶ 227).

"Luo also asserted allegations against [Dr.] Wretman at this time, which likewise resulted in a[ similar notice sent] to him . . . [in] November [ ] 2021." (Id. ¶ 220.) "[Defendant] Denby-Brinson was named as the Administrative Advisor on [ ] Plaintiff's and [Dr.] Wretman's [notices], [ ] a role [in which] she would serve throughout the duration of OHR's investigations against both." (Id. ¶ 225.)

### 3. Reports of Relationship with Dr. Wretman

In March 2022, "OHR notified [ ] Plaintiff that she was being investigated for a report concerning [ ] improper relations with a student because of her relationship with [Dr.] Wretman based on something [Dr.] Godoy, or possibly another reporting party, had indicated in their investigation interviews." (Id. ¶ 268 (parentheses omitted).) "[I]t was never made clear by OHR how such an allegation emerged following [Dr.] Godoy's and/or Luo's reports, particularly because the [notice] contained no information about

what actions or inactions had led to the allegation of [improper relations with a student]." (Id. ¶ 270.)

**D. OHR Findings and Discharge Recommendation**

"Via an email[ ] received [by Plaintiff] on or about May 6, 2022, from [Defendant] Hall, OHR declared that investigators had determined by a preponderance of evidence that [ ] Plaintiff had violated the nepotism policy, the I[mproper Relationships Between Students and Employees ('IRBSE')] policy, and the [retaliation] policy as alleged by [Dr.] Godoy, but [that] there was not a preponderance of evidence that [ ] Plaintiff had violated [the retaliation] policy as alleged by Luo." (Id. ¶ 372.) Sometime thereafter, "[Defendants] Clemens and Denby-Brinson alone determined that [ ] Plaintiff should be recommended for discharge from her faculty position and tenure." (Id. ¶ 376.) "On or about June 15, 2022, [ ] Plaintiff received a written notice of intent to discharge from [Defendant] Clemens[, which] also placed Plaintiff on administrative leave." (Id. ¶ 380.) She then "requested a faculty hearing to appeal [that] recommendation." (Id. ¶ 381.)

**E. Reports of Plaintiff's COI**

"[A]bout three weeks after [ ] Plaintiff [ ] requested a faculty hearing in her OHR matters, . . . [Defendant] Bryde [and another individual] informed [ ] Plaintiff that there would be a review for a violation of [ ] UNC-CH's [Conflict of Interest ('COI') p]olicy, concerning a 2019 grant-funded study, . . . which

was supported by the . . . Department of Justice (DOJ)." (Id. ¶ 387 (some internal parentheticals omitted).) "Relevant to the alleged COI [violation], the [study's] research team included, among others, [Dr.] Wretman . . . as a formal and funded research collaborator, as well as [ ] Plaintiff as the lead Principal Investigator. This working arrangement was normal for [ ] Plaintiff [and Dr.] Wretman based on past work." (Id. ¶ 389.)

"The COI Office's 2022 review revealed that the [applicable] DOJ guidelines . . . prohibit intimate partners from working on research teams where one partner is the lead." (Id. ¶ 390.) "The [ ] text [of] the [ ] DOJ [ g]uide[lines ] had never been provided to [ ] Plaintiff before her July 2022 meeting with [Defendant] Bryde [ ], including when she received the funding award, but [ ] was cited in the COI finalization letter . . . ." (Id. ¶ 393; see also id. ¶¶ 394 (alleging that, in 2019, "all that was provided to [ ] Plaintiff" was a list of "[s]ome examples of . . . conflict situations" which did not include the relevant DOJ guidelines (internal quotation marks omitted)), 397 (alleging that "the UNC-CH COI Office had [n]ever provided [Plaintiff] with the [DOJ g]uide[lines]"), 398 (alleging that, in early 2022, "[t]he project passed [ ] review perfectly well, with no concerns raised").) "Despite all these circumstances, [Defendant] Bryde alleged that [ ] Plaintiff had not adequately disclosed information about her

personal relationships [sic] with [Dr.] Wretman when she sought the grant that funded the research project." (Id. ¶ 400.)

### **F. COI Finding and Amended Discharge Recommendation**

In October 2022, "the COI Office communicated its determinations that [ ] Plaintiff [ ] violated the COI [p]olicy." (Id. ¶ 401.) In January 2023, "[Defendant] Clemens amended his notice of intent to discharge [Plaintiff,] setting forth the finding of the [COI policy] violation . . . as an additional reason for discharge" (id. ¶ 407) despite, "[o]n information and belief, . . . the fact that no faculty member had ever been discharged from their employment for such a COI policy violation before" (id. ¶ 408; see also id. ¶ 467 (alleging that faculty member testified to existence of "'[another] couple[ who] published together throughout [one] person's career until [that person] graduated'")). "Plaintiff again requested a faculty hearing to appeal [Defendant] Clemens's recommendation." (Id. ¶ 409.)

### **G. Faculty Hearing and Recommendation**

"[T]he hearing was held . . . from on or about March 25, 2024 through on or about May 29, 2024" (id. ¶ 442), and, "[f]ollowing [its] completion [ ], the F[aculty Hearing Committee] developed [a] report . . . contain[ing] the following determinations" (id. ¶ 447): that "[e]xactly half of the [ ] panel . . . found that [ ] UNC-CH [ ] met its burden to present clear and convincing evidence of [ ] Plaintiff's violation of the retaliation [policy while]

. . . [e]xactly half of the [ ] panel . . . found that the administration did not meet its burden" (id. ¶ 448), that UNC-CH failed to prove under the same standard "that [ ] Plaintiff . . . violated the nepotism policy" (id. ¶ 450), that UNC-CH "did not meet its burden" under the same standard as to "Plaintiff['s] violat[ion of] the IRBSE policy" (id. ¶ 451), and that UNC-CH "met its burden" under the same standard as to "Plaintiff['s] violat[ion of] the COI [p]olicy" (id. ¶ 452).

**H. Defendant Roberts's Discharge Decision**

Despite the panel's determinations in Plaintiff's favor and its "unanimous[] recommend[ation] that [ ] Plaintiff [receive sanctions but] not be discharged" (id. ¶ 458; accord id. ¶ 453), "[Defendant] Roberts notified the [Faculty Hearing Committee] of his disagreement with th[ose] recommendations" (id. ¶ 459). In an August 2024 letter, Defendant Roberts stated that he "disagreed with the [Faculty Hearing Committee's] . . . findings concerning the [retaliation] allegation, the IRBSE allegation, and [its] recommendation that [ ] Plaintiff not be discharged." (Id. ¶ 461; see also id. ¶ 459.) After "the [Faculty Hearing Committee] responded to [Defendant Roberts's letter by] . . . affirm[ing its] recommendations and votes" (id. ¶ 469), "on or about September 19, 2024, [ ] Plaintiff received [Defendant] Roberts's notice of discharge, which declared [Defendant] Roberts's assessment that [ ]

Plaintiff [ ] violated the COI [p]olicy, the IRBSE [policy], and the [retaliation policy]" (id. ¶ 470).

### I. Plaintiff's Appeal

In October 2024, "Plaintiff submitted an appeal" of Roberts's decision (id. ¶ 474), of which "the [Board of Trustees ] agreed to consider portions" (id. ¶ 475; see also id. ¶¶ 476-82 (alleging information excluded from appeal without explanation)). "Consistent with policies, . . . [Defendant Roberts] submit[ted] a written response to [ ] Plaintiff's appeal" (id. ¶ 484; see also id. ¶ 485) substantively "[s]imilar to his [earlier] letter of disagreement" (id. ¶ 486). "[I]n a letter dated August 15, 2025" (id. ¶ 494), "the B[oard of Trustees] panel determined that [ ] Plaintiff had not met [her] burden to show clear and material error with respect to [Defendant] Robert's [sic] decision to terminate her" (id. ¶ 495).[3]

### J. Alleged Procedural Deficiencies

#### 1. Investigation

With respect to Defendants' investigation into Plaintiff's alleged misconduct, between November 2021 and April 2022, "OHR investigators [ ] held interviews . . . ostensibly concerning [Dr.]

---

3 "On August 21, 2025, [ ] Plaintiff received a second letter" (id. ¶ 506) which "corrected [an] error" in the first letter (id. ¶ 510; see also id. ¶ 508 ("The first letter erroneously stated . . . that [UNC-CH] had met its burden [as to an IRBSE violation] . . . when in fact th[e panel ] unanimously determined [otherwise.]" (internal quotation marks omitted))).

Wretman's conduct" (id. ¶ 274) during which "[P]laintiff and her alleged conduct were also discussed multiple times, thus representing a great mixing of both responding parties and allegations" (id. ¶ 275). "In addition, OHR's investigations of [ ] Plaintiff and [Dr.] Wretman both bear the same case number, and all the OHR investigation interviews were led almost universally by the same two OHR employees, [Defendants] Enlow and James-Whidbee." (Id. ¶ 276 (parenthetical omitted).)

Further, "investigators asked reporting parties and witnesses questions that were not associated with UNC-CH policies, which resulted in individuals making aspersions against [ ] Plaintiff that were not based in fact nor [sic] evidence." (Id. ¶ 277; see also id. ¶¶ 278-90 (alleging several false or inaccurate statements made by Dr. Godoy, Luo, and others to investigators), 723-32 (alleging "procedurally defective and biased investigation [ ] designed to support [ ] predetermined conclusion that Plaintiff was responsible for [ ] alleged misconduct").) Similarly, "the investigators asked Luo broad questions that were not associated with specific UNC-CH policies, and which led Luo to make disparaging statements against [ ] Plaintiff that were not based in fact nor [sic] evidence" (id. ¶ 215).

Moreover, "upon information and belief, around the same time [as Luo's OHR interview], Luo began contacting other UNC-CH employees . . . to invite them into OHR actions against Plaintiff

and [Dr.] Wretman." (Id. ¶ 212). Relatedly, also "[o]n information and belief, . . . both before and after [Dr. Godoy's] OHR interview, [Dr.] Godoy was reaching out to other doctoral students . . . to draw additional individuals into OHR complaints against [Dr.] Wretman and [ ] Plaintiff" (id. ¶ 235), while "gossip and speculation [about these] matters . . . [spread] among SSW [ ] students [and] faculty" (id. ¶ 236).

Additionally, "[t]ranscripts from investigation interviews show that Luo communicated [ ] and shared information with other reporting parties and witnesses, despite written OHR guidance to the contrary." (Id. ¶ 229). Consistent with that evidence, "on information and belief, . . . Plaintiff['s ] investigat[ion] for nepotism was known throughout [sic] those involved in the OHR investigations even before they were interviewed by OHR" (id. ¶ 230), "the wider SSW community came to know about this investigation of nepotism due to OHR's breach of . . . confidentiality" (id. ¶ 231), and "Plaintiff's confidential OHR matters were being widely discussed in the SSW community" (id. ¶ 291; see also, e.g., id. ¶¶ 232 ("The biasing nature of this policy and legal violation was compounded by the fact that ultimately none of Luo's retaliation allegations against [ ]



Case 1:25-cv-00953-LAF-LPA Document 22 Filed 09/03/26 Page 14 of 76

Plaintiff were founded . . . ."), 296 ("Such an environment at the SSW was biasing of investigatory activities . . . .")).[4]

### 2. OHR Findings and Discharge Recommendation

In finding that Plaintiff had violated the discrimination and harassment policies, "OHR erroneously declared that [ ] Plaintiff became aware of [Dr.] Godoy's EOC/Title IX reports of April 2021 through a meeting with [a] Title IX [c]oordinator, [ ] when [in fact] it came via [Defendant] Chapman." (Id. ¶ 303.) Plaintiff "was told [in May 2021] . . . that [the] matter [involving Dr.] Godoy was done and not further actionable" (id. ¶ 305), and "Plaintiff was never informed that [Dr.] Godoy's reports were not resolved" (id. ¶ 307), such that Plaintiff "had no knowledge [ ] of [Dr.] Godoy's re-engagement with OHR . . . when [Plaintiff] sent her email on February 13, 2022" (id. ¶ 308).

4 Additionally, "[i]n November 2021, . . . [Plaintiff reported] that she was experiencing retaliation . . ., as she was being excluded from research studies by others involved in the OHR matters." (Docket Entry 1-3, ¶ 411.) And, "[i]n January 2022, [ ] Plaintiff reported concerns about EOC processes . . . [to] UNC-CH's official whistleblower reporting system." (Id. ¶ 413.) After "Plaintiff [again] made a report of EOC concerns and [retaliation] violations" in June 2022 (id. ¶ 418) and "in January 2023" (id. ¶ 425), Plaintiff learned in August 2023 "that no action would be taken, and that she should direct any concerns to her faculty hearing" (id. ¶ 427; see also id. ¶¶ 420-22 (alleging existence of EOC assessor's conflict of interest impacting ability "to conduct an unbiased EOC assessment"), 423 (alleging "errors of fact and omission" in assessment report), 431 (alleging failures to communicate with Plaintiff or to "gather[] any information from her about [ ] EOC concerns")).

Further deficiencies in OHR's findings regarding retaliation include: "[Defendant] Chapman['s] . . . deci[sion] to stop responding to [ ] Plaintiff's communications about OHR matters" (id. ¶ 309), UNC-CH's failure to "inform[ Plaintiff] that [Dr.] Godoy had been given [a support person as] an accommodation . . . [while] enroll[ed] in [a] course [Plaintiff taught]" (id. ¶ 313), OHR's "erroneous[] assert[ion] that . . . Plaintiff [knew] about [Dr.] Godoy's protected activity in[] February 2022" (id. ¶ 315), and the absence of a proper basis for finding "a materially adverse action" (id. ¶ 320; see also id. ¶¶ 321 (alleging consideration of irrelevant factors), 324 (same), 329 (alleging that OHR failed to find that Plaintiff acted with intent to retaliate), 332 (alleging that "OHR ignored [its] own [g]uidelines"), 333 (alleging that OHR failed to show that "Plaintiff's single email would be discouraging to a reasonable person, [as] is required" by applicable policy), 339-43 (alleging that OHR ignored relevant evidence favorable to Plaintiff)).

Next, "[a]lthough OHR's finding that [ ] Plaintiff [ ] violated the nepotism policy was overturned at a future step in [ ] Plaintiff's processes, [ ] the investigation of this issue was biasing of other processes and matters" (id. ¶ 347) and, for myriad reasons, OHR failed to support its nepotism finding with adequate evidence (see id. ¶¶ 348 (alleging deviation from relevant policy), 349-54 (alleging that OHR "disregarded" certain testimony and

potential evidence derived therefrom), 355-56 (alleging erroneous reliance on "vague, speculative [ ] statement[s]"), 359-60 (alleging contradictory policy interpretations)). Likewise, OHR failed to support its finding of an IRBSE violation with evidence. (See id. at 56; see also id. ¶¶ 361-69 (alleging omission of relevant details), 370-71 (alleging "unclear analysis" and reliance on inaccurate information).) And, as to OHR's discharge recommendation, Defendants failed to "g[i]ve [ ] Plaintiff an opportunity to respond to the OHR report nor [sic] present reasons why she should not be recommended for discharge." (Id. ¶ 378.)

**3. Faculty Hearing and Recommendation**

Multiple deficiencies occurred in connection with Plaintiff's faculty hearing, including improper pre-hearing procedures (see id. ¶ 437-40 (alleging improper offer to proceed with four-member panel)), insufficient time for "full presentation" (id. ¶ 445; see also id. ¶ 446 (alleging that "Plaintiff and her attorney ran out of time")), disproportionate penalties (see id. ¶ 454), and "error[s] of fact . . . [and] omission" in the Faculty Hearing Committee's report (id. ¶¶ 456-57).

**4. Defendant Roberts's Discharge Decision**

"[Defendant] Robert's [sic] letter [contained ] erroneous analysis" (id. ¶ 462), failed to "evidence a materially adverse action" (id. ¶ 463) or "inten[t]" on Plaintiff's part (id. ¶ 464; accord id. ¶ 465), and failed to consider relevant information and

"factors" (id. ¶ 466; see also id. ¶¶ 467-68). Further, "[o]n information and belief, [Defendant] Roberts deferred to [Defendant] Denby-Brinson as part of his decision-making about [ ] Plaintiff, which led to hi[s] overruling the [Faculty Hearing Committee], despite . . . [p]olicies stating that the [c]hancellor shall consider only the written transcript of the hearing and the report of the [Faculty Hearings Committee]." (Id. ¶ 473.)

**5. Plaintiff's Appeal**

In agreeing to consider portions of Plaintiff's appeal (see id. ¶ 475), the Board of Trustees failed to "explicate" as to "[w]hy some grounds were not accepted as a basis for appeal" (id. ¶ 482; see also id. ¶¶ 476-81 (alleging particular excluded information)). Moreover, "[Defendant] Roberts's letter [addressing Plaintiff's appeal] contained errors of fact, overlooked key facts concerning the processes, and misrepresented events." (Id. ¶ 486; see also id. ¶¶ 487-92 (alleging examples), 508 (same), 507 (alleging "error in fact and analysis").) Additionally, the Board of Trustees failed to consider certain documents relevant to Plaintiff's appeal (see id. ¶¶ 498-503), the Board of Trustees' chair expressed "a biased" statement against Plaintiff (id. ¶ 505) "outside a formal communication and meeting of the [Board of Trustees]" (id. ¶ 504), and Plaintiff's receipt of a corrected letter "suggest[s] bias and a profound misunderstanding of the facts of [ ] Plaintiff's matters" (id. ¶ 511).

### 6. Policy Violations

"[P]rocedural violation[s]" (id. ¶ 517) arose regarding the following policies:

- the discrimination and harassment policy (see id. ¶¶ 517-21 (alleging failure to explain retaliation policy), 522-30 (alleging "unfair and biased" investigation, in that "Plaintiff's case was treated as the same case as [Dr.] Wretman['s]"), 531-35 (alleging insufficient opportunities "to be heard, [ ] submit information, and [ ] identify witnesses"), 536-38 (alleging Defendant Chapman's improper "influence[ on] investigation[]"), 539 (alleging failure to exclude "immaterial information gathered from a biased third[ ]party"), 540-46 (alleging failure to "safeguard [Plaintiff's] privacy" (internal quotation marks omitted)), 547-48 (alleging wrongful "omi[ssion of] witnesses and witness statements . . . that were exonerative"), 549-57 (alleging failure to follow "disciplinary recommendation" procedures), 663b. (alleging that "investigation against Plaintiff . . . disregarded . . . procedural protections"), 664b. (alleging that "investigators disregarded certain provisions" of retaliation policy));

- EOC "guidelines concerning investigations" (id. ¶ 558; see also id. ¶¶ 559-61 (alleging that "[Defendant] Denby-Brinson's roles . . . created a biasing conflict of interest"), 562-64 (alleging that "OHR investigators neglected to note" Plaintiff's ability to communicate with others to protect her interests "in their report"), 565-67 (alleging confidentiality violations));

- the "[c]onflicts of [i]nterest" policy (id. ¶ 568; see also id. ¶¶ 569-74 (alleging shortcomings in Defendants' "review" and "investigation"), 575-76 (alleging failure to recommend disciplinary action), 577-81 (alleging failure to "provide [ ] guidance" or credit "Plaintiff's efforts to seek [ ] guidance"));

- "[t]enure [p]olicies" (id. ¶ 582 (internal quotation marks omitted); see also id. ¶¶ 582-85 (alleging wrongful "inclusion" of "evidence related

to [Dr.] Wretman's case" at Plaintiff's hearing), 586-88 (alleging "[Defendant] Denby-Brinson's [improper] presence" at hearing), 589-98 (alleging "viola[tions of] Plaintiff's right to present [ ] testimony [ ] and other evidence" and "confront and cross-examine adverse witnesses"), 599-602 (alleging improper "[s]plitting of [ ] votes"), 603-05 (alleging improper consideration of "exhibits not discussed in [ ] hearing transcript or [ ] report"), 606-17 (alleging that "the B[oard of Trustees] refused to consider" procedural requirements and relevant evidence)); and

- "[t]rustee [p]olicies" (see id. ¶ 637; see also id. ¶¶ 637-41 (alleging that chairman's letter failed to consider required factors and reached "unreasonable" conclusion)).

**7. External Circumstances**

Finally, "UNC-CH adopted [its discrimination and harassment policy] in an effort to lower the protections for females accused of sexual misconduct" (id. ¶ 664a), including "to avoid enforcement by [DOJ's] Office of Civil Rights[ and] . . . to avoid rescission of federal funds" (id.). "[B]eginning with President Barack Obama's Dear Colleague Letter of 2011, . . . the United States Department of Education (DOE) has enacted considerable shifts in how it requires universities that receive federal funding to respond to alleged violations of civil rights" (id. ¶ 135), and "UNC-CH has received particular scrutiny and sanctions from the DOE" (id. ¶ 136) and became "embroiled in high profile controversies during the time of [ ] Plaintiff's [disciplinary] matters" (id. ¶ 146). "On information and belief, the severity of th[o]se sanctions . . . and the related public relations damages resulted in UNC-CH

shifting into practices that overcorrected how they [sic] carried out activities related to [its discrimination and harassment policy] and Title IX" (id. ¶ 144), such that, "[u]pon information and belief, [a] statistically [ ] overwhelming majority of investigations that have ever been conducted by [UNC-CH] into an alleged violation of [its harassment policy] have involved female respondents" (id. ¶ 664a.iv.).[5]

**II. Procedural History**

After Plaintiff brought suit against Defendants in the North Carolina Superior Court in Orange County (see Docket Entry 1-2 at 1), Defendants removed the matter "pursuant to 28 U.S.C. §§ 1331, 1441, and 1446" (Docket Entry 1 at 2). Against all Defendants, the Complaint brings claims for "unlawful procedures" (Docket Entry 1-3 at 79),[6] "arbitrary decision, capricious decisions, and abuse of discretion" (id. at 93), "violation of Title IX[,] 20 [U.S.C. §] 1681 [('Title IX')]" (id. at 99), "violation of 42 U.S.C. § 1983 [('Section 1983')] — denial of due process and conspiracy" (id. at 103), and "civil conspiracy" (id. at 117). Against UNC-CH, the Complaint brings claims for "breach of contract" (id. at 107),

5 The Complaint also alleges that "racial tensions and accusations of discrimination have been longstanding difficulties within the SSW." (Id. ¶ 114; see also id. ¶¶ 115-34 (alleging examples "highly consistent with [ ] social justice framework . . . [in] social work higher education").)

6 This quotation and subsequent claim-identification quotations omit all-caps and bold font, as well as underscoring.

"violation[s] of [the North Carolina] state constitution (id. at 116), and, against UNC-CH and Defendant Hall, for "negligent hiring, supervision and retention" (id. at 111). Lastly, against Individual Defendants, the Complaint brings claims for "intentional infliction of emotional distress" (id. at 113) and "negligent infliction of emotional distress" (id. at 114). The Complaint requests damages and Plaintiff's "restor[ation] to her full employment with backpay." (Id. at 118.)

Defendants moved to dismiss the Complaint pursuant to, inter alia, Federal Rule of Civil Procedure (the "Rules") 12(b)(6) (see Docket Entry 12 at 1; see also Docket Entry 13 (the "Redacted Supporting Brief")), Plaintiff responded in opposition (see Docket Entry 19 (the "Opposition Brief")), and Defendants replied (see Docket Entry 21 (the "Reply")). Defendants also moved to seal portions of two exhibits submitted with the Motion to Dismiss (see Docket Entries 12-1, 12-2, 15, 16) and portions of the Redacted Supporting Brief (see Docket Entry 17 (the "Unredacted Supporting Brief")) that reference those exhibits. (See Docket Entry 14.)

## DISCUSSION

### I. Motion to Seal

#### A. Relevant Standards

"[T]he courts of this country recognize a general right to inspect and copy . . . judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). "The right of

public access to documents or materials filed in a district court derives from two independent sources: the common law and the First Amendment." Virginia Dep't of State Police v. Washington Post, 386 F.3d 567, 575 (4th Cir. 2004). "While the common law presumption in favor of access attaches to all 'judicial records and documents,' the First Amendment guarantee of access has been extended only to particular judicial records and documents." Stone v. University of Md. Med. Sys. Corp., 855 F.2d 178, 180 (4th Cir. 1988) (citation omitted) (quoting Nixon, 435 U.S. at 597).

"[T]he right of public access, whether arising under the First Amendment or the common law, may be abrogated only in unusual circumstances." Doe v. Public Citizen, 749 F.3d 246, 266 (4th Cir. 2014) (internal quotation marks omitted). As the Fourth Circuit has explained, "public access promotes not only the public's interest in monitoring the functioning of the courts but also the integrity of the judiciary," as it "serves to promote trustworthiness of the judicial process . . . and to provide the public with a more complete understanding of the judicial system, including a better perception of fairness." Id. (internal quotation marks omitted); see also id. ("The political branches of government claim legitimacy by election, judges by reason. Any step that withdraws an element of the judicial process from public view makes the ensuing decision look more like a fiat and requires rigorous justification." (internal quotation marks omitted)).

Therefore, as a "[g]eneral[ matter], courts have been hesitant to seal or redact information that will 'play a role in the adjudicative process or adjudicate substantive rights.'" Russe v. United States, No. 1:20CV92, 2022 WL 11965612, at *4 (W.D.N.C. Oct. 20, 2022) (quoting In re U.S. for an Order Pursuant to 18 U.S.C. Section 2703(D), 707 F.3d 283, 290 (4th Cir. 2013)); see also, e.g., Scott v. City of Durham, No. 1:20CV558, 2022 WL 767557, at *2 (M.D.N.C. Mar. 14, 2022) (explaining that, in evaluating sealing request, "the court also considers whether the public needs access to the materials to understand a judicial decision").

Under the First Amendment, "access [to judicial records] may be restricted only if closure is necessitated by a compelling government interest and the denial of access is narrowly tailored to serve that interest." Public Citizen, 749 F.3d at 266 (internal quotation marks omitted). In turn, the common-law "presumption [of access] can be rebutted only by showing that countervailing interests heavily outweigh the public interests in access." Id. (internal quotation marks omitted). Under either standard, "[t]he burden of establishing that a particular document should be sealed rests on the party promoting the denial of access." United States v. Moussaoui, 65 F. App'x 881, 889 (4th Cir. 2003).[7] The more

---

7 This framework also "applies to requests by a party to file a redacted document, i.e., a document sealed in part." Mr. Dee's Inc. v. Inmar, Inc., No. 1:19CV141, 2021 WL 3809256, at *2 (M.D.N.C. Aug. 26, 2021).

rigorous First Amendment standard applies to attachments to dispositive motions, including "documents submitted with a motion to dismiss." Heward v. Board of Educ. of Anne Arundel Cnty., Civ. Action No. 23-195, 2023 WL 6067072, at *2 (D. Md. Sept. 15, 2023). Therefore, the Unredacted Supporting Brief and both exhibits generally would trigger "the right of access granted by the First Amendment, because they were filed in connection with a motion to dismiss." ATI Indus. Automation, Inc. v. Applied Robotics, Inc., 801 F. Supp. 2d 419, 427 (M.D.N.C. 2011).

As a matter of procedure, the Court "must give the public notice of the request to seal and a reasonable opportunity to challenge the request." Washington Post, 386 F.3d at 576.[8] Then, "it must consider less drastic alternatives to sealing." Id. Ultimately, "if it decides to seal[, the Court] must state the reasons (and specific supporting findings) for its decision and the reasons for rejecting alternatives to sealing." Id. "Adherence to this procedure serves to ensure that the decision to seal materials will not be made lightly and that it will be subject to meaningful appellate review." Id. This approach also reflects the reality that "[t]he operations of the courts and the judicial conduct of

8 Here, the Motion to Seal has remained on the public docket since its filing in December 2025, with no objections filed thereto. (See Docket Entries dated Dec. 1, 2025, to present.) Thus, the undersigned deems the initial procedural step for sealing satisfied, as all interested persons have received "notice of the request to seal and a reasonable opportunity to challenge the request," Washington Post, 386 F.3d at 576.

judges are matters of utmost public concern," Landmark Commc'ns, Inc. v. Virginia, 435 U.S. 829, 839 (1978), as well as that "the public's business is best done in public," Cochran v. Volvo Grp. N. Am., LLC, 931 F. Supp. 2d 725, 727 (M.D.N.C. 2013).

Finally, under this Court's Local Rules, "[s]ealing is [d]isfavored," M.D.N.C. LR 5.4(a), and parties "should not [ ] file[ sealed documents] unless necessary for determination of the matter before the Court," M.D.N.C. LR 5.4(a)(3); see also M.D.N.C. LR 5.4(a)(5) ("The [relevant] provisions of [the Local Rules] are intended to minimized the filing of sealed documents, to protect the public right of access, to ensure the docket is clear so that documents can be found easily, and to allow for review of motions to seal in a way appropriate for the case and that reduces cost, time, and confusion.").

**B. Defendants' Sealing Requests**

"Defendants [have] request[ed] that th[e] Court seal portions of [two e]xhibits [submitted with the] Motion to Dismiss and [ ] portions of [the Redacted S]upporting Brief that reference the sealed portions of those exhibits." (Docket Entry 14 at 1.) The first exhibit consists of an "April 14, 2022 EOC Investigation Report" (id. at 3) spanning 40 pages (see Docket Entry 15), 26 of which contain information that Defendants have marked for redaction (see id.); the second exhibit consists of an "August 12, 2024 letter by [Defendant] Roberts regarding the findings of the Faculty

Hearing Committee" (Docket Entry 14 at 3), and Defendants have marked information on four of its seven pages for redaction (see Docket Entry 16). The Unredacted Supporting Brief quotes and cites both exhibits in its "Statement of Facts" (Docket Entry 17 at 3 (all-caps font and emphasis omitted); see also id. at 5-7, 10).

According to Defendants, these materials warrant sealing by redaction "[b]ecause the[] exhibits reference non-party UNC-CH students and employees" (Docket Entry 14 at 2) and "include student education records [ ] protected by federal privacy laws and personnel information [ ] protected by state statute" (id. at 3). Plaintiff consents to the Motion to Seal. (See id. at 1.) However, because neither the exhibits in question nor the portions of the Unredacted Supporting Brief that recount them provide information "necessary for determination of the [Motion to Dismiss]" M.D.N.C. LR 5.4(a)(3), the Court (per the undersigned) will deny the Motion to Seal and will order the exhibits and Unredacted Supporting Brief stricken.

As noted above, the Unredacted Supporting Brief quotes from and cites to both redacted exhibits in its "Statement of Facts" (Docket Entry 17 at 3 (all-caps font and emphasis omitted); see also id. at 5-7, 10). Yet, the Unredacted Supporting Brief argues for dismissal without referencing the contents of those exhibits (see id. at 11-30; accord Docket Entry 17 at 11-30); instead, Defendants staked their arguments "on the facts as alleged" (Docket

Entry 13 at 25; accord Docket Entry 17 at 25). (See also, e.g., Docket Entry 13 at 18 (seeking dismissal of Section 1983 claims based on "[Plaintiff's] own allegations").) In other words, Defendant never should have filed these exhibits or referenced them in the Unredacted Supporting Brief because they do not perform any function necessary to the determination of the Motion to Dismiss. See M.D.N.C. LR 5.4(a)(3).[9] And, with respect to the 40-page exhibit, Defendants further contravened this Court's Local Rules, see M.D.N.C. LR 7.1(c) ("[V]oluminous materials should not be submitted for filing . . . unless such materials are essential.").

The Court (per the undersigned) therefore will (A) "order [Docket Entries 15, 16, and 17] stricken," id.; see also Six v. Generations Fed. Credit Union, 891 F.3d 508, 519 (4th Cir. 2018) (noting district courts' "inherent powers, not conferred by rule or statute, to manage their own affairs so as to achieve the orderly and expeditious disposition of cases" (internal quotation marks omitted)). The Redacted Supporting Brief shall remain on the public docket, as it redacts only information immaterial to Defendants' arguments in support of the Motion to Dismiss.

---

9 Additionally (as the analysis that follows above shows), the Complaint "fail[s] to state a plausible claim for relief as to [its] federal claims even without consideration of Defendants' exhibits, and thus, th[e C]ourt need not decide whether it has the authority to [consider them]," Wretman v. University of N.C. Sys., No. 1:24CV233, 2025 WL 1797220, at *4 n.4 (M.D.N.C. June 30, 2025).

## II. Motion to Dismiss

Defendants moved for dismissal of the Complaint "pursuant to Rules 12(b)(1), 12(b)(2), and 12(b)(6)" (Docket Entry 12 at 1), on the grounds, inter alia, that (A) the Section 1983 claims (i) "are entirely barred by Defendants' sovereign immunity" (Docket Entry 13 at 11; see also id. at 15 ("U[niversity] Defendants and [Individual Defendants] sued in their official capacities are immune from claims arising under [Section ] 1983.")), "[b]ut even if not, [(ii) Plaintiff] has failed to plausibly allege any constitutional violation" (id. at 11), and (B) the "Title IX claim[s] fail[] on the facts as alleged" (id. at 25).[10] The rule provisions invoked by Defendants provide for dismissal for "lack of subject-matter jurisdiction," Fed. R. Civ. P. 12(b)(1), "lack of personal jurisdiction," Fed. R. Civ. P. 12(b)(2), and "failure to state a claim," Fed. R. Civ. P. 12(b)(6), respectively.

---

10 Defendants also have argued that (A) Plaintiff's "failure to exhaust her administrative remedies" (Docket Entry 13 at 15) prevents the Court from exercising jurisdiction over her "first and second claim[s]" (id.; see also Docket Entry 1-3 at 79-99 (asserting, under North Carolina law, "first claim" for "unlawful procedures" and "second claim" for "arbitrary decision, capricious decisions, and abuse of discretion" (all-caps and bold font omitted))), and (B) Plaintiff's "state-law claims are subject to dismissal on a number of different grounds, including principles of res judicata, Defendants' sovereign immunity, [and ] failure to state any claim" (Docket Entry 13 at 12). Plaintiff has contended otherwise. (See Docket Entry 19 at 10-12, 19-32.) "Th[e C]ourt need not resolve these arguments," Wretman, 2025 WL 1797220, at *6, because (for reasons detailed in the discussion that follows above) "Plaintiff's Title IX and § 1983 claims [should] be dismissed," id., and the Court should "decline supplemental jurisdiction over Plaintiff's state law claims," id.

Starting with the last of those provisions, "[t]o survive a motion to dismiss pursuant to Rule 12(b)(6), [a] plaintiff['s] 'factual allegations must be enough to raise a right to relief above the speculative level,' thereby 'nudging [its] claims across the line from conceivable to plausible.'" Aziz v. Alcolac, 658 F.3d 388, 391 (4th Cir. 2011) (internal brackets omitted) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). When making that assessment, the Court must "accept[] all well-pleaded allegations in [ P]laintiff's [C]omplaint as true," Edwards v. City of Goldsboro, 178 F.3d 231, 244 (4th Cir. 1999), but allegations that amount to "no more than conclusions[] are not entitled to the assumption of truth," Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see also id. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). Conversely, "[a] motion under Rule 12(b)(1) raises the question of 'whether the plaintiff has a right to be in the district court at all and whether the [district] court has the power to hear and dispose of the claim.'" Hoelzer v. Board of Governors of Univ. of N.C., No. 1:20CV1072, 2022 WL 973069, at *2 (M.D.N.C. Mar. 31, 2022) (internal brackets omitted) (quoting Holloway v. Pagan River Dockside Seafood, Inc., 669 F.3d 448, 452 (4th Cir. 2012)). In turn, the limitation on a district court's exercise of personal jurisdiction "protects the individual liberty

of the parties." Jackson Creek Marine, LLC v. Maryland, 153 F.4th 423, 429 n.4 (4th Cir. 2025) (internal quotation marks omitted).

"Neither the Supreme Court nor th[e Fourth Circuit] has conclusively determined whether an Eleventh Amendment[/sovereign] immunity defense goes to a [federal] court's subject matter [or personal] jurisdiction or a plaintiff's ability to state a claim," Albert v. Lierman, 152 F.4th 554, 563 n.9 (4th Cir. 2025),[11] although the Supreme Court has called the defense a "jurisdictional bar," Pennhurst State Sch. & Hosp. v. Holderman, 465 U.S. 89, 100 (1984); see also Jackson Creek, 153 F.4th at 428 (observing that "sovereign immunity limits the grant of judicial authority in Art[icle] III" (internal quotation marks omitted)); Constantine v. Rectors & Visitors of George Mason Univ., 411 F.3d 474, 480 (4th Cir. 2005) ("Eleventh Amendment immunity has attributes of both subject-matter jurisdiction and personal jurisdiction."); Stevens v. Cabarrus Cnty. Bd. of Educ., 514 F. Supp. 3d 797, 818 (M.D.N.C.

11 "The phrase 'Eleventh Amendment immunity' is often used . . . as a convenient shorthand for state sovereign immunity. But the phrase is something of a misnomer. Cases that use the phrase 'Eleventh Amendment immunity' are generally understood as speaking about state sovereign immunity more broadly." Jackson Creek, 153 F.4th at 430 n.5 (internal citations and some quotation marks omitted); see also Edelman v. Jordan, 415 U.S. 651, 662-63 (1974) ("While the [Eleventh] Amendment by its terms does not bar suits against a State by its own citizens, th[e Supreme] Court has consistently held that an unconsenting State is immune from suits brought in federal courts by her own citizens as well as by citizens of another State."); Jackson Creek, 153 F.4th at 429 ("[S]tate sovereign immunity derives from the structure of the original Constitution itself.").

2021) ("[A] motion to dismiss based on sovereign immunity is a jurisdictional issue."). In any event, under Rule 12(b)(1) and Rule 12(b)(2) – like under Rule 12(b)(6) – "[t]he Court is to draw all reasonable inferences and resolve all factual disputes in [ P]laintiff's favor," Gulledge v. Cabarrus Cnty. Bd. of Educ., No. 1:24CV916, 2025 WL 1332311, at *2 (M.D.N.C. May 7, 2025) (internal quotation marks omitted); see also Sneha Media & Ent., LLC v. Associated Broad. Co. P Ltd., 911 F.3d 192, 196 (4th Cir. 2018) ("[W]hen considering a motion to dismiss under Rule 12(b)(2) at [the ] preliminary stage, . . . [courts] tak[e] the allegations in the light most favorable to the plaintiff."); RPR & Assocs. v. O'Brien/Atkins Assocs., P.A., 921 F. Supp. 1451, 1460-61 (M.D.N.C. 1995) ("In a Rule 12(b)(1) case, the court must give the plaintiff the same procedural protections provided under Rule 12(b)(6); thus, all the facts alleged in the complaint are drawn in the plaintiff's favor."), aff'd, Nos. 96-1130, 96-1131, 103 F.3d 120 (table), 1996 WL 680724 (4th Cir. Nov. 26, 1996).

### A. Section 1983 Claims

As a preliminary matter, the Court should note that Defendants' argument for dismissal of the Complaint's Section 1983 claims emphasizes that Plaintiff "brought [those] claims against the Individual Defendants in their official capacities only."

(Docket Entry 13 at 17 (emphasis added).)[12] In opposing dismissal of the Section 1983 claims against Individual Defendants, the Opposition Brief does not dispute that point. (See Docket Entry 19 at 12 (arguing against dismissal of Section 1983 claims against Individual Defendants but failing to address contention that Plaintiff sued them only in their official capacities); see also id. at 3 (stating that Plaintiff "sued nine individuals" and summarizing claims without mentioning capacity in which she sued them).) Nor could Plaintiff reasonably have disputed that point, as the Complaint's caption plainly (and exclusively) states that she sued each Individual Defendant in his or her "official capacity." (Docket Entry 1-3 at 1.)[13]

---

12 Although the Redacted Supporting Brief submits that "the parties agree [that] the [Complaint's S]ection 1983 claims against [I]ndividual[ D]efendants . . . should be dismissed" (Docket Entry 13 at 17 n.8), the Opposition Brief states that, "while dismissal is appropriate as to the[ Section 1983] claims against U[niversity ]Defendants[,] it would not be appropriate against [ I]ndividual[ ] Defendants" (Docket Entry 19 at 12). The undersigned therefore will proceed with further analysis.

13 Plaintiff's restriction of her claims against Individual Defendants to their official capacities appears intentional, as (A) the attorney who filed Plaintiff's Complaint (Michael C. Suczynski) (see Docket Entry 1-3 at 118 (bearing his signature)), also previously filed the complaint in the case brought by Dr. Wretman, and (B) that complaint names individuals as defendants in differing capacities, see Compl., Wretman v. University of N.C. Sys., No. 1:24CV233, Docket Entry 4, at 1 (M.D.N.C. Mar. 15, 2024) (naming Defendant Roberts "in his official capacity," Defendant Guskiewicz "individually," and Defendants Clemens, Denby-Brinson, Enlow, Hall, James-Whidbee, and Chapman (as well as others) "individually and in his[/her] official capacity"); see also id. at 81 (bearing signature of "Matthew C. Suczynski" as "Attorney[] for (continued...)

Accordingly, as to Individual Defendants, the Court need only determine whether the Complaint states Section 1983 claims against them in their official capacities. Official capacity claims "'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" Kentucky v. Graham, 473 U.S. 159, 165 (1985) (quoting Monell v. Department of Soc. Servs., 436 U.S. 658, 690 n.55 (1978)). For any damages-based

13(...continued)
[Dr. Wretman]"). Plaintiff's Section 1983 claims "[a]gainst [a]ll Defendants" (Docket Entry 1-3 at 103 (bold font and underscoring omitted)) do include two references to Individual Defendants "acting in their individual capacities" (id. ¶¶ 695, 698), but those stray references represent apparent, cut-and-paste errors made when recycling identical paragraphs from Dr. Wretman's complaint (which, as just documented, actually asserts such individual capacity claims), see Compl., Wretman, ¶¶ 415, 418. In this case, "[a]s indicated in the [Complaint's] case caption, all [I]ndividual [D]efendants are named only in their official capacities." Silver v. Garcia, No. 19CV7, 2019 WL 919012, at *1 (W.D. Tex. Feb. 25, 2019), appeal dismissed, No. 19-50253, 2019 WL 4667598 (5th Cir. July 10, 2019). "[W]hen a plaintiff does not allege capacity specifically, the court must examine the nature of the plaintiff's claims, the relief sought, and the course of proceedings to determine whether a state official is being sued in a personal capacity." Biggs v. Meadows, 66 F.3d 56, 61 (4th Cir. 1995). "Th[at ] rule does not apply to the case before [this Court]. By the rule's own terms, it applies only 'when a plaintiff does not allege capacity specifically.'" Amos v. Maryland Dep't of Pub. Safety & Corr. Servs., 126 F.3d 589, 609 (4th Cir. 1997) (quoting Biggs, 66 F.3d at 61), vacated and remanded on other grounds, 524 U.S. 935 (1998), relevant portion left in place on remand, 178 F.3d 212, 215 n.1 (4th Cir. 1999), appeal dismissed, 205 F.3d 687 (4th Cir. 2000). "Unlike the prisoner[-plaintiff] in *Biggs*, whose complaint was silent on the issue of the defendants' capacity, [Plaintiff] here alleged capacity specifically by expressly pleading that [Individual Defendants] were being sued in their official capacities." Id.; see also id. (emphasizing that, "unlike the prisoner[-plaintiff] in *Biggs*, the [plaintiffs] in th[at ] case [we]re not proceeding pro se").

claim under Section 1983, "[b]ecause an official-capacity suit is, in all respects other than name, to be treated as a suit against the entit[ies employing the officials, the] official-capacity claims [against Individual Defendants] should be dismissed as duplicative[, as the Complaint] . . . also name[s their employing entities, i.e., University Defendants] as [ ] defendant[s]." Nance v. City of Albermarle, 520 F. Supp. 3d 758, 778 (M.D.N.C. 2021) (internal quotation marks and citation omitted); see also Mitchell v. Winston-Salem State Univ., No. 1:19CV130, 2020 WL 1516537, at *6 (M.D.N.C. Mar. 30, 2020) ("All three [of the i]ndividual [d]efendants are employed by the UNC system, which is an agency of the State of North Carolina. To the extent [the p]laintiff sues [the i]ndividual [d]efendants in their official capacities, they are state officials acting in their official capacities, and therefore may not be sued under § 1983 for money damages." (internal citation and quotation marks omitted)).

Defendants also contend that "U[niversity] Defendants . . . are immune from claims arising under [Section] 1983." (Docket Entry 13 at 15; see also id. at 16-17 (developing argument for University Defendants' sovereign immunity).) "Generally, state entities such as [a public u]niversity, and its employees acting in their official capacity, are immune from suits filed pursuant to [Section] 1983." Doe v. University of S.C., No. 3:18CV161, 2018 WL 1215045, at *3 (D.S.C. Feb. 12, 2018), recommendation adopted, 2018

WL 1182508 (D.S.C. Mar. 6, 2018). Consistent with that general rule, the Fourth Circuit has "previously determined that UNC's constituent institutions, including . . . the UNC Board of Governors, may claim [sovereign] immunity from suit in federal court . . . ." Doe v. Univerity of N.C. Sys., 133 F.4th 305, 314 (4th Cir. 2025); see also id. (describing "UNC System as a single agency comprised of different constituent institutions" (internal quotation marks omitted)).

Based on that controlling authority, the Court should grant the Motion to Dismiss as to Plaintiff's Section 1983 claims against University Defendants. See id. (holding that "district court erred in denying the UNC institutions' motion to dismiss [the plaintiff's Section 1983] claims against them on sovereign immunity grounds"); see also Will v. Michigan Dep't of State Police, 491 U.S. 58, 71 (1989) ("[N]either a State nor its officials acting in their official capacities are 'persons' under § 1983."); Mitchell, 2020 WL 1516537, at *6 ("[B]ecause [a university in the UNC system] is an agency of the State of North Carolina, it is not a 'person' within the meaning of § 1983 . . . . Moreover, even if [such a university] qualified as a 'person,' the Eleventh Amendment would protect it from suit under § 1983."). That disposition applies not just to the Section 1983 claims' damages component but also to any request for injunctive relief from University Defendants, as the state sovereign immunity "bar applies regardless of the nature of

the relief sought," Pennhurst, 465 U.S. at 100. "And, as when the State [or one of its agencies] itself is named as the defendant, a suit against state officials [in their official capacities] that is in fact a suit against a State is barred regardless of whether it seeks damages or injunctive relief." Id. at 101-02.

"The landmark case of *Ex parte Young*, 209 U.S. 123 (1908), created an exception to th[at last] general principle by asserting that a suit challenging the constitutionality of a state official's action in enforcing state law is not one against the State." Green v. Mansour, 474 U.S. 64, 68 (1985) (parallel citations omitted). "*Young* also held that the Eleventh Amendment does not prevent federal courts from granting prospective injunctive relief to prevent a continuing violation of federal law." Id. (emphasis added). The Supreme Court "ha[s] refused to extend the reasoning of *Young*, however, to claims for retrospective relief." Id. (emphasis added); see also Pennhurst, 465 U.S. at 102 ("[T]he theory of *Young* has not been provided an expansive interpretation."). "In particular, [the Supreme Court consistently has] held that[,] when a plaintiff sues a state official alleging a violation of federal law, the federal court may award an injunction that governs the official's future conduct, but not one that awards retroactive monetary relief." Pennhurst, 465 U.S. at 102-03 (emphasis added); see also Biggs v. North Carolina Dep't of Pub. Safety, 953 F.3d 236, 242 (4th Cir. 2020) ("[T]he *Ex Parte*

*Young* exception to sovereign immunity . . . doesn't allow for suits against state agencies."). The Ex Parte Young exception thus "applies only when a complaint [against a state official in his/her official capacity] alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." Albert, 152 F.4th at 560 (emphasis added) (internal quotation marks omitted).

According to Defendants, "[Plaintiff] has not raised *Ex parte Young*, or made any indication in her Complaint, or briefing, that she is seeking prospective injunctive relief." (Docket Entry 21 at 6 (emphasis added) (citation omitted).) In fact, at the conclusion of the Section 1983 claims, the Complaint states that, "[a]s a result of the [denial of due process], Plaintiff is entitled to prospective relief . . . ." (Docket Entry 1-3, ¶ 697 (emphasis added).) The Complaint's prayer for relief elaborates on that statement by demanding that "Plaintiff be restored to her full employment with backpay." (Id. at 118 (emphasis added).) The Court therefore must evaluate whether Plaintiff's demand for reinstatement to her job and/or for backpay "seeks relief properly characterized as prospective," Albert, 152 F.4th at 560 (emphasis added) (internal quotation marks omitted).

"If an injunction . . . would in essence compensate a party for a past injury, then it is retrospective, not prospective, under *Ex parte Young*." Id. at 561 (emphasis added) (internal quotation marks omitted). By definition, "[Plaintiff's demand] for backpay

seeks payment of money which [s]he contends should have been paid, but was not." Dwyer v. Regan, 777 F.2d 825, 836 (2d Cir. 1985) (internal brackets, ellipsis, and quotation marks omitted). "If these sums should have been paid, they should have been paid by the State . . . and an award of backpay would necessarily have to be satisfied from State funds. Thus, [Plaintiff's] backpay [demand seeks] . . . a retroactive award which requires the payment of funds from the state treasury . . . ." Id. (emphasis added) (internal quotation marks omitted); see also, e.g., Harris Cnty. v. Kennedy, 786 F. Supp. 3d 194, 220 (D.D.C. 2025) (describing "backpay" as "retroactive relief").

As explained by the Fourth Circuit (and many other courts):

> Whether [Plaintiff's backpay demand] be legal or equitable in nature, [she ] cannot receive retrospective relief from [Individual Defendants] sued in their official capacities. Thus the Eleventh Amendment bars [her Section 1983 claims] for backpay and other forms of retroactive relief that are in reality claims against the state itself. . . . Consequently, [Plaintiff's Section 1983] claims against [ I]ndividual [Defendants] in their official capacities for [such] retroactive relief must be dismissed.

Montgomery v. Maryland, 266 F.3d 334, 340 (4th Cir. 2001) (emphasis added), vacated and remanded on other grounds, 535 U.S. 1075 (2002), opinion after remand, 72 F. App'x 17, 19 (4th Cir. 2003) (noting that the plaintiff "abandoned [her Section] 1983 claim"); see also, e.g., Fred v. Roque, 916 F.2d 37, 39 (1st Cir. 1990) ("Backpay is a retroactive award, and consequently payment thereof from [a state] may not be sought in a federal forum."); Lenea v.

Lane, 882 F.2d 1171, 1178 (7th Cir. 1989) ("[The plaintiff's backpay] claim is really one for a retroactive award of monetary relief which requires the payment of funds from the state's treasury. . . . [B]ackpay from the state is barred by the Eleventh Amendment."); Dwyer, 777 F.2d at 836 (ruling that Section 1983 claim for backpay "is barred by the Eleventh Amendment"); United Carolina Bank v. Board of Regents of Stephen F. Austin State University, 665 F.2d 553, 561 (5th Cir. Unit A 1982) ("A backpay award against a state, whether viewed as damages for illegally terminated employment or as an aspect of equitable relief is retroactive in nature and is therefore barred by the eleventh amendment. We hold, therefore, that the eleventh amendment bars this [Section 1983] suit against . . . the [individual defendants] in their official capacity . . . ." (internal citation omitted)).

On the other hand, the Fourth Circuit has held that (A) "a state employee unconstitutionally discharged from h[er] employment suffers a continuing violation of [her] property right," Republic of Paraguay v. Allen, 134 F.3d 622, 628 (4th Cir. 1998) (emphasis added) (referring to Coakley v. Welch, 877 F.2d 304, 306-07 & n.2 (4th Cir. 1989)), and (B) "reinstatement is a form of prospective relief," Bland v. Roberts, 730 F.3d 368, 390 (4th Cir. 2013); see also Immigration & Naturalization Serv. v. Lopez-Mendoza, 468 U.S. 1032, 1047 n.4 (1984) (describing "reinstatement and continued employment" as "prospective relief"); hence, Plaintiff's Section

1983 "claims for reinstatement to [her] previous employment meet the *Ex Parte Young* exception," Biggs, 953 F.3d at 243; see also Bland, 730 F.3d at 390 (agreeing "that the [defendant wa]s not entitled to Eleventh Amendment immunity to the extent [the plaintiffs] seek reinstatement"); Coakley, 877 F.2d at 306 (affirming denial of dismissal motion premised on theory that Eleventh Amendment rendered the defendant "immune from [the plaintiff's] claim for the injunctive remedy of reinstatement"). Nonetheless, "[a]s other courts have previously explained, the *Ex Parte Young* exception only authorizes suits against state officials who have the power to provide the injunctive relief requested by the plaintiff." Al-Habashy v. Virginia Dep't of Juv. Just., No. 7:13CV459, 2014 WL 4781796, at *11 (W.D. Va. Sept. 24, 2014) (citing as example Klein v. University of Kansas Med. Ctr., 975 F. Supp. 1408, 1417 (D. Kan. 1997)); accord, e.g., Lee v. Foothill-De Anza Cmty. Coll. Dist., 733 F. Supp. 3d 815, 827 (N.D. Cal. 2024); Siani v. State Univ. of N.Y. at Farmingdale, 7 F. Supp. 3d 304, 317 (E.D.N.Y. 2014); see also Ex Parte Young, 209 U.S. at 157 ("In making an officer of the state a party defendant in a suit to enjoin the enforcement of an act alleged to be unconstitutional, it is plain that such officer must have some connection with the enforcement of the act . . . .").

"District courts have therefore dismissed official-capacity claims against individual [university] administrators under *Ex*

*Parte Young* where the plaintiff failed to show that those administrators had the actual power to reinstate the plaintiff to a previous position." Smith v. University of Tex. at San Antonio, No. 23CV538, 2024 WL 4256461, at *9 (W.D. Tex. Aug. 21, 2024) (citing cases), recommendation adopted, 2024 WL 4256444 (W.D. Tex. Sept. 18, 2024); see also, e.g., Singh v. University of N.C. at Chapel Hill, 659 F. Supp. 3d 659, 679 n.9 (M.D.N.C. 2023) ("[T]here is no evidence [the defendant in question] has control over reporting [the plaintiff seeks to enjoin] and therefore the claim [against said defendant] for prospective relief . . . cannot be maintained."), appeal dismissed, No. 23-1350, 2023 WL 6374188 (4th Cir. June 20, 2023); Klein, 975 F. Supp. at 1417 ("None of the individuals that [the plaintiff] has sued has the power to provide him with the relief he seeks – reinstatement. . . . Therefore, [the plaintiff's] claims for injunctive relief against the individual defendants in their official capacities are dismissed."). As documented in the Background section, the Complaint "alleges that [Defendant Roberts] terminated [Plaintiff's] employment and that [other Individual Defendants participated in and/or] provided advice during the [disciplinary] process. This indicates that [Defendant Roberts] ha[s] hiring and firing authority over [Plaintiff's] position, but [other Individual Defendants] do[] not." Crosbie v. Utah State Univ., No. 1:25CV121, 2026 WL 222176, at *5 (D. Utah Jan. 28, 2026) (footnote omitted).

Simply put, based on the Complaint's allegations, among Individual Defendants, "only [Defendant Roberts] has the authority to reinstate [P]laintiff] . . . . Therefore, the official-capacity claims against any of the [I]ndividual [D]efendants besides [Defendant Roberts should be] dismissed." Siani, 7 F. Supp. 3d at 317; see also Crosbie, 2026 WL 222176, at *5 (ruling, as to the defendant-officials who lacked "hiring and firing authority over [the plaintiff's] position," that the plaintiff "fail[ed] to state a claim for prospective relief against any of th[ose d]efendant[-officials] in their official capacity under § 1983"); Smith, 2024 WL 4256461, at *9 (rejecting "conten[tion] that [the defendant-officials we]re proper *Ex Parte Young* defendants because [they] proposed [the plaintiff's] termination[] and[/or] . . . presented the termination action to the [officials] . . . who made the ultimate termination decision," because "past recommendation of termination does not give rise to an authority to reinstate").

The foregoing discussion reduces Plaintiff's Section 1983 claims down to – at most – a claim against Defendant Roberts, in his official capacity, for prospective relief (in the form of reinstatement) to remedy a "denial of due process" (Docket Entry 1-3 at 103 (all-caps and bold font, as well as underscoring, omitted)). Regarding that claim, the Complaint alleges that:

1) "Plaintiff, as a tenured employee at UNC-CH, faced disciplinary action that included the possibility of discharge"

(id. ¶ 674), such that "the Due Process [Clause] of the Fourteenth Amendment applied to the disciplinary processes utilized" (id.); see also id. ¶¶ 684 ("UNC's policies created a property right in Plaintiff's continued employment with [UNC-CH] . . . ."), 685 ("Plaintiff further has a constitutionally protected liberty interest because the allegations brought against [her] ultimately resulted in a discharge from UNC-CH, a sanction that will have significant and lifelong ramifications with respect to her employment and reputation.")); and

2) "[UNC] failed to afford Plaintiff the minimum procedural safeguards required by due process, before discharge" (id. ¶ 678), by (A) giving "[i]nsufficient notice of the allegations against her" (id. ¶ 688a), (B) failing to allow her "to cross-examine any of her accusers aside from the one successful Faculty Hearing wherein the result was immediately ignored by [Defendant] Roberts and the [UNC-CH Board of Trustees]" (id. ¶ 688b), and (C) using "[i]nvestigators, who . . . refused to interview witnesses provided to them by Plaintiff" (id. ¶ 688c; see also id. ¶¶ 687 (alleging that Defendants "deprived [Plaintiff] of the minimal requirements of procedural fairness, proper notice, and a meaningful opportunity to be heard"), 691 (alleging that Individual Defendants "took actions that led to [Plaintiff's] expulsion from [UNC-CH], without affording [her] proper notice and an opportunity to be heard"), 692 ("Defendant Hall knowingly violated Plaintiff's . . . rights to

notice, a meaningful opportunity to be heard, and the right to cross-examine witnesses.").

Defendants have argued that the Complaint "fails to allege any constitutional violation" (Docket Entry 13 at 18), because "[Plaintiff's] contentions that she was deprived of due process are simply unsupported by her own factual allegations" (id. at 19; see also id. at 18-20 (arguing that the Complaint's "allegations make clear that [Plaintiff] received written notice of all the allegations for which she was being investigated by EOC," "met with EOC on multiple occasions to discuss those concerns," "had meetings with the conflict-of-interest office to discuss its review," "received written reports describing both the EOC and conflict-of-interest office's determinations," "received an evidentiary hearing before a faculty panel, . . . which lasted 18 hours over a period of five days, [] during which she was represented by counsel" and "'cross-examination and questioning time was unlimited,'" following an investigation during which "EOC interviewed approximately fifteen different witnesses, including [Plaintiff] and the two reporting parties" (citing Docket Entry 1-3, ¶¶ 165, 169, 219, 226, 248-50, 266, 268, 271, 272, 274, 299-371, 387, 401-06, 442, and quoting id. ¶ 444))). A careful review of the Complaint and applicable authority supports Defendants' argument for dismissal of Plaintiff's Section 1983 claims.

"To plead a viable claim under [the Due Process Clause, Plaintiff] must allege: (1) that [s]he had a constitutionally cognizable life, liberty, or property interest; (2) that [s]he was deprived of that interest by some form of state action; and (3) that the procedures employed were constitutionally inadequate." Doe v. Virginia Polytechnic Inst. & State Univ., 77 F.4th 231, 236 (4th Cir. 2023) (emphasis added) (internal quotation marks omitted). The above (parenthetical) quotations from the Redacted Supporting Brief confirm that Defendants have not contested the sufficiency of the Complaint's allegations on those first two elements; rather, they have focused on the third element. (See Docket Entry 13 at 18-20.)

As to that element, the Court should note first that "[t]he fundamental requirements of due process are notice and an opportunity to be heard." Doe v. Virginia Polytechnic, 77 F.4th at 236 (emphasis added) (internal quotation marks omitted). When assessing compliance with those requirements in a particular case, the Court's "inquiry about the process due is flexible and depends on context." Id. In the specific context of termination of employment, the Supreme Court has explained that "[t]he tenured public employee is entitled to oral or written notice of the charges against h[er], an explanation of the employer's evidence, and an opportunity to present h[er] side of the story." Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 546 (1985); see also id.

("To require more than this prior to termination would intrude to an unwarranted extent on the government's interest in quickly removing an unsatisfactory employee."). Taking the allegations of the Complaint in the light most favorable to Plaintiff, no violation of those entitlements occurred in this case.

For starters, although the Complaint purports to predicate Plaintiff's claim for denial of due process (in material part) on supposed "[i]nsufficient notice of the allegations against her" (Docket Entry 1-3, ¶ 688a), Defendants correctly have argued that the Complaint's "allegations make clear that [Plaintiff] was informed well before her hearing of the various allegations and investigations that formed the basis for her discharge" (Docket Entry 13 at 19-20). By way of example:

1) in May 2021, Plaintiff participated in a meeting with Defendant Chapman about Dr. Godoy's "report[] that the team dynamics made her uncomfortable" (Docket Entry 1-3, ¶ 170) and that "[Dr.] Wretman made inappropriate comments" (id.), which Defendant Chapman "describ[ed ] as indicative of harassment" (id. ¶ 171);

2) "[o]n or about June 3, 2021, Luo met with [ ] Plaintiff to raise concerns about the research team and its functioning, as well as [Dr.] Wretman" (id. ¶ 187), including "concerns about 'anti-Asian hate,' 'bullying,' . . . 'harassing,' [and a] 'toxic working environment'" (id. ¶ 188);

3) "[o]n or about June 4, 2021, . . . Plaintiff reported Luo's concerns . . . via EOC's online portal" (id. ¶ 192) and thereafter "sought guidance from UNC-CH administrators about how to manage working relationships while EOC assessments of her report and Luo's concerns were made" (id. ¶ 195);

4) "[o]n November 23, 2021, [ ] Plaintiff received a Notice of Investigation (NOI) from OHR indicating [(A)] that Luo alleged that [ ] Plaintiff had violated the retaliation policy" (id. ¶ 219), (B) that "OHR [would ] investigate [ ] Plaintiff formally for retaliation for Luo's perceptions that [ ] Plaintiff allegedly had changed her supervision style; cancelled meetings; failed to provide timely communications; failed to timely administer Luo's performance evaluation; and provided an inaccurate reflection of Luo's work in her performance evaluation" (id. ¶ 222), and (C) "that OHR was investigating [ ] Plaintiff for violations [of] the nepotism policy based on Luo's statements to OHR" (id. ¶ 226);

5) in response to that NOI, "Plaintiff sought additional guidance . . . from [an] . . . Executive Director . . . in the OHR . . . as well as [Defendant ] Denby-Brinson" (id. ¶ 252), which led to "meetings in January and February 2022, with [that OHR Executive Director] and [Defendant] Denby-Brinson" (id. ¶ 253), after which Plaintiff (via e-mail to others, including Dr. Godoy) "memorialize[d] her own actions and understanding with others so that she would have defenses against any future allegations of

retaliation" (id. ¶ 254 (internal quotation marks omitted); see also id. ¶ 259 (alleging that Plaintiff's memorialization "acknowledged ongoing OHR investigations"));

6) "[o]n or about February 14, 2022, OHR administers [sic] and leaders immediately characterized [ ] Plaintiff's email as 'retaliation' in their email communications with . . . Plaintiff" (id. ¶ 265; see also id. ¶ 344 ("[O]nce [ ] Plaintiff's [sic] was informed of [Dr.] Godoy's reaction to [Plaintiff's] email, she met with [Defendant] Denby-Brinson . . . ."));

7) "[o]n or about March 9, 2022, . . . [Plaintiff] received an updated NOI indicating that [Dr.] Godoy was alleging that by sending the email . . . Plaintiff had violated the [ ] retaliation policy" (id. ¶ 266);

8) "[o]n or about March 16, 2022, OHR notified [ ] Plaintiff that she was being investigated for a report concerning IRBSE (or improper relations with a student) because of her relationship with [Dr.] Wretman" (id. ¶ 268);

9) OHR interviewed "Plaintiff on/about March 24, 2022" (id. ¶ 271; see also id. ¶ 417 (alleging that, during period of January through March 2022, OHR Executive Director "provid[ed] consultation to [ ] Plaintiff regarding her OHR investigation"));

10) "[v]ia an email, received [by Plaintiff] on or about May 6, 2022, from [Defendant] Hall, OHR declared [in a report from Defendants Enlow and James-Whidbee] that investigators had

determined by a preponderance of evidence that [ ] Plaintiff had violated the nepotism policy, the IRBSE policy, and the [retaliation policy] as alleged by [Dr.] Godoy, but there was not a preponderance of evidence that [ ] Plaintiff had violated [the retaliation policy] as alleged by Luo" (id. ¶ 372);

11) that OHR report contained detailed information about the basis for the disciplinary charges against Plaintiff (see, e.g., id. ¶¶ 303, 315, 321, 326, 348, 349, 355, 356, 357, 362, 366, 370), but "provided no disciplinary recommendation" (id. ¶ 374);

12) "[o]n or about May 12, 2022, [ ] Plaintiff met with [Defendants] Clemens and Denby-Brinson" (id. ¶ 379), who "verbally informed [ ] Plaintiff that [Defendant] Clemens was recommending [Plaintiff] for discharge from UNC-CH" (id.);

13) "[o]n or about June 15, 2022, [ ] Plaintiff received written notice of intent to discharge from [Defendant] Clemens" (id. ¶ 380; see also id. ¶¶ 381 ("On or about June 28, 2022, [ ] Plaintiff . . . requested a faculty hearing to appeal [Defendant] Clemens's recommendation."), 418 ("In June 2022, after [Defendant Clemens's] recommendation of discharge, . . . Plaintiff made a report of EOC concerns and [retaliation policy] violations."), 419 ("In July 2022 emails, [ ] Plaintiff's attorney raised with [the OHR Executive Director ] issue[s regarding Plaintiff's reported concerns] . . . ."), 424 (describing additional report made by Plaintiff to UNC-CH officials in January 2023), 425 (same));

14) "[o]n or about July 19, 2022, . . . Plaintiff met with [Defendant] Bryde and [a ] Director [in the] Office of Research, School of Medicine" (id. ¶ 387) and they "informed [ ] Plaintiff that there would be a review for a violation of the UNC-CH's COI Policy, concerning a 2019 grant-funded study . . . which was supported by the National Institute of Justice" (id.; see also id. (explaining that grant-maker "[wa]s a division within the Department of Justice (DOJ)")), because "the research team included, among others, [Dr.] Wretman in a role as a formal and funded research collaborator, as well as [ ] Plaintiff as the lead Principal Investigator" (id. ¶ 389);

15) at that meeting, (A) Plaintiff received notice that "DOJ guidelines . . . prohibit intimate partners from working on research teams where one partner is lead" (id. ¶ 390; see also id. ¶ 393 (alleging that, at "her July 2022 meeting with [Defendant] Bryde and [the Office of Research Director]," Plaintiff received "text from the official DOJ Grants Financial Guide")), and (B) "[Defendant] Bryde alleged that [ ] Plaintiff had not adequately disclosed information about her personal relationships with [Dr.] Wretman when she sought the grant" (id. ¶ 400);

16) "[o]n or about October 13, 2022, the COI Office communicated [to Plaintiff] its determinations that [she] had violated the COI Policy" (id. ¶ 401);

17) "[o]n or about January 18, 2023, [Defendant] Clemens amended his notice of intent to discharge setting forth the finding of the violation of the UNC-CH COI Policy as an additional reason for discharge" (id. ¶ 407; see also id. ¶ 408 ("On or about January 19, 2023, [ ] Plaintiff again requested a faculty hearing to appeal [Defendant] Clemens's recommendation.")); and

18) "the hearing was held over about 18 hours . . . [over] the span of about 10 weeks, from on or about March 25, 2024 through on or about May 29, 2024" (id. ¶ 442).

Unsurprisingly, given those allegations, in arguing that the Complaint "[p]lausibly [a]llege[s] [c]onstitutional [v]iolations" (Docket Entry 19 at 13 (underscoring omitted)), the Opposition Brief does not even mention (let alone develop an argument for) lack of "oral or written notice of the charges against [Plaintiff or of] an explanation of [her] employer's evidence," Loudermill, 470 U.S. at 546. (See Docket Entry 19 at 13-15.) Nor (based on the Complaint) could Plaintiff so argue, for reasons well-explained by a neighboring court faced with a similar scenario:

> For notice to be sufficient under the *Loudermill* test, the notice must be "timely under the particular circumstances of the case" and it must apprise the [p]laintiff "of the nature of the charges and general evidence against h[er]." Elaborate or formal procedures are not required . . . .
>
> . . . .
>
> Turning to Plaintiff's case here, there can be no doubt that she was provided adequate notice. . . . "[D]ue process does not mandate that all evidence on a charge or

> even the documentary evidence be provided" in an employment dismissal case. Plaintiff need only be provided such "descriptive explanation as to permit [her] to identify the conduct giving rise to the dismissal and thereby make a response." There is simply no question that Plaintiff was aware of the conduct giving rise to her dismissal.

Bowers v. Rector & Visitors of Univ. of Va., 478 F. Supp. 2d 874, 889 (W.D. Va. 2007) (internal ellipsis, emphasis, and some quotation marks omitted) (quoting Linton v. Frederick Cnty. Bd. of Cnty. Comm'rs, 964 F.2d 1436, 1439-40 (4th Cir. 1992)), aff'd sub nom., Bowers v. Scurry, 278 F. App'x 278 (4th Cir. 2008).

Indeed, the Complaint's allegations (recited above) "show[ Plaintiff] was afforded notice and a detailed explanation of the charges and the evidence against h[er] at every step of the [multi]-year process." Grant v. Trustees of Indiana Univ., 870 F.3d 562, 572 (7th Cir. 2017) (parenthetical omitted). As such, no basis exists "to suggest that Plaintiff misunderstood any of the charges or was unable 'to recognize the operative conduct.'" Hanton v. Gilbert, 842 F. Supp. 845, 853 (M.D.N.C.) (quoting Linton, 964 F.2d at 1441), aff'd, 36 F.3d 4 (4th Cir. 1994); see also Garraghty v. Jordan, 830 F.2d 1295, 1301 (4th Cir. 1987) (rejecting due process claim based on Loudermill's "notice requirement" where the plaintiff "had at th[e pre-termination meeting], if not before, actual notice of what he was accused of doing and the basis for the accusation").

Without factual allegations establishing lack of notice, Plaintiff can maintain her due process claim only if the Complaint contains factual allegations sufficient to establish that Defendants denied her "an opportunity to present h[er] side of the story," Loudermill, 470 U.S. at 546, in contravention of "[t]he fundamental requirement[] of due process . . . [of] an opportunity to be heard," Doe v. Virginia Polytechnic, 77 F.4th at 236 (internal quotation marks omitted); see also Bowers, 478 F. Supp. 2d at 889 ("As for the . . . opportunity to be heard -- very little is required. But [the p]laintiff must be given the chance to communicate on her own behalf." (internal citation omitted)). The Section 1983 claims make two concrete, non-conclusory allegations that concern this aspect of due process: (1) "Plaintiff was never able to cross-examine any of her accusers aside from the one successful Faculty Hearing wherein the result was immediately ignored by [Defendant] Roberts and the [UNC-CH Board of Trustees]" (Docket Entry 1-3, ¶ 688b); and (2) "[t]he [i]nvestigators . . . refused to interview witnesses provided to them by Plaintiff" (id. ¶ 688c). Those allegations do not suffice.

Going in reverse order, as the Redacted Supporting Brief documents, the Complaint "alleges that EOC interviewed approximately *fifteen* different witnesses, including [Plaintiff] and the two reporting parties, during the course of its investigation" (Docket Entry 13 at 20 (emphasis in original)

(citing Docket Entry 1-3, ¶¶ 271, 272, 274)), after which Plaintiff (and her counsel) participated in a lengthy hearing where (per the Complaint) "'cross-examination and questioning time was unlimited'" (id. (quoting Docket Entry 1-3, ¶ 444)). The Court should conclude (as urged by Defendants) that "EOC's decision not to interview every witness put forward by [Plaintiff] thus cannot support an inference that [she] was deprived of due process" (id.). See Riccio v. County of Fairfax, 907 F.2d 1459, 1464 (4th Cir. 1990) ("*Loudermill* does not impose on the government employer the burden to perform all pretermination acts that could benefit the employee subject to discharge."); Manjili v. Virginia Commonwealth Univ., No. 3:26CV91, 2026 WL 2446395, at *5-6 (E.D. Va. Aug. 20, 2026) (holding that allegation that insufficient investigation caused the plaintiff's "terminat[ion] on a disputed and selectively compiled administrative record" failed to "establish[] that [the p]laintiff received constitutionally inadequate process," where he later "had an opportunity to supplement the record with materials he considered absent" (internal quotation marks omitted)); see also Frumkin v. Board of Trustees, Kent State Univ., 626 F.2d 19, 21 (6th Cir. 1980) ("The Supreme Court has consistently rejected a concept of due process which would afford all complaining parties . . . an inflexible 'checklist' of legal rights.").

Plaintiff's allegation that she "was never able to cross-examine any of her accusers aside from the one successful Faculty

Hearing wherein the result was immediately ignored by [Defendant] Roberts and the [UNC-CH Board of Trustees]" (Docket Entry 1-3, ¶ 688b (emphasis added)) similarly fails to state a due process violation. "A government employee facing possible termination simply is not entitled to all of the rights of a criminal defendant." Riccio, 907 F.2d at 1465. Consequently, "the crux of the issue, in terms of due process under the Fourteenth Amendment, is not whether the due process hearing . . . was held in the presence of the authority having final responsibility to determine [Plaintiff's] discharge, but instead whether the hearing accorded to h[er] was meaningful." Bates v. Sponberg, 547 F.2d 325, 332 (6th Cir. 1976), cited with approval in Smith v. Rector & Visitors of Univ. of Va., 78 F. Supp. 2d 533, 540 (W.D. Va. 1999) (summarizing Bates as "holding no due process violation [occurs] when the hearing afforded a tenured professor was 'meaningful,' even though it was not conducted in the presence of the authority having final responsibility to determine the professor's discharge and even though final authority imposed a penalty more severe than that recommended by the initial hearing committee").

As previously documented, the Complaint alleges that Plaintiff "was given a [Faculty H]earing at which [s]he appeared, witnesses were called, evidence was presented, and factual findings were made," Smith, 78 F. Supp. 2d at 540, and afterwards, "based on his evaluation, [Defendant Roberts] made a discretionary decision that

differed from the [Faculty Hearing] panel's sanction recommendation," id. "[D]ue process does not require that the ultimate decision-maker agree with the [Faculty Hearing] panel that provide[d Plaintiff] with a hearing." Id. at 541. A contrary understanding either would render decision-making by anyone other than the Faculty Hearing panel "meaningless (since the ultimate decision-maker would be limited to rubber-stamping th[at ]panel's recommendations) or due process must require a second hearing before the final decision-maker (which we know is not the case – *see Bates*, 547 F.2d at 332)." Smith, 78 F. Supp. 2d at 541.

To sum up, despite the fact that Plaintiff's opportunity to cross-examine witnesses occurred before the Faculty Hearing panel whose recommendation ultimately went unheeded, Defendant Roberts's (and the UNC-CH Board of Trustees') "consideration and action upon the report of the [Faculty Hearing panel] met the minimal requirements of due process," Bates, 547 F.2d at 333; see also Kaplan v. University of Louisville, 10 F.4th 569, 583 (6th Cir. 2021) ("[T]he faculty committee declined to recommend [the plaintiff's] termination. True enough. But we have held that a terminated professor received adequate due process even where a majority of the faculty committee reviewing his grievance voted against his termination."); Riccio, 907 F.2d at 1465 (declining to find "error in [the plaintiff's] alleged inability . . . to present his side of the story to the ultimate decisionmaker" and construing

Loudermill to have rejected asserted "right to an in-person encounter with the ultimate decisionmaker"); Abatena v. Norfolk State Univ., No. 2:13CV699, 2014 WL 1819665, at *13 (E.D. Va. May 7, 2014) ("[The p]laintiff claims that [the administrator's] actions in [discharging the plaintiff and] outright rejecting the [g]rievance [c]ommittee's findings and recommendations rather than affirming, modifying, or referring the case back to the [g]rievance [c]ommittee for further deliberation deprived [the plaintiff] of his continued employment and his liberty interest in his good name and professional reputation. Far from disclosing a violation of his constitutional rights, [the p]laintiff's [c]omplaint, viewed in his favor, reveals that [the university] provided procedural safeguards beyond the requirements of the Fourteenth Amendment." (internal citation and quotation marks omitted)).

The Opposition Brief nonetheless asserts that the Complaint states a due process claim based on Plaintiff's allegations that, "beginning with the OHR and COI investigations, continuing through [Defendant] Roberts's override of the Faculty Hearing Committee's unanimous determination against discharge, and culminating in the [UNC-CH] Board of Trustees' review, UNC-CH materially departed from its own established policies and procedures." (Docket Entry 19 at 13 (emphasis added); see also id. at 14 (pointing to "policy violations[ alleged] in paragraphs 516 through 557 of the Complaint" and "procedural violations . . . [alleged] in paragraphs

603 through 605 [of the Complaint]").) That assertion lacks merit for reasons clearly articulated by the Fourth Circuit (and many other courts): "Alleged violations of due process in the deprivation of a protectable interest are to be measured against a federal standard of what process is due and that standard is not defined by state-created procedures . . . ." Riccio, 907 F.2d at 1469; see also, e.g., Wozniak v. Adesida, 932 F.3d 1008, 1011 (7th Cir. 2019) ("[The plaintiff] contends that the [disciplinary c]ommittee and the [b]oard [of trustees] did not follow all of the [u]niversity's rules and regulations for tenure-revocation proceedings, but this has nothing to do with the Constitution. The meaning of the Due Process Clause is a matter of federal law, and a constitutional suit is not a way to enforce state law through the back door."); de Llano v. Berglund, 282 F.3d 1031, 1035 (8th Cir. 2002) ("[E]ven if [the plaintiff] is correct that internal [university termination] procedures were violated, this would at most provide him with a state law cause of action, and not a federal constitutional claim."); Hanton, 842 F. Supp. at 853 ("This [C]ourt is deciding whether the process afforded [the p]laintiff met federal standards, not whether it fulfilled state dismissal requirements. A violation of only state-created procedures does not constitute a federal due process violation.").

Lastly (regarding Plaintiff's Section 1983 claims), the Opposition Brief grouses (without developed argument) about

"investigator bias[ and] suppression of evidence" (Docket Entry 19 at 13; see also id. at 14 (arguing that "paragraphs 516 through 557 of the Complaint" show "deficiencies in the EOC investigation, which include bias[ and] evidentiary omissions")), as well as the fact that "two witnesses whose statements were used to impeach Plaintiff's testimony [at the Faculty Hearing] were never subject to credibility assessments by OHR investigators, nor were they available for cross-examination during the [Faculty H]earing" (id. at 14-15; see also id. at 15 ("[A]s alleged in paragraphs 282 through 290 of the Complaint, the witness statements at issue were themselves biased and factually erroneous.")). Those matters do not establish a due process violation for a number of reasons.

First, the cited allegations from the Complaint all appear in Plaintiff's state-law-based, "first claim of relief [for] unlawful procedures" (Docket Entry 1-3 at 79 (all-caps and bold font omitted)), under the heading of "[Procedures for Reporting and Responding to the Complaints of Discrimination, Harassment and related Misconduct Involving a University Employee] Procedural Violations" (id. (emphasis added) (bold font omitted)). (See id. ¶¶ 516-57.) As just discussed, such violations of university policies and procedures do not provide a basis for a federal constitutional claim. See, e.g., Riccio, 907 F.2d at 1469.

Second, the few allegations from within the 42 paragraphs of the Complaint cited by Plaintiff that reference purported bias by

investigators do so in a conclusory manner and/or without showing malfeasance of the sort that conceivably could support a federal constitutional claim; for example, the Complaint appears to deem investigators "biased" (Docket Entry 1-3, ¶ 529), because they "asked pointed questions" (id.; see also id. ¶¶ 523-26 (objecting that "[i]nvestigators who led in Plaintiff's case were also the investigators who led in [Dr.] Wretman's case," that "Plaintiff's case had the same case number as [Dr.] Wretman's case," that "[Defendant] Denby-Brinson was named as the Administrative Advisor on both [ ] Plaintiff's and [Dr.] Wretman's investigations," and that "[f]act finding concerning [ ] Plaintiff was combined with fact finding concerning [Dr.] Wretman")). Under these circumstances, the Court should conclude that "[Plaintiff] did not plead facts supporting a finding that any of the [investigators] showed actual bias against her." Jackson v. Pierre, 810 F. App'x 276, 280 (5th Cir. 2020); see also de Llano, 282 F.3d at 1035 (rejecting the plaintiff's reliance on generalized assertions of bias and emphasizing "presumption that [officials] are honest and impartial" (internal quotation marks omitted)).

Third, any allegations of "suppression of evidence" (Docket Entry 19 at 13) or "evidentiary omissions" (id. at 14) during the investigation, such as that "[i]nvestigators omitted witnesses and witness statements from their report that were exonerative of [ ] Plaintiff, including statements by [Carolyn] Adams, [former Dean

Gary L.] Bowen, [Spenser R.] Radtke, [Dr.] Wretman, and [Dr. Sheryl] Zimmerman" (id. ¶ 548), do not "establish[] that Plaintiff received constitutionally inadequate process," Manjili, 2026 WL 2446395, at *5, because, at the Faculty Hearing, she "had an opportunity to supplement the record with materials [s]he considered absent," id. at *6; see also Riccio, 907 F.2d at 1465 ("A government employee facing possible termination simply is not entitled to all of the rights of a criminal defendant."); Frumkin, 626 F.2d at 21 ("The Supreme Court has consistently rejected a concept of due process which would afford all complaining parties . . . an inflexible 'checklist' of legal rights.").

Fourth, "the Due Process Clause does not regulate the [Faculty H]earing's every detail," Wozniak, 932 F.3d at 1011, and thus no due process claim arises simply because "two witnesses whose statements were used to impeach Plaintiff's testimony [at the Faculty Hearing] were never subject to credibility assessments by OHR investigators, nor were they available for cross-examination during the [Faculty H]earing" (Docket Entry 19 at 14-15; see also id. at 15 ("[A]s alleged in paragraphs 282 through 290 of the Complaint, the witness statements at issue were themselves biased and factually erroneous.")). As documented herein, the Complaint admits that Plaintiff "sat for an interview with the investigators[ and] . . . respon[ded] to [the investigators'] report [via] a [multi]-day hearing at which [s]he called witnesses and introduced

h[er] own evidence," Kaplan, 10 F.4th at 583, with "the active participation of a legal representative [whose presence] likely [would have] mitigate[d] an[y] otherwise considerable risk of erroneous deprivation [of Plaintiff's protected interests]," Frumkin, 626 F.2d at 21. Plainly stated, Plaintiff got a "Cadillac plan of due process," Kaplan, 10 F.4th at 583, which "certainly met the requirement of an opportunity to be heard, even if [it ] lack[ed] all the accoutrements she sought," Jackson, 810 F. App'x at 280; see also Loudermill, 478 U.S. at 545 ("[T]he pretermination hearing though necessary, need not be elaborate.").

In the end, the Court should conclude that, even if "there were instances where [Defendants] could have treated [Plaintiff] more fairly, none of the alleged procedural defects to which [the Complaint] points indicates a violation of the *Loudermill* standard." Riccio, 907 F.2d at 1464; see also Bishop v. Wood, 426 U.S. 341, 350 (1976) ("The Due Process Clause of the Fourteenth Amendment is not a guarantee against incorrect or ill-advised personnel decisions."); Manjili, 2026 WL 2446395, at *6 n.11 ("[P]rocedural due process guarantees only constitutionally adequate procedures; it does not guarantee success." (internal quotation marks omitted)); Hanton, 842 F. Supp. at 854 ("[The p]laintiff has had ample opportunities to respond to [the disciplinary] charges . . . . Due process requires that she have

these opportunities, not that she ultimately prevail.”). The Court therefore should dismiss Plaintiff’s Section 1983 claims.

### **B. Title IX Claims**

Defendants also seek dismissal of the Complaint’s Title IX claims against all Defendants. (See Docket Entry 13 at 21-25; Docket Entry 21 at 6-8). Title IX provides that “[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance[.]” 20 U.S.C. § 1681(a). “The implied right of action by which private plaintiffs may sue to enforce Title IX ‘extends to employment discrimination.’” Kashdan v. George Mason Univ., 70 F.4th 694, 700-01 (4th Cir. 2023) (quoting Preston v. Virginia ex rel. New River Cmty. Coll., 31 F.3d 203, 206 (4th Cir. 1994)).[14] “To state a Title IX employment discrimination claim, a plaintiff must allege facts that, ‘if true, raise a plausible inference that the university discriminated

---

14 Although “Title IX reaches institutions and programs that receive federal funds, 20 U.S.C. § 1681(a), . . . it has consistently been interpreted as not authorizing suit against school officials, teachers, and other individuals . . . .” Fitzgerald v. Barnstable Sch. Comm., 555 U.S. 246, 257 (2009). Further, Plaintiff’s Title IX claims against Individual Defendants in their official capacities (see Docket Entry 1-3 at 1) “‘represent only another way of pleading an action against [their employers, i.e., University Defendants],’” Willey v. Board of Educ. of St. Mary’s Cnty., 557 F. Supp. 3d 645, 660 (D. Md. 2021) (quoting Graham, 473 U.S. at 165). Hence, the Court should dismiss Plaintiff’s Title IX claims against Individual Defendants.

against [her] on the basis of sex.'" Id. (quoting Sheppard v. Visitors of Va. State Univ., 993 F.3d 230, 235 (4th Cir. 2021)).

"Satisfying this [pleading] standard requires a plaintiff to plausibly allege a but-for causal link between [her] sex and the university's challenged disciplinary proceeding." Id. at 701 (internal quotation marks omitted). A complaint must demonstrate causation whether the plaintiff "plead[s her] Title IX claim under the so-called 'erroneous outcome' [or] 'selective enforcement' theories, which are two accepted ways to plead a Title IX employment discrimination claim." Id. As the term suggests, "[a]n erroneous outcome claim alleges that the plaintiff was innocent and wrongly found to have committed an offense," Sheppard, 993 F.3d at 235 n.6 (internal quotation marks omitted), and "particular circumstances that suggest gender bias was a motivating factor behind the erroneous finding,'" Doe v. Loh, 767 F. App'x 489, 491 (4th Cir. 2019) (internal quotation marks omitted); see also Kashdan, 70 F.4th at 701 (requiring "improper motivating factor [ ] be a but-for cause of the erroneous outcome"); Doe v. George Mason Univ., No. 1:19CV1249, 2020 WL 14000928, at *8 (E.D. Va. Apr. 23, 2020) ("Mere allegations of a procedurally or otherwise flawed proceeding . . . combined with a conclusory allegation of gender discrimination is not sufficient to survive a motion to dismiss." (internal quotation marks omitted)). "To state a selective-enforcement claim," on the other hand, "a plaintiff must plausibly

allege that[,] regardless of [her] guilt or innocence, [her] gender was a but-for cause of the severity of the sanctions or of the decision to initiate the challenged disciplinary proceeding in the first place." Kashdan, 70 F.4th at 701 (emphasis added).

Here, the Complaint alleges (A) "that the outcome [of Plaintiff's investigation] was erroneous" (Docket Entry 1-3, ¶ 663a) and (B) that "[UNC-CH] applied its policies and procedures in a gender-biased manner" (id. ¶ 662). Under either theory, Defendants contend that the Complaint lacks "facts showing gender bias . . . [and thus] fail[s] to nudge [Plaintiff's Title IX] claim across the line from possible to plausible" (Docket Entry 13 at 22), while Plaintiff insists that the Complaint "adequately allege[s] facts giving rise to a reasonable inference of sex discrimination under Title IX" (Docket Entry 19 at 19). Defendants' position should prevail.

To begin, the Complaint lacks non-conclusory allegations of sex-based bias, and its remaining allegations of bias bear no relation to Plaintiff's sex. In setting forth Title IX claims, the Complaint alleges "gender[ ]bias[ ]" (Docket Entry 1-3, ¶ 662; accord id. ¶ 664) and "discriminat[ion] against Plaintiff [ ] on the basis of her sex" (id. ¶ 662). Such "conclusory allegation[s] . . . [remain] insufficient to state a plausible claim of sex discrimination." Wright v. Rector & Visitors of George Mason Univ., No. 1:24CV2, 2024 WL 4241664, at *9 (E.D. Va. Sept. 19,

2024). Instead, the Complaint must demonstrate a "causal connection between gender bias and the [ ] outcome [of Plaintiff's proceedings]," Doe v. George Mason Univ., 2020 WL 14000928, at *8, by alleging "particularized facts suggesting gender bias was a motivating factor in [Defendants'] findings," id.

The Complaint falls short on that front, as its remaining, non-conclusory allegations of "bias" bear no relation to Plaintiff's sex. (See Docket Entry 1-3, ¶¶ 232, 296, 347, 422, 505, 511, 529, 539, 553, 560-61, 665, 707-08, 723, 727, 734, 735, 737, 742, 743.) For example, the Complaint alleges "bias" resulting from perceived conflicts of interest (see id. ¶¶ 422, 560) and "gossip" (id. ¶ 231) among "faculty and [ ] students" (id. ¶ 561; see also id. ¶¶ 231-32 (alleging that such discussions "bias[ed]" Plaintiff's proceedings)), and that a letter misstating a faculty-hearing determination "suggest[ed] bias" against Plaintiff (id. ¶¶ 508-11). Even construed in a light most favorable to Plaintiff, those (and similar) allegations of bias fail to satisfy her burden to show discrimination "on the basis of sex," 20 U.S.C. § 1681(a), and represent no more than "[m]ere allegations of a procedurally or otherwise flawed proceeding that led to an adverse and erroneous outcome," Doe v. George Mason Univ., 2020 WL 14000928, at *8 (internal quotation marks and brackets omitted). "[C]ombined with [Plaintiff's] conclusory allegation[s] of gender discrimination[, such allegations

prove in]sufficient to survive a motion to dismiss." Id. (internal quotation marks omitted).

For similar reasons, the various procedural irregularities alleged in the Complaint also fail to plausibly allege discrimination on the basis of sex. Those irregularities include allegations that UNC-CH's discrimination and harassment policy "is an unreliable method of determining fault" (Docket Entry 1-3, ¶ 663a; see also id. (alleging 15 reasons for policy's unreliability ranging from investigators' "power to find facts [and] prosecute" to allegedly improper use of "preponderance" burden of proof, all unrelated to Plaintiff's sex)) and that Defendants improperly "conduct[ed] joint investigations with [Dr.] Wretman's investigation" (id. ¶ 663c) and "fail[ed] to interview witnesses provided by [ ] Plaintiff" (id.).

"[C]ourts have recognized that evidence of clear procedural irregularities can support a plausible inference of sex discrimination," Doe v. Marshall Univ. Bd. of Govs., 683 F. Supp. 3d 522, 535 (S.D. W. Va. 2023) (internal quotation marks and brackets omitted), so long as "'a fact-finder is convinced that the defendant deviated from proper procedures . . . by design[ and] to achieve covertly what it could not do openly: discriminate against the plaintiff on the basis of [her] sex,'" id. (quoting Doe v. University of S. Ind., 43 F.4th 784, 793 (7th Cir. 2022)). But nothing in the Complaint supports such an inference; even if the

alleged procedural irregularities "raise[d] serious questions of fairness generally, that [would] not [provide] a basis for setting aside [UNC-CH's] decision under Title IX," Doe v. Furman Univ., No. 6:24CV6193, 2026 WL 179487, at *9 (D.S.C. Jan. 22, 2026), as the Complaint lacks "facts sufficient to show that . . . [Plaintiff suffered those procedural irregularities] because of [her] gender rather than because the [purportedly deficient p]olic[ies or procedures led to an erroneous outcome] . . . regardless of [her] gender status," id. See also Pappas v. James Madison Univ., No. 5:22CV28, 2023 WL 2768425, at *12 (W.D. Va. Mar. 31, 2023) ("[E]ven if one were to accept [the plaintiff's] conclusory assertions that the process was irregular and the outcome erroneous, nothing in the complaint demonstrates that he was discriminated against *because of his sex* . . . ."); Frierson v. Shaw Univ., 674 F. Supp. 3d 224, 230 (E.D.N.C. 2023) ("[M]erely identifying mistakes or imperfections in an investigation does not suffice to raise a plausible inference of sex discrimination.").[15]

Next, the Complaint's allegations of external pressure, standing alone, fail to support a Title IX claim. The Complaint alleges the existence of "[c]ircumstances suggest[ing] that [ ]

15 To the extent the Complaint seeks redress for Defendants' alleged breach(es) of binding agreements between UNC-CH and Plaintiff (see, e.g., Docket Entry 1-3, ¶ 374 (alleging Defendants' failure to follow "policy-based requirements")), such allegations "are best analyzed as breach of contract claims," Naumov v. McDaniel Coll., Inc., Civ. Action No. 15-482, 2017 WL 1214406, at *6 (D. Md. Mar. 31, 2017), rather than under Title IX, see id.

UNC-CH adopted [its discrimination and harassment policy] in an effort to lower the protections for females accused of sexual misconduct" (Docket Entry 1-3, ¶ 664a) and that, for example, "the [DOE] has enacted considerable shifts in how it requires universities that receive federal funding to respond to alleged violations of civil rights" (id. ¶ 135; see also id. ¶ 146 (alleging existence of "high profile controversies during the time of [ ] Plaintiff's [disciplinary] matters")). Relatedly, the Complaint alleges, "[u]pon information and belief, [that a] statistically [ ] overwhelming majority of investigations that have ever been conducted by [UNC-CH] into an alleged violation of [its discrimination and harassment policy] have involved female respondents" (id. ¶ 664a.iv.).

"But courts 'uniformly hold' that external pressure — such as the Dear Colleague Letter — 'alone is not enough to state a claim that the university acted with bias in a particular case.'" Pappas, 2023 WL 2768425, at *11 (quoting Doe v. Coastal Carolina Univ., 522 F. Supp. 3d 173, 179 (D.S.C. 2021)). Instead, the Complaint's allegations of external pressure merely "provide[] a backdrop that, when combined with other circumstantial evidence of bias in a specific proceeding, may give rise to a plausible [Title IX] claim." Doe v. George Mason Univ., 2020 WL 14000928, at *12 (internal quotation marks and brackets omitted). But, as discussed above, no such allegations of sex-based bias appear in the

Complaint. Moreover, the allegation that, "[u]pon information and belief, . . . [women comprise an] overwhelming majority of [the respondents in UNC-CH's] investigations . . . [into ] alleged violation[s] of [its harassment policy]" (Docket Entry 1-3, ¶ 664a.iv.) fails for at least two reasons: (1) "[c]ourts reject statistical evidence which merely indicates [that one gender] disproportionately comprise[s] those accused of [or disciplined for] misconduct . . . as insufficient to establish gender-based discrimination," Doe v. George Mason Univ., 2020 WL 14000928, at *8; and (2) such broad allegations of systemic gender bias "based upon information and belief [represent the kind of] speculative and conclusory allegations . . . that Iqbal and Twombly do not allow the [C]ourt to consider," Doe v. Furman Univ. 2026 WL 179487, at *7 (internal quotation marks omitted)).

The Complaint also fails to allege facts showing any comparator Defendants treated more favorably than Plaintiff. In continued pursuit of Plaintiff's selective-enforcement claim, the Complaint alleges that "no faculty member had ever been discharged from their employment for [] a COI policy violation [such as Plaintiff's]" (Docket Entry 1-3, ¶ 408), and that a faculty member testified to the existence of "'[another] couple[ who] published together throughout [one] person's career until [that person] graduated'" (id. ¶ 467). (See also Docket Entry 19 at 18-19 (contending that, because "no faculty member had previously been

terminated for a COI violation," Plaintiff's discipline "under [that] policy [ ] supports an inference of sex-based animus").)

"The Fourth Circuit has not addressed whether claims under a selective enforcement theory require a plaintiff to allege [the existence of] a similarly situated comparator," Owen v. Liberty Univ., No. 6:19CV7, 2020 WL 1856798, at *5 (W.D. Va. Apr. 13, 2020), aff'd, No. 20-1596, 2022 WL 127894 (4th Cir. Jan. 13, 2022), and, in general, "[p]laintiffs are not required as a matter of law to point to a similarly situated comparator to succeed on a discrimination claim," Haywood v. Locke, 387 F. App'x 355, 359 (4th Cir. 2010). Nevertheless, a plaintiff may allege the existence of a comparator to support a selective enforcement claim "by plausibly showing that a similarly situated person of the opposite sex was treated more favorably." Kashdan, 70 F.4th at 701; see also Wright, 2024 WL 4241664, at *7 ("'Such a showing would include evidence that the plaintiff and comparator were subject to the same standards and engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.'" (brackets and ellipses omitted) (quoting Haywood, 287 F. App'x at 349)). Here, the Complaint lacks any specific allegations that could similarly situate Plaintiff alongside either the alleged "couple[ who] published together" (Docket Entry 1-3, ¶ 467) or any individual who engaged in similar conduct but received less

discipline "for [ ] a COI policy violation" (id. ¶ 408), as the Complaint fails to allege even the sex of those individuals (see id. ¶¶ 408, 467). See, e.g., Doe v. George Mason Univ., 2020 WL 14000928, at *13 (requiring comparator allegations to show, inter alia, "similarly situated person of the opposite gender").[16]

For all of those reasons, Plaintiff's Title IX claims fail as a matter of law.

**C. Plaintiff's State Claims**

Because Plaintiff's federal claims should not proceed, the Court should decline to exercise supplemental jurisdiction over her state claims. Federal courts possess "original jurisdiction of all civil actions arising under the Constitution[ and] laws . . . of the United States." 28 U.S.C. § 1331. When a federal court

---

16 The Opposition Brief alleges, for the first time, "[on] information and belief[,] that male faculty members at UNC-CH have engaged in romantic relationships with students without facing comparable investigations, let alone termination" (Docket Entry 19 at 18) and further alleges the existence of "evidence [ ] support[ing] an inference of disparate treatment between Plaintiff and similarly situated male faculty" (id. at 15; see also id. at 16-17 (alleging that male faculty member "plagiariz[ed]" a "grant application" and that UNC-CH "permitted [him] to resign from his administrative role [and] retain[] his faculty position and distinguished chair")). Yet, as the Reply correctly notes, "'statements by counsel that raise new facts constitute matters beyond the pleadings and cannot be considered on a Rule 12(b)(6) motion.'" (Docket Entry 21 at 6 (quoting E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc., 637 F.3d 435, 449 (4th Cir. 2011)).) Therefore, because the Opposition Brief's allegations do not appear in the Complaint, the Court cannot consider them at this stage of the proceedings. See, e.g., Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013) ("It is well-established that parties cannot amend their complaints through briefing . . . .").

exercises such jurisdiction over such a federal claim, "[a] claim that neither arises from a federal question nor satisfies the requirements for diversity jurisdiction may nevertheless be entertained in federal court [via] supplemental jurisdiction under 28 U.S.C. § 1367." Mebane v. GKN Driveline N. Am., Inc., 499 F. Supp. 3d 220, 231 (M.D.N.C. 2020). Importantly, supplemental jurisdiction constitutes "a doctrine of discretion," United Mine Workers of Am. v. Gibbs, 383 U.S. 715, 726 (1966), and "[n]eedless decisions of state law should be avoided," id. As a result, if "federal claims are dismissed before trial, . . . the state claims should be dismissed as well." Id.; see also 28 U.S.C. § 1367(c)(3) ("The district courts may decline to exercise supplemental jurisdiction over a claim . . . [if] the district court has dismissed all claims over which it has original jurisdiction[.]").

Although Plaintiff's claims under Section 1983 and Title IX raise a federal question, her other claims all arise under North Carolina law[17] and thus do not satisfy federal question

17 The Complaint's claims of "unlawful procedures" (Docket Entry 1-3 at 79 (all-caps and bolt font omitted)) and "arbitrary [and] capricious decisions and abuse of discretion" (id. at 93 (same)) seek review of state agency decisions pursuant to "N[orth] C[arolina] G[eneral] S[tatute Section] 150B-43" (id. ¶ 619; accord id. ¶ 513) and thus plainly arise under North Carolina law. The same holds true for the Complaint's claims "under the North Carolina Constitution" (id. ¶ 753; see also id. ¶¶ 749-52). Next, the Complaint's "claim for breach of contract" (id. ¶ 704) "is a state law claim," Glenn v. Thorpe & Sons Auto., No. 1:23CV779, 2024 WL 5705086, at *2 (M.D.N.C. Apr. 8, 2024); see also Capps v. Newmark S. Region, LLC, 53 F.4th 299, 301 (4th Cir. 2022) (treating
(continued...)

jurisdiction. Given the recommendation of dismissal of Plaintiff's federal claims, the Court should decline to exercise supplemental jurisdiction over her state claims. See Carnegie-Mellon Univ. v. Cohill, 484 U.S. 343, 350 n.7 (1988) ("[I]n the usual case in which all federal-law claims are eliminated before trial, the balance of factors to be considered . . . — judicial economy, convenience, fairness, and comity — will point toward declining to exercise jurisdiction over the remaining state-law claims.").[18]

17(...continued)
breach of contract as state claim for purposes of subject matter jurisdiction). As to the Complaint's claims for negligent or intentional tortious conduct (see Docket Entry 1-3 at 111-16 (asserting claims for "negligent hiring, supervision and retention," "intentional infliction of emotional distress," and "negligent infliction of emotional distress" (all-caps and bold font omitted))), "state [ ] law governs . . . the substantive elements of [those] tort action[s]," In re: Lipitor, 892 F.3d 624, 646 (4th Cir. 2018) (internal quotation marks omitted). Finally, the Complaint's claim for "civil conspiracy" (Docket Entry 1-3, ¶ 757) appears to invoke North Carolina law permitting Plaintiff to "associate [ D]efendants together [for pleading and evidentiary purposes]," Chandler v. Forsyth Tech. Cmty. Coll., No. 1:15CV337, 2016 WL 4435227, at *22 (M.D.N.C. Aug. 19, 2016) (internal quotation marks omitted) (citing Fox v. Wilson, 85 N.C. App. 292, 300, 354 S.E.2d 737, 742-43 (1987)).

18 Diversity of citizenship jurisdiction does not exist for Plaintiff's state claims because, as alleged in the Complaint, "Plaintiff[ ] is a citizen and resident of [ ] North Carolina" (Docket Entry 1-3, ¶ 1) and seeks relief against North-Carolina-based entities and officials (see id. ¶¶ 2-14). See, e.g., UMB Bank, N.A. v. New Port Cmty. Dev. Auth., No. 2:23CV28, 2023 WL 9197749, at *4 (E.D. Va. Sept. 26, 2023) ("Courts 'have interpreted the diversity statute to require "complete diversity" of citizenship.' This requires that each plaintiff's citizenship be different from each defendant's citizenship." (quoting Carden v. Arkoma Assocs., 494 U.S. 185, 187 (1990)).

## CONCLUSION

Defendants request the sealing of documents immaterial to the Motion to Dismiss. Further, the Complaint fails to state a claim under Section 1983 and Title IX, and the Court should decline to exercise supplemental jurisdiction over Plaintiff's state claims.

**IT IS THEREFORE ORDERED** that (A) the Motion to Seal (Docket Entry 14) is **DENIED** and (B) Docket Entries 15, 16, and 17 are **STRICKEN.**

**IT IS RECOMMENDED** that the Motion to Dismiss (Docket Entry 12) be **GRANTED** as to Plaintiff's federal claims pursuant to Rule 12(b)(6) and that the Court decline to exercise supplemental jurisdiction over her state claims under 28 U.S.C. § 1367(c)(3).

/s/ L. Patrick Auld
**L. Patrick Auld**
**United States Magistrate Judge**

September 3, 2026